EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lourdes Amadeo Ocasio; Miguel Marrero, ambos por sí y en representación de sus hijos A.M.A, M.M.A. y otros<br><br>        Recurridos<br><br>               v.<br><br>Pedro Pierluisi Urrutia en su capacidad como Gobernador del Gobierno de Puerto Rico; Departamento de Salud, por conducto de su Secretario, Dr. Carlos Mellado López<br><br>        Peticionarios | Certiorari<br><br>2023 TSPR 17<br><br>211 DPR ___ |

Número del Caso:  AC-2022-0070


Fecha:  16 de febrero de 2023


Tribunal de Apelaciones:

     Panel I


Oficina del Procurador General:

     Hon. Fernando Figueroa Santiago
     Lcdo. Omar Andino Figueroa
     Lcda. Mariola Abreu Acevedo


 Abogado de la parte recurrida:

     Lcdo. Adrián O. Díaz Díaz


Abogados del *Amicus Curiae:*

     Lcdo. Jorge Martínez Luciano
     Lcdo. Emil Rodríguez Escudero


 Materia:  Sentencia con Opiniones de Conformidad.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Lourdes Amadeo Ocasio; Miguel Marrero, ambos por sí y en representación de sus hijos A.M.A, M.M.A. y otros<br><br>Recurridos<br><br>v.<br><br>Pedro Pierluisi Urrutia en su capacidad como Gobernador del Gobierno de Puerto Rico; Departamento de Salud, por conducto de su Secretario, Dr. Carlos Mellado López<br><br>Peticionarios | | AC-2022-0070 |

SENTENCIA

En San Juan, Puerto Rico, a 16 de febrero de 2023.

Examinado el recurso de apelación presentado por la parte peticionaria, Hon. Pedro Pierluisi Urrutia y otros, el cual fue acogido como una petición de *certiorari*, por ser el vehículo procesal adecuado, así como la oposición al mismo presentado por la parte recurrida, la Sra. Lourdes Amadeo Ocasio y otros, se expide el auto de *certiorari* y se revoca la Sentencia del Tribunal de Apelaciones.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de Conformidad a la que se unen los Jueces Asociados señores Kolthoff Caraballo, Rivera García y Feliberti Cintrón. La Jueza Asociada señora Pabón Charneco emitió una Opinión de Conformidad a la que se une el Juez Asociado señor Rivera García. El Juez Asociado señor Estrella Martínez emitió una Opinión de Conformidad. El Juez Asociado señor Colón Pérez emitió una Opinión de Conformidad.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lourdes Amadeo Ocasio; Miguel Marrero, ambos por sí y en representación de sus hijos A.M.A., M.M.A. y otros<br><br>Recurridos<br><br>v.<br><br>Pedro Pierluisi Urrutia en su capacidad como Gobernador del Gobierno de Puerto Rico; Departamento de Salud, por conducto de su Secretario, Dr. Carlos Mellado López<br><br>Peticionarios | AC-2022-0070 |

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la que se unieron los Jueces Asociados señor KOLTHOFF CARABALLO, señor RIVERA GARCÍA y señor FELIBERTI CINTTÓN.

En San Juan, Puerto Rico, a 16 de febrero de 2023.

Estoy conforme con la Sentencia que hoy se certifica. Con esta revocamos un dictamen erróneo. Como punto de partida estábamos obligados a ponderar si la controversia era justiciable. En esta ocasión, por principios de academicidad y legitimación activa no nos corresponde (ni estamos en posición de) determinar si la emergencia disminuyó o cesó. En ausencia de una controversia viva y real, tampoco podemos pasar juicio sobre las facultades del Gobernador para promulgar ciertas órdenes ejecutivas. Cualquier expresión de nuestra parte respecto a esos asuntos equivaldría a una opinión consultiva.

Distinto a lo expresado por algunos compañeros, al examinar los sucesos fácticos vemos que las controversias se tornaron académicas, casi por completo. Queda claro que los requisitos de uso de mascarillas y vacunación, tal como fueron impugnados, se eliminaron. De hecho, actualmente solo se mantiene la medida de vacunación compulsoria contra COVID-19 para los estudiantes de 16 años o más. Por otro lado, la declaración de emergencia por sí misma no causa un peligro potencial a los demandantes.

En esa dirección, **la única controversia viva es la validez del mandato de vacunación impuesto a los estudiantes de 16 años o más.** Para resolverla bastaba con examinar la fuente principal bajo la que se instituyó el requisito, la Ley. Núm. 25 de 25 de septiembre de 1983, <u>infra</u>. Tras realizar este análisis —el único necesario— resulta evidente que la ley invistió al Secretario de Salud con la facultad para establecer los requisitos de vacunación de la población estudiantil. Esta conclusión es suficiente para disponer de la controversia.

Aunque podría parecer tentador expresarnos sobre el estado de emergencia y la separación de poderes en el contexto de una pandemia, este caso —como todos— requiere un análisis riguroso de los elementos de justiciabilidad. No tendría sentido, y por imperativo constitucional no podemos, pasar juicio sobre la constitucionalidad de unos requisitos que desaparecieron. Sería absurdo y fútil ordenar el cese de algo que ya cesó.

Hoy correctamente evitamos adentrarnos —a destiempo— en un análisis de las facultades del Gobernador para concluir que el nivel de la emergencia disminuyó. En un ejercicio de prudencia y sensatez rehuimos evaluar los méritos de una controversia académica para llegar a la contundente conclusión de que, en un futuro, el Primer Ejecutivo no deberá utilizar órdenes ejecutivas para dirigir al territorio en lo relacionado al COVID-19. Por eso, estoy conforme.

I

En 2021, el matrimonio compuesto por la Sra. Lourdes Amadeo Ocasio y el Sr. Miguel Marrero, por sí y en representación de sus hijos menores de edad, junto a cientos de demandantes, instaron una demanda sobre sentencia declaratoria, interdicto y daños contra el Hon. Pedro Pierluisi Urrutia, en su capacidad oficial de Gobernador de Puerto Rico, y el Dr. Carlos Mellado López, en su capacidad de Secretario de Salud. En extrema síntesis, el matrimonio Marrero Amadeo impugnó la constitucionalidad de ciertas medidas dirigidas a atender la crisis de salud pública causada por la pandemia del COVID-19.

Particularmente, alegó que mediante la Orden Ejecutiva 2021-504, el Gobernador sostuvo la declaración de emergencia y delegó al Secretario de Salud el poder para establecer directrices relacionadas al COVID-19, en

violación a la doctrina de separación de poderes. Asimismo, arguyó que a través de las Órdenes Administrativas 2021-508 y 2021-509, el Secretario de Salud instauró el requisito de uso de mascarillas y la vacunación compulsoria contra COVID-19 para los estudiantes de 12 años o más y el personal escolar, como condición para el regreso presencial a clases. A su entender, esto transgredía sus derechos constitucionales.

Por otro lado, el Gobierno solicitó desestimación. Esgrimió que el matrimonio Marrero Amadeo no tenía legitimación activa pues no demostró que las órdenes en controversia le causaron daños. Además, sostuvo que el Gobernador actuó dentro de sus facultades estatutarias y que las medidas instauradas eran razonables para proteger el interés apremiante del Estado.

Tras varios trámites, el Tribunal de Primera Instancia dictó sentencia y desestimó la demanda. Concluyó que los demandantes no lograron acreditar que sufrieron o sufrirían un daño particularizado e irreparable. Resolvió que el Gobernador y el Secretario de Salud ejercieron su autoridad, según delegada por la Asamblea Legislativa. Asimismo, razonó que las medidas en controversia eran necesarias para adelantar el interés apremiante del Estado en proteger la salud pública.

Inconforme, el matrimonio Marrero Amadeo presentó una apelación ante el Tribunal de Apelaciones. En suma, reiteró

que la política de vacunación obligatoria atentaba contra sus derechos fundamentales.

Por su parte, el Gobierno solicitó la desestimación del recurso ya que, a su entender, las controversias eran académicas. Adujo que la Orden Ejecutiva 2022-19 y la Orden Administrativa 2022-533 dejaron sin efecto los mandatos de vacunación según impugnados. A la par, defendió la autoridad delegada al Gobernador para atender el estado de emergencia.

En oposición, el matrimonio Marrero Amadeo expresó que la controversia no era académica porque subsistía la declaración del estado de emergencia. Respecto a la separación de poderes, indicó que el Art. 5.10 de la Ley del Departamento de Seguridad Pública de Puerto Rico, Ley Núm. 20-2017, 25 LPRA sec. 3650, era inconstitucional pues otorgaba poderes irrestrictos al Gobernador en situaciones de emergencia.

Perfeccionado el recurso, el foro apelativo intermedio sentenció que la controversia no era académica porque permanecía el requisito de uso de mascarillas y el requisito de vacunación, aunque modificado. Si bien confirmó la desestimación de las causas de acción sobre interdicto y daños, determinó que el matrimonio Marrero Amadeo ostentaba legitimación activa para cuestionar la forma en que se promulgaron las directrices y el contenido de estas. A la vez, tras evaluar la controversia en sus méritos, el foro apelativo intermedio validó la política de

vacunación compulsoria contra COVID-19. Concluyó, no obstante, que

> (i) el Gobernador no está autorizado por la Ley 20-2017 para emitir orden alguna, relacionada con la pandemia provocada por el COVID-19, que afecte los derechos y obligaciones de terceros y (ii) el Secretario de Salud, en cuanto disponga sobre medidas que afecten los derechos y obligaciones de terceros, deberá actuar de conformidad con el proceso dispuesto en la Ley 38-2017 sobre adopción de reglamentos. Ap. 1159.

Insatisfecho, el Gobierno presentó ante nos un *Recurso de apelación* y una *Urgente moción en auxilio de jurisdicción.* Así, acogimos el recurso como uno de *certiorari* y ordenamos la paralización de los efectos de la sentencia del Tribunal de Apelaciones.[1]

En lo pertinente, el Procurador General reconoció que no había una controversia real y viva que ameritara algún dictamen judicial. Afirmó que no era necesario adjudicar cuáles son las facultades del Gobernador durante una emergencia porque los demandantes estarían sujetos al mandato de vacunación por virtud de la Ley Núm. 25 de 25 de septiembre de 1983, infra, y no sujeto a la declaración de emergencia.

En contraste, el matrimonio Marrero Amadeo arguyó que posee legitimación activa para impugnar los poderes del Gobernador para gobernar por decreto. Especuló que la declaración de emergencia dejaba la puerta abierta para decretar otras órdenes. En síntesis, reiteró que había un

---

[1] Sala de Verano compuesta por el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señores Rivera García y Colón Pérez.

peligro potencial y palpable porque la Orden Administrativa Núm. 2022-533 imponía la obligatoriedad del uso de mascarillas en las instituciones educativas, así como el requisito de vacunación contra el COVID-19.

En el interín autorizamos la comparecencia de la Cámara de Representantes de Puerto Rico como *amicus curiae*. Con el beneficio de la comparecencia de las partes, este Tribunal expidió el recurso de certiorari y atinadamente revoca la sentencia del Tribunal de Apelaciones.

Procedo a explicar mi conformidad con esta determinación.

II

A. Legitimación activa y sentencia declaratoria

Hemos reiterado que, bajo el precepto de justiciabilidad, "[l]a intervención de los tribunales tendrá lugar sólo si existe una controversia genuina entre partes opuestas que tienen un interés real en obtener un remedio que afecte sus relaciones jurídicas". Hernández, Santa v. Srio. de Hacienda, 208 DPR 727, 738 (2022). Uno de los aspectos que tenemos que evaluar para ejercer nuestro poder adjudicativo es si la parte tiene legitimación activa, esto es, la capacidad para realizar eficazmente actos procesales, demandar, y la tenencia de un interés legítimo en la controversia. Pérez Rodríguez v. López Rodríguez *et al.*, 2022 TSPR 92, 210 DPR __ (2022); Ramos, Méndez v. García García, 203 DPR 379, 393-394 (2019).

Así, quien solicita un remedio judicial debe demostrar que: (1) sufrió un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre el daño y la acción ejercida, y (4) la causa de acción surge al palio de la Constitución o de una ley. Hernández, Santa v. Srio. de Hacienda, supra, pág. 739; Ramos, Méndez v. García García, supra, págs. 394-395. Desde luego, cuando se presenta una acción contra una agencia o un funcionario gubernamental los tribunales interpretan estos criterios de manera liberal y flexible. Ramos Rivera v. García García, supra, pág. 395; Bhatia Gautier v. Gobernador, 199 DPR 59, 69 (2017).

Ahora bien, el sujeto activo de la impugnación de una actuación gubernamental no puede valerse de una mera alegación de inconstitucionalidad. Hernández, Santa v. Srio. de Hacienda, supra, pág. 741. Más bien, su legitimación activa debe estar sustentada a través de todas las etapas procesales del pleito. Hernández Torres v. Hernández Colón et al., 131 DPR 593, 602 (1992).

La persona cuyos derechos se afectan por un estatuto u ordenanza puede solicitar una sentencia declaratoria. Regla 59.2(a) de Procedimiento Civil, 32 LPRA Ap. V; Beltrán Cintrón et al. v. ELA et al., 204 DPR 89, 109 (2020). Este mecanismo se utiliza para declarar derechos, estados y otras relaciones jurídicas, aunque existan otros remedios disponibles. Regla 59.1 de Procedimiento Civil, supra.

Particularmente, la sentencia declaratoria sirve para disipar la incertidumbre jurídica cuando los hechos alegados demuestran que existe una controversia sustancial —suficientemente inmediata, madura y real— entre partes con intereses legales adversos, sin que medie lesión previa. Mun. Fajardo v. Srio. Justicia *et al.*, 187 DPR 245, 254 (2012); Moscoso v. Rivera, 76 DPR 481, 492 (1954). Véase, además, R. Hernández Colón, Derecho procesal civil, 6ta ed., San Juan, Ed. LexisNexis de Puerto Rico, 2017, Sec. 6001, pág. 623.

Como es lógico, aunque la sentencia declaratoria permite dilucidar los méritos de una reclamación ante un peligro potencial, como quiera quien la solicita debe cumplir con los criterios de legitimación activa. Senado v. Tribunal Supremo y otros, 208 DPR 115, 134 (2021). Véanse, además, Rosario Rodríguez v. Rosario Colomer *et al.*, 208 DPR 419, 427-428 (2021); Hernández Torres v. Hernández Colón *et al.*, supra. Así, no cabe duda de que en el ámbito de la sentencia declaratoria el reclamante tiene que establecer su legitimación activa —un interés particular e individualizado— para que proceda la impugnación de un estatuto. Senado v. Tribunal Supremo y otros, supra, págs. 128-129.

Es correcto concluir que los demandantes tenían legitimación activa para cuestionar la validez procesal y sustantiva de las órdenes ejecutivas. **Lo que sucede es que esa legitimación no se extiende a toda orden ejecutiva que**

**no les afecte, por el mero hecho de que fuera promulgada para atender la crisis de salud provocada por el COVID-19.** En este caso era imprescindible delimitar que la legitimación está atada a los daños reales, inmediatos y precisos, e incluso potenciales, pero no abstractos o hipotéticos, que los demandantes adujeron.

Desde una mirada amplia y liberal, se percibe que algunos de los demandantes poseen legitimación activa ya que precisaron el peligro potencial de sufrir ciertos daños por los mandatos entonces vigentes de vacunación y uso de mascarillas.[2] Véase, Ap. 318. Por ejemplo, algunos padres particularizaron que, por virtud de las órdenes ejecutivas, se exigió que sus hijos menores de edad cumplieran con el uso de mascarillas y/o el requisito de vacunación contra el COVID-19 para recibir servicios educativos. Íd.

En esa dirección, lo correcto sería resolver que los demandantes tenían legitimación activa para cuestionar dos requisitos en particular: los mandatos de vacunación contra COVID-19 y de uso de mascarillas. Esto incluye, por supuesto, impugnar la forma en que se adoptaron, así como su contenido. Sin embargo, esa legitimación no se extiende

---

[2] Aunque en la demanda, y durante el pleito, se hicieron alegaciones generales sobre, entre otros asuntos, limitaciones de acceso a establecimientos y servicios, los demandantes no proveyeron detalles ni instancias específicas que nos puedan llevar a concluir que poseen legitimación activa para impugnar esos asuntos. Además, correctamente el Tribunal de Primera Instancia indicó que no quedaba clara la legitimación activa de los demandantes para cuestionar las medidas impuestas por terceros y sus patronos, e incluso, faltarían partes indispensables. Sentencia del Tribunal de Primera Instancia, Ap., pág. 544, esc. 2.

a toda posible ramificación hipotética de la crisis provocada por el COVID-19.

Sobrepasado el asunto de legitimación, este caso presentaba un problema de academicidad.

B. Academicidad

Para determinar si la controversia entre las partes sigue viva y subsiste en el tiempo tenemos que evaluar los eventos anteriores que dieron inicio al pleito, la adversidad presente y los eventos futuros. Super Asphalt v. AFI y otro, 206 DPR 803, 816 (2021); Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 933 (2011); U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 281 (2010). Una controversia es académica cuando los acontecimientos y cambios fácticos tornan en ficticia su solución, de tal modo que un fallo del tribunal no tendría efectos prácticos. Bhatia Gautier v. Gobernador, supra, pág. 74; Amador Roberts et als. v. ELA, 191 DPR 268, 282-283 (2014); San Gerónimo Caribe Project v. A.R.Pe., 174 DPR 640, 652 (2008).

Conforme hemos expresado, los tribunales deben abstenerse de resolver los méritos de un asunto académico pues este deja de ser justiciable y, por lo tanto, no apto para la intervención judicial. Amador Roberts et als. v. ELA, supra; Báez Díaz v. ELA, 179 DPR 605, 618 (2010); Moreno v. Pres. U.P.R. II, 178 DPR 969, 975 (2010). "[I]f in the course of litigation a court finds that it can no

longer provide a plaintiff with any effectual relief, the case generally is moot". Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796 (2021).

Claro está, la academicidad admite excepciones **que deben invocarse con mesura**. Pueblo v. Díaz, Rivera, 204 DPR 472, 481 (2020); S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 151 (2011); Moreno v. Pres. U.P.R. II, supra, pág. 974. Estas operan cuando: (1) se plantea una cuestión recurrente que tienda a evadir la revisión judicial; (2) la situación de hechos ha sido modificada por el demandado, pero el cambio no aparenta ser permanente, y (3) subsisten consecuencias colaterales vigentes. Bhatia Gautier v. Gobernador, supra, págs. 74-75; Torres Santiago v. Depto. Justicia, 181 DPR 969, 983 (2011).

La excepción de recurrencia aplica "en aquellas instancias en las que es razonable pensar que la misma controversia puede surgir en el futuro y que nuevamente se tornará académica **antes de que algún tribunal pueda adjudicarla**". (Negrilla suplida). Pueblo v. Díaz, Rivera, supra, pág. 482. Véase, además, IG Builders *et al.* v. BBVAPR, 185 DPR 307, 334-335 (2012); P.N.P. v. Carrasquillo, 166 DPR 70, 76 (2005). Nótese que la probabilidad de que el asunto evada la intervención judicial no es que escape llegar al Tribunal Supremo, sino que las circunstancias frustren que se pueda obtener un remedio en **algún tribunal**. Pueblo v. Díaz, Rivera, supra.

Por otro lado, la excepción de cesación voluntaria sin visos de permanencia dispone que "un caso es académico solo si: (1) puede asegurarse que **la violación alegada** no va a volver a ocurrir y (2) el remedio provisional concedido o los eventos acaecidos han erradicado completa e irrevocablemente los efectos de la violación alegada". (Negrilla suplida). U.P.R. v. Laborde Torres y otros I, supra, pág. 283. En otras palabras, el caso es académico si se puede probar que no existe una expectativa razonable de que la conducta impugnada se repita. Íd., pág. 284.

Si bien el peso de la prueba recae en quien alega que el pleito es académico, nuestro estudio de la excepción de cesación voluntaria no debe adentrarse en el campo de la especulación. Véase, Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 938. Tan es así que, en deferencia hacia un poder hermano, no adjudicaremos un hecho que hasta el momento sea puramente figurativo. Íd.

Respecto a las restricciones durante la pandemia causada por COVID-19, en Tandon v. Newsom, 141 S Ct. 1294 (2021), el máximo foro federal adjudicó que ciertos demandantes tenían derecho a un **remedio interdictal de emergencia** ("emergency injunctive relief"), pendiente una apelación. En lo pertinente, ese foro interpretó que retirar o modificar una restricción de COVID durante el

curso del litigio, no necesariamente convierte el caso en académico.[3] Íd., pág. 1297.

Este pronunciamiento se basó en Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 68 (2020), otro caso en el que concluyó que un **remedio interdictal** ("injunctive relief") no era académico porque los solicitantes estaban bajo la amenaza constante de que se reimpusiera la medida impugnada. Nótese que allí el gobernador constantemente cambiaba la clasificación de ciertas áreas sin aviso previo.[4] Íd.

Recientemente, algunos tribunales federales, en escenarios similares al de aquí, han determinado que la excepción de cesación voluntaria no aplica luego de que se eliminan los mandatos impugnados. De ese modo, han concluido que la controversia se vuelve académica una vez la medida impugnada se retira. En otras palabras, los tribunales federales han resuelto que las controversias son académicas y no aplica la excepción de cesación voluntaria cuando lo que se impugnó dejó de surtir efecto. Véanse, Weisshaus v. Hochul, Núm. 21-64-CV, 2022 WL 17256755 (2do Cir. 2022); Clark v. Governor of New Jersey, 53 F. 4th 769 (3er Cir. 2022); Resurrection Sch. v. Hertel, 35 F. 4th 524 (6to Cir. 2022), cert. denegado, 143 S. Ct. 372 (2022). Es más, a igual conclusión se ha llegado aunque subsista (como

---

[3] La cita original reza: "even if the government withdraw or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case".

[4] La cita original dispone: "The Governor regularly changes the classification of particular areas without prior notice".

en Puerto Rico) una declaración de estado de emergencia. Eden, LLC v. Justice, 36 F. 4th 166, 171-172 (4to Cir. 2022); Brach v. Newsom, 38 F.4th 6 (9no Cir. 2022); Hinkle Fam. Fun Ctr., LLC v. Grisham, 586 F. Supp. 3d 1118 (D.N.M. 2022).

A la luz de este marco doctrinal, me veo obligado a afirmar que las controversias son, en su mayoría, académicas. Más allá de la declaración de emergencia, las medidas particulares impugnadas se eliminaron. **La vacunación compulsoria para los estudiantes de 16 años o más es el único requisito de este tipo que se mantiene.**

En cambio, **el Tribunal de Apelaciones razonó que la controversia no era académica porque permanecía el requisito de uso de mascarillas y el requisito de vacunación, aunque modificado.** Por otra parte, el Procurador General sí reconoció que la controversia se tornó académica. Afirmó que adentrarnos a adjudicar cuáles son las facultades que tiene el Gobernador durante una emergencia

> tiene *cero efectos prácticos* sobre los demandantes porque aún si se concluyera que el Gobernador no puede regular ese aspecto durante una emergencia, estos continuarían sujetos a la regulación de la vacunación promulgada por una fuente legal totalmente independiente al Gobernador que es la Ley Núm. 25-1983, la cual no ha sido impugnada. (Énfasis en el original). Sol. Cert., pág. 3.

En contraste, el matrimonio Marrero Amadeo arguyó que la declaración de emergencia subsiste, y que eso deja la

puerta abierta para decretar otras órdenes. En suma, reiteró que había un "peligro, no solamente potencial, sino palpable" porque la Orden Administrativa Núm. 2022-533 imponía la obligatoriedad del uso de mascarillas en las instituciones educativas, así como el requisito de vacunación contra el COVID-19.[5]

Ahora bien, a través de la OE-2022-19 de 7 de marzo de 2022, **el Gobernador eliminó**, entre otras cosas, **los requerimientos de uso de mascarillas** en la mayoría de las áreas y **los mandatos de vacunación**. También, **dejó sin efecto cualquier otra orden ejecutiva que fuera incompatible** con esta.

Cónsono con esto, mediante la OA-2022-533 de 8 de marzo de 2022, el Secretario de Salud **dejó sin efecto todas las órdenes administrativas que establecían medidas de prevención contra el COVID-19**. No obstante, **dispuso que los estudiantes de 16 años o más estarían sujetos al requerimiento de inmunización contra el COVID-19, según los _Requisitos de vacunación para el curso escolar 2022-2023_ a tenor de la Ley Núm. 25 de 25 de septiembre de 1983**. Posteriormente, también **eliminó la obligatoriedad del uso de mascarillas en las instituciones educativas**. Véase, OA-2022-548 de 13 de septiembre de 2022.

Esto demuestra que **las órdenes ejecutivas que generaron** todas las controversias no mantienen vigencia hoy

---

[5] Como se aprecia más adelante, el requisito de uso de mascarillas en estas instituciones se eliminó.

**día**. En realidad, las "órdenes vigentes" son órdenes que **retiraron los requisitos impugnados —vacunación contra el COVID-19 y el uso de mascarillas—**. Véanse, OA-2022-533 y OA-2022-548. **El único requisito que se mantiene es el de vacunación para los estudiantes de 16 años o más. Las otras controversias son académicas.**[6]

Resulta insoslayable reconocer que el decreto de estado de emergencia, por sí mismo, no impone obligación alguna a los demandantes, ni implementa requisitos o medidas específicas. Más bien, se limita a explicar que tiene el fin de facultar al gobierno a "llevar a cabo todos los esfuerzos e implementar todas aquellas medidas necesarias" para salvaguardar la salud pública frente al COVID-19. Boletín Administrativo Núm. OE-2020-020 de 12 de marzo de 2020. Por lo tanto, la declaración de emergencia no causa un daño real o particular a los demandantes, ni tiene, **por sí sola**, la posibilidad de lesionar los derechos de las partes.[7]

Incluso, aquí no aplica alguna de las excepciones a la academicidad. No se trata de una cuestión recurrente que tienda a evadir la revisión judicial. Reconozco que

---

[6] Aunque algunos de los demandantes son maestros de instituciones educativas, no surge que actualmente no están sujetos a requisito de vacunación alguno relacionado con el COVID-19.

[7] Reconozco que podría ser cuestionable que el decreto de emergencia haya durado aproximadamente tres años sin que medie la intervención del Poder Legislativo. Sin embargo, ante la academicidad de este litigio, ese cuestionamiento habría que hacerlo en otro pleito. La Asamblea Legislativa no es parte de este pleito. No estamos ante una controversia en la que ese Poder busque reivindicar sus prerrogativas constitucionales. Aunque nada impide que inste un pleito a esos efectos, la Cámara de Representantes de Puerto Rico se limitó a presentar un alegato como *amicus curiae*.

mientras subsista una declaración de emergencia, la sustitución de una orden ejecutiva o medida por otra no necesariamente convierte la controversia en académica de forma automática. Véase, <u>Tropical Chill Corp. v. Pierluisi Urrutia</u>, Civil Núm. 21-1411(RAM), 2022 WL 2712538, pág. *5 (D.P.R. 2022). Sin embargo, **la controversia no deja de ser académica por el mero hecho de que el decreto de emergencia continúe en vigor.**

Aun bajo una interpretación en extremo amplia de que la declaración de emergencia subsiste y del proceder del Poder Ejecutivo de promulgar directrices a través de órdenes, **no es razonable pensar que la misma controversia surgirá en el futuro y evadirá la revisión de algún tribunal**. El trámite de este caso demuestra que los reclamos de las partes fueron atendidos en su momento. Carecemos de fundamentos para sostener que no se proveerá algún remedio judicial a tiempo, de adoptarse nuevamente este tipo de medidas. Por eso, reitero que no aplica la excepción de cuestión recurrente que escape la revisión en los tribunales.

El análisis objetivo y ponderado de las circunstancias de autos demuestra que tampoco aplica la excepción de cese voluntario sin visos de permanencia. Resolver lo contrario conlleva especular que las medidas eliminadas se volverán a promulgar. Para concluir eso tendríamos que adjudicar hechos que en este momento son puramente figurativos. Desde el 7 de marzo de 2022 —y podría decirse que desde antes— el

patrón es claro: eliminar restricciones y requisitos. No tenemos certeza alguna de que eso cambiará.

Asimismo, y no menos importante, al examinar la excepción de cesación voluntaria tenemos que reconocer que nada en el expediente apunta a que la flexibilización y eliminación de las medidas se debió a este pleito. Más bien, el cambio en las acciones del Gobernador está desvinculado de este litigio. Por último, distinto a Tandon, supra, y Roman Cath. Diocese of Brooklyn, supra, aquí el Gobernador no cambia los requisitos constantemente sin aviso previo. El tracto fáctico de la controversia que hoy nos ocupa no revela una amenaza constante de que el gobierno reinstalará las directrices impugnadas; todo lo contrario.

Es menester recalcar que, aunque la declaración de emergencia persiste por sí sola, no impone obligaciones a las partes. Las controversias son académicas. Solo nos correspondía evaluar la única directriz que se impuso y continúa en vigor: el requisito de vacunación a los estudiantes de 16 años en adelante. En términos simples, bajo el supuesto de que al menos uno de los demandantes es un estudiante de 16 años o más al que le aplica el mandato de vacunación para asistir a las instituciones educativas, teníamos que examinar si este requisito se instauró de una

forma legítima.[8] Adelanto que procede contestar en la afirmativa.

III

El Art. 1 de la Ley Orgánica del Departamento de Salud, Ley Núm. 81 de 14 de marzo de 1912, 3 LPRA sec. 171, preceptúa que el Secretario de Salud tendrá a su cargo **todos los asuntos que se le encomienden por ley** relacionados con la salud pública. Entre estos asuntos se le concedió la facultad para tomar las medidas que juzgue necesarias para combatir epidemias. Art. 5 de la Ley Núm. 81-1912, 3 LPRA sec. 175.

En lo que respecta a la controversia medular de autos, la Ley Núm. 25 de 25 de septiembre de 1983, conocida como la Ley de Inmunizaciones a Niños Preescolares y Estudiantes, (Ley Núm. 25), 24 LPRA sec. 182 *et seq*., estatuye la política general de que todos los estudiantes deberán estar debidamente inmunizados para ser admitidos o matriculados en las escuelas. Conviene aclarar que, la ley define el término "inmunización" como "la administración al cuerpo humano de la vacuna o toxoide por medio de inyección o administración oral para mantenerse inmunizado de aquellas enfermedades **según sea requerida por el Secretario de Salud en la publicación anual**[...]". (Negrilla suplida). Art. 1 de la Ley Núm. 25, 24 LPRA sec. 182.

---

[8] Aunque el foro primario no adjudicó expresamente que algunos de los estudiantes tenían 16 años o más, surge del expediente que entre los demandantes hay estudiantes de estas edades. Es decir, no está en controversia que en el pleito hay estudiantes de 16 años en adelante.

A la par, el estatuto dispone que el Secretario de Salud deberá publicar anualmente, tres meses antes del comienzo de cada curso escolar, las enfermedades contra las que los estudiantes tendrán que inmunizarse. Art. 10 de la Ley Núm. 25, 24 LPRA sec. 182i. Estas inmunizaciones, así como la forma y frecuencia con que se administran, deberán ajustarse a las prácticas médicas reconocidas. Íd. Del texto de la ley surge con meridiana claridad que en el ámbito escolar el Secretario de Salud: (1) podrá requerir cualquier inmunización —vacuna— que tenga a bien, y (2) vendrá obligado a publicar estos requisitos anualmente. Íd.

Si bien la Ley Núm. 25 contempla que el Secretario de Salud podrá dictar las reglas y reglamentos que estime necesarios para su cumplimiento, esto no significa que tiene que seguir el procedimiento general de reglamentación para publicar los requisitos de vacunación para cada año escolar. Véase, Art. 13 de la Ley Núm. 25, 24 LPRA sec. 182l. En ese aspecto, lo único que este estatuto dictamina es que se haga una publicación anual. Es decir, esta ley no limita la forma en que el Secretario de Salud puede publicar anualmente los requisitos. Por lo general, la publicación se hace a través de un aviso a la comunidad escolar. Véase, Aviso de *Requisitos de vacunación para el curso escolar 2022-2023*, http://www.salud.pr.gov/CMS/DOWNLOAD/6220 (última visita, 27 de diciembre de 2022); Aviso de *Requisitos de vacunación para el curso escolar 2020-2021*,

https://www.salud.gov.pr/CMS/DOWNLOAD/121 (última visita, 27 de diciembre de 2022).

Ciertamente, el Secretario de Salud tiene amplia discreción para determinar cuáles serán los requisitos de vacunación para los estudiantes y para escoger la forma en que estos se publican. Esta facultad no está atada, ni se circunscribe, a una declaración de estado de emergencia. En cambio, esta potestad emana de una delegación válida hecha por la Asamblea Legislativa como parte del poder de razón del Estado ("police power").

Sabemos que los funcionarios de la Rama Ejecutiva efectúan el deber de cumplir y hacer cumplir las leyes mediante el ejercicio del poder de razón del Estado. Nieves v. AM Contractors, 166 DPR 399, 412 (2005). Al amparo de este "los gobiernos tienen la responsabilidad de proteger la salud, la seguridad y el bienestar de sus ciudadanos. Es por ello que, tradicionalmente, gozan de gran discreción para legislar sobre asuntos relacionados con estas áreas de interés". ELA v. Northwestern Selecta, 185 DPR 40, 60 (2012). Véase, además, Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 835 (2014).

Desde Jacobson v. Massachusetts, 197 US 11 (1905), es norma firmemente establecida que los estados tienen discreción para exigir la vacunación de sus ciudadanos en pos de la salud pública. Véase, además, Zucht v. King, 260 US 174, 176-177 (1922). Asimismo, hemos reconocido que "el Estado puede aprobar leyes que requieran de manera

compulsoria ciertas vacunas ante la amenaza de una epidemia". Lozada Tirado v. Testigos de Jehová, 177 DPR 893, 918, esc. 13 (2010).

Por otro lado, mediante el principio cardinal de la inviolabilidad de la dignidad del ser humano, nuestra Carta Magna reconoce el derecho fundamental a la intimidad y la protección contra ataques abusivos a la vida privada y familiar. Art. II, Sec. 1, Const. P.R., LPRA, Tomo 1; Lozada Tirado v. Testigos de Jehová, supra, pág. 910. Hemos interpretado que el derecho de todo paciente a consentir o rechazar tratamiento médico emana de estos preceptos y de la Decimocuarta Enmienda de la Constitución federal. Lozada Tirado v. Testigos de Jehová, supra, pág. 911. Sin embargo, **no se trata de un derecho absoluto**. Íd., pág. 916. Cuando está en controversia los tribunales deben hacer un balance entre este y ciertos intereses del Estado. Íd.

Por ejemplo, los foros judiciales deben considerar el interés del Estado en que los ciudadanos se sometan a cierto tratamiento médico durante una crisis de salud pública con el fin de proteger a terceros. Íd., pág. 918. Esto es así pues la doctrina del rechazo a tratamiento médico no debe sobrepasar asuntos apremiantes como la salud de la población general, y mucho menos, la salud de los menores. Entiéndase que no procede invocar esta doctrina como evasiva de un requisito de inmunización firmemente arraigado y razonable como el de la Ley Núm. 25. Esta ley

provee espacio para las respectivas exenciones razonables por motivos religiosos o clínicos.

Con relación a la única controversia que queda viva, el Procurador General enfatizó que la facultad del Secretario de Salud para requerir la vacunación en el contexto escolar no está atada a un estado de emergencia o a alguna delegación hecha por el Gobernador.

Como contrapartida, los demandantes arguyeron que la Ley Núm. 25 no faculta al Secretario de Salud a requerir la vacunación contra el COVID-19 porque la vacuna no está aprobada, ni inmuniza. En síntesis, manifestaron que esa ley no resuelve el problema de la ilegalidad de la vacunación compulsoria ya que el estatuto no permite que se impongan mandatos de vacunación sin un reglamento, de productos no aprobados, y a personas mayores de 21 años o más. No le asiste la razón.

Indiscutiblemente la inmunización según requerida por el Secretario de Salud en el Aviso de *Requisitos de vacunación para el curso escolar 2022-2023*, es válida porque se hizo mediante la publicación anual que exige la Ley Núm. 25. En suma, requerir que los estudiantes de 16 años en adelante cuenten con dos dosis de la vacuna contra el COVID-19, es un ejercicio válido de las potestades que la Asamblea Legislativa delegó al Secretario de Salud. Esta facultad es independiente de la declaración de un estado de emergencia.

A los foros judiciales no nos corresponde determinar cuál es la política de sanidad idónea. De hecho, aunque los demandantes se nieguen a aceptarlo, la vacuna contra el COVID-19 está autorizada por la FDA. Además, no se necesita reglamento alguno para instaurar este requisito. Si bien el estado de emergencia por la pandemia es uno de los factores que hace evidente la favorabilidad de esta política de vacunación, la crisis de salud pública no es una condición necesaria para que el requisito sea válido.

Luego de examinar los argumentos de las partes, es forzoso concluir que en este caso no se está violentando algún derecho fundamental. El requisito de vacunación en controversia está relacionado razonablemente con el fin legítimo de proteger la salud pública y se impuso con la facultad en ley para ello. Recordemos que los estudiantes cobijados por alguna excepción médica o religiosa aplicable están exceptuados de este requisito. Véase, OA-2022-533, pág. 10.

No hay motivo para distinguir la vacuna contra el COVID-19 del resto de las vacunas que se requieren para cada curso escolar. Aunque el Art. 13 de la Ley Núm. 25, supra, menciona que el Secretario de Salud y el Secretario de Educación dictarán las reglas y los reglamentos **que estimen necesarios para el cumplimiento de la ley**, esto no debe interpretarse como que se necesita un reglamento para instituir las exigencias de vacunación en las instituciones escolares. Esta ley no impone requisitos de forma. En la

práctica, sería absurdo afirmar que se necesita un reglamento para requerir que un estudiante esté vacunado contra el tétano, por ejemplo. Lo mismo aplica a la vacuna contra el COVID-19.

Entonces, como aquí la Ley Núm. 25 es una fuente de autoridad suficiente e independiente para requerir que los estudiantes de 16 años o más reciban la vacuna contra el COVID-19, **no es necesario ni adecuado adentrarnos en las órdenes ejecutivas y los poderes del Gobernador**. Esta interpretación permite resolver por completo la controversia de autos. Es norma reiterada que el proceso político entre las Ramas hermanas debe seguir su cauce, y que "[e]n ausencia de circunstancias que ameriten la intervención judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo". Presidente de la Cámara v. Gobernador, 167 DPR 149, 161-162 (2006). Véase, además, Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 939.

IV

De lo expuesto vemos que algunos de los demandantes tenían legitimación activa para cuestionar la aplicación de ciertas medidas ejecutivas. Empero, como tiende a pasar durante situaciones de emergencia, el Poder Ejecutivo atemperó las medidas para atender la crisis causada por el COVID-19. Al examinar los sucesos fácticos advertimos que las controversias se tornaron académicas, casi por completo. Tal como indica el Juez Asociado señor Colón

Pérez en su Opinión de conformidad, "el Poder Ejecutivo eliminó la cuarentena, el distanciamiento físico, el uso obligatorio de mascarillas, el cernimiento en contra del COVID-19, la vacunación obligatoria, el requisito de evidencia de resultado negativo de pruebas de detección de COVID-19 y la limitación de aforo en ciertos establecimientos comerciales". Op. de conformidad del Juez Asociado señor Colón Pérez, pág. 70.

En realidad, el remedio que los demandantes buscaban era que se paralizaran las directrices emitidas mediante ciertas órdenes ejecutivas. No obstante, no podemos ordenar el cese de algo que ya terminó. En vista de que estamos imposibilitados de conceder este remedio, sería fútil emitir una opinión a todas luces consultiva para pasar juicio sobre la constitucionalidad de algo que desapareció. La declaración de emergencia intrínsecamente, y por separado, no causa un peligro potencial a los demandantes.

En este momento, la única controversia viva es el mandato de vacunación impuesto a los estudiantes de 16 años o más. Para resolverla bastaba con examinar la Ley Núm. 25 y, con ello, concluir que el Secretario de Salud tiene la facultad para imponer requisitos de vacunación a la población estudiantil. Naturalmente, teníamos que arribar a la determinación de que esta facultad incluye requerir la vacuna contra el COVID-19, tal como sucede con el resto de las vacunas.

No albergo duda de que este análisis —relativamente sencillo— nos permitía adjudicar correctamente las controversias de este caso. Por el contrario, es equivocado indicar que **en este caso** nos correspondía delimitar el alcance de las prerrogativas que tiene el Gobernador para promulgar determinadas órdenes ejecutivas. Ante una controversia académica, era imprescindible rechazar la invitación a pasar juicio sobre los límites de la declaración de emergencia. **Únicamente podríamos atender estos temas en el contexto de un caso y controversia real y vigente. La Constitución no nos faculta para embarcarnos ahora en un análisis abstracto de estos asuntos.**

Recuérdese que este pleito comenzó esencialmente como un pleito de sentencia declaratoria de daños e *injunction*. Igualmente, **nótese que no se trata del Poder Legislativo reclamando sus prerrogativas constitucionales**. Por último, no olvidemos que los demandantes cuentan con la oportunidad de acudir a los tribunales, de verse afectados en el futuro por alguna medida.

Puede ser tentador emitir una opinión sobre un tema novedoso, atractivo y del que poco o nada se ha escrito. No obstante, en un ejercicio de templanza y circunspección hoy reconocemos que no debemos adentrarnos en el vertiginoso campo de la especulación. Por más curiosa que nos parezca la trama de la declaración de emergencia y de las órdenes ejecutivas, este caso, como todos, requiere un análisis riguroso de los elementos de justiciabilidad. En tal

gestión, era indispensable limitarnos a concluir que el Secretario de Salud —por virtud de ley— puede requerir la vacunación de la población estudiantil.

Ante la situación fáctica que presenta este caso, no es el Poder Judicial el llamado a determinar y pautar la deseabilidad o no de una declaración de emergencia. Ese es un asunto de política pública que no nos corresponde a nosotros. A pesar de lo cuestionable que le pueda parecer a alguien mantener un estado de emergencia por casi tres años, hoy declinamos forzar un caso para expresarnos al respecto. Para salvaguardar los procesos democráticos y nuestro sistema republicano de gobierno, siempre será necesario aplicar los principios de autolimitación judicial.

Por todo lo anterior estoy conforme. Sin duda, debemos revocar la sentencia que emitió el Tribunal de Apelaciones debido a que las controversias son académicas. En cuanto a la única controversia viva, ameritaba resolver que por virtud de la Ley Núm. 25, el Secretario de Salud puede requerir la vacunación de los estudiantes.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

<table>
<tr><td>Lourdes Amadeo Ocasio; Miguel Marrero, ambos por sí y en representación de sus hijos A.M.A., M.M.A. y otros<br><br>Recurridos<br><br>v.<br><br>Pedro Pierluisi Urrutia en su capacidad como Gobernador del Gobierno de Puerto Rico; Departamento de Salud, por conducto de su Secretario, Dr. Carlos Mellado López<br><br>Peticionarios</td><td>AC-2022-0070</td></tr>
</table>

Opinión de Conformidad emitida por la Jueza Asociada señora Pabón Charneco a la cual se une el Juez Asociado señor Rivera García.

En San Juan, Puerto Rico, a 16 de febrero de 2023.

En esta ocasión, nos enfrentamos a una controversia novel, relacionada al alcance de las facultades del Primer Ejecutivo para promulgar Órdenes Ejecutivas ante una emergencia sanitaria sin precedente: la pandemia del COVID-19. De este modo, estoy conforme con la Sentencia que hoy se certifica específicamente porque la controversia ante la consideración este Tribunal se ha tornado académica y por tal razón no es justiciable. En cuanto a la única controversia que entendemos se encuentra viva, respecto al

mandato de vacunación impuesto a los estudiantes de 16 años o más, concluimos que la misma se sostiene fundamentado en la Ley Núm. 25 de 25 de septiembre de 1983, *infra*.

Asimismo, discrepo de lo expresado por algunos compañeros de este Tribunal respecto a declarar que la emergencia por COVID-19 ha disminuido o cesado. Adjudicar este asunto laceraría la doctrina de separación de poderes, la cual estamos llamados a proteger. Tampoco coincido con el mecanismo propuesto por algunos compañeros y que le sugiere al Poder Ejecutivo cómo debe atender en adelante alguna crisis de salud provocada por esta pandemia. De esta forma se pretende que seamos nosotros, el Poder Judicial, quienes le indiquemos al Poder Ejecutivo y Legislativo cómo trabajar. Cuando, por el contrario, nuestro trabajo se debe limitar a analizar si una rama de gobierno ha usurpado los poderes de otra y no en dictar política pública.

Hoy correctamente este Tribunal se circunscribe a revocar al foro apelativo intermedio sin realizar un análisis en los méritos de una controversia ficticia, ejerciendo con prudencia sus poderes y velando por un ejercicio sano y correcto de la separación de poderes. De esta forma, evitamos actuar desacertadamente convirtiéndonos en un foro que emite opiniones consultivas.

Por los hechos del presente caso encontrarse expuestos correctamente en la Opinión de Conformidad del Juez Asociado señor Martínez Torres, procedo adoptar los mismos y a

discutir brevemente los hechos procesales de mayor relevancia, el derecho aplicable y mi postura al respecto.

I.

Los recurridos en el caso de autos presentaron una demanda ante el Tribunal de Primera Instancia con el propósito de impugnar la constitucionalidad de ciertas Órdenes Administrativas emitidas por el Secretario de Salud de Puerto Rico en repuesta a la pandemia del COVID-19 que enfrentaba Puerto Rico y el mundo entero. Específicamente, se solicitó al foro primario que dejara sin efecto los poderes otorgados al Secretario de Salud mediante la Orden Ejecutiva 2021-054 para establecer las "guías, directrices, protocolos y recomendaciones para atender – de forma particularizada por cada servicio, negocio, actividad o área, según sea necesario conforme al riesgo de contagio – la emergencia del COVID-19".[1]

También solicitaron se le ordenara al Secretario de Salud cesar y desistir de continuar con la implantación de las Órdenes Administrativas 2021-508 y 2021-509 que requerían la vacunación compulsoria contra el COVID-19 para estudiantes mayores de doce (12) años en las escuelas públicas y privadas y las universidades de Puerto Rico y sus

---

[1] Esta delegación de poder, debemos resaltar, también proviene de la *Ley Orgánica del Departamento de Salud*, Ley Núm. 81 de 14 de marzo de 1912, mediante la cual el Poder Legislativo en su Artículo 5 delegó al Secretario del Departamento de Salud el poder de tomar todas la medidas que juzgue necesarias para combatir alguna epidemia.

empleados, así como el uso de mascarillas en ciertas circunstancias.[2] En adición a esto, solicitaron se le concediera una compensación en daños y que se ordenara a la Asamblea Legislativa a atender los asuntos relacionados a la emergencia del COVID-19 que pudiera tener efectos sobre los derechos de los ciudadanos.

Respecto a la vacunación compulsoria de los estudiantes de doce (12) años en adelante, el Secretario de Salud expresó en la Orden Administrativa Núm. 2021-509 que este requisito desempeñaba un papel imprescindible en el control de la pandemia y que permitía proveer un ambiente más seguro en el entorno educativo. A manera de excepción, y de conformidad con la Ley Núm. 25 de 25 de septiembre de 1983, conocida como *Ley de las Inmunizaciones Compulsorias a los Niños Pre-escolares y Estudiantes del Estado Libre Asociado de Puerto Rico*, quedaron exentos de la vacunación contra el COVID-19, los estudiantes cuyos sistemas inmunes estuvieran comprometidos, fueran alérgicos a las vacunas, u otras contradicciones médicas a la vacuna. Además, quedaron igualmente exentos los estudiantes que por motivos de creencias religiosas no pudieran ser vacunados.

La vacunación compulsoria se extendió, de igual forma, al personal docente y no docente de las escuelas, centros

---

[2] De igual forma, las Órdenes Administrativas referidas imponían órdenes de cuarentena y aislamiento, medidas cautelares individuales, el requisito de evidencia de vacunación o resultado negativo de una prueba antígeno de COVID-19 para eventos que recibieran público de más de quinientas (500) personas.

educativos y universidades públicas y privadas. No obstante, aplicaron las mismas excepciones sobre motivos religiosos y motivos de salud establecidos en la Ley Núm. 25 de 25 de septiembre de 1983, *supra*.

Ahora bien, el **7 de marzo de 2022**, el Gobernador de Puerto Rico firmó la **Orden Ejecutiva Núm. OE-2022-019** donde **eliminó el mandato de vacunación contra el COVID-19**.[3] Sin embargo, el Secretario de Salud continuaría haciendo las determinaciones necesarias relacionadas a los certificados de salud y la vacunación de los estudiantes.

La OE-2021-019 dio paso a la aprobación de la **Orden Administrativa Núm. 2022-533 del Departamento de Salud**. En ella, el Secretario de Salud de Puerto Rico **eliminó el mandato de utilización de mascarillas** en áreas exteriores e interiores.[4] En cuanto a la vacunación compulsoria, mandato eliminado por el Gobernador en la Orden Ejecutiva antes mencionada, dispuso que los estudiantes menores de edad estarían sujetos a la vacunación obligatoria, de conformidad con la Ley Núm. 25 de 25 de septiembre de 1983, *supra,* incluyendo la vacuna contra el COVID-19 en la lista de

---

[3] Además, permitió todas las actividades multitudinarias. En los casos de actividades multitudinarias de más de mil (1,000) personas, ordenó al Secretario de Salud a promulgar los protocolos que fueran necesarios. Mediante esta Orden Ejecutiva, **eliminó** de igual forma los requisitos de cernimiento sobre estatus de vacunación o pruebas para detectar el COVID-19 a los visitantes en los restaurantes, barras, chinchorros, cafetines, cines, centros comunales, gimnasios, salones de belleza, casinos, entre otros. Por último, eliminó las normas que debían seguir los viajeros que llegaran a Puerto Rico.

[4] De igual forma, la Orden Administrativa Núm. 2022-548 flexibilizó aún más el uso de las mascarillas.

enfermedades que requieren inmunización. No obstante, están exentos de esta vacunación los estudiantes de cinco (5) a quince (15) años y los estudiantes que tengan una excepción médica o religiosa.

## II.

De forma exhaustiva este Tribunal ha expresado y reafirmado que podemos evaluar únicamente aquellos casos que son justiciables. *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 931 (2011); *U.P.R. v. Laborde Torres y otros I*, 180 DPR 253, 279-280 (2010); *Noriega v. Hernández Colón*, 135 DPR 406, 420 (1994). Incluso, es este uno de los primeros temas discutidos en las Escuelas de Derecho, por lo que es de vasto conocimiento para toda la comunidad de profesionales legales.

Los tribunales solo estamos llamados a intervenir en controversias reales y vivas, en las cuales las partes que posean un interés puedan obtener un remedio conforme a derecho. *E.L.A. v. Aguayo*, 80 DPR 552, 584 (1958). "En vista de que la justiciabilidad es una doctrina autoimpuesta, los propios tribunales deben preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional". *Smyth, Puig v. Oriental Bank*, 170 DPR 73, 76 (2007).

Para tal análisis, existen cinco (5) elementos a evaluar que **no** permiten que una controversia sea

justiciable: (1) cuando se trata de resolver una cuestión política; (2) cuando una de las partes no tiene legitimación activa; (3) **cuando hechos posteriores al inicio del pleito lo convierten en académico**; (4) las partes buscan obtener una opinión consultiva, o (5) se promueve un pleito que no está maduro. *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 932.

Específicamente, la doctrina de academicidad busca evitar el uso innecesario de los recursos judiciales, "asegurar que haya la adversidad suficiente para que las controversias se presenten y defiendan competente y vigorosamente" e impedir que se dicten precedentes que resulten superfluos. Íd; *U.P.R. v. Laborde Torres y otros I*, *supra*, pág. 280. Así pues, una controversia puede convertirse en académica cuando los cambios fácticos o judiciales acaecidos durante el trámite judicial tornan en ficticia su solución, lo que resultaría en una opinión consultiva. *San Gerónimo Caribe Project v. A.R.Pe.*, 174 DPR 640, 652-653 (2008).

Sin embargo, esto no implica que toda controversia que se torna académica está impedida de ser resuelta. Nuestro marco judicial nos presenta ciertas excepciones que nos permiten la consideración de un caso que, de otro modo, resultaría académico. Así pues, los tribunales podrán considerar controversias que se han tornado académicas si cumple con cualquiera de estas excepciones: (1) una cuestión

recurrente o susceptible de volver a ocurrir; (2) cuando el demandado ha modificado la situación de hechos, pero el cambio no aparenta ser permanente, y (3) cuando aspectos de la controversia se tornan académicos, pero subsisten consecuencias colaterales que tiene vigencia y actualidad. *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 933. Sin embargo, los tribunales deberán utilizar estas excepciones con gran mesura, puesto que no se pueden obviar los límites constitucionales que inspiran la doctrina de academicidad. *Moreno v. Pres. U.P.R. II*, 178 DPR 969, 974 (2010).

**En el caso de autos, luego de evaluar los petitorios de la parte recurrida, soy de la postura que las controversias se han tornado académicas.** Más aún, estoy convencida que el presente caso es un clásico ejemplo a estudiar sobre las instancias en las que una controversia se torna académica por hechos que ocurrieron posteriormente al haber comenzado el pleito. De este modo, como disponen los elementos de justiciabilidad, estamos impedidos de entender en el presente caso.

Contrario a lo dispuesto por algunos compañeros de este Tribunal que concluyen que las Órdenes Ejecutivas y Administrativas que motivaron el presente litigio aún continúan vigentes, somos de la postura que las mismas no mantienen vigencia por las razones que discutiremos a continuación. Como ya discutimos, la Orden Ejecutiva (OE-2021-054) y las Órdenes Administrativas (OA-2021-508 y OA-

2021-509) impugnadas en la Demanda ordenaban el uso de mascarillas y la vacunación compulsoria para los estudiantes mayores de doce (12) años como requisito de admisión a las escuelas y universidades públicas y privadas. Este requisito de igual forma se extendía al personal docente y no docente de las escuelas, centros educativos y universidades, públicas y privadas.

No obstante, debemos puntualizar, que los reclamos de los recurridos ya se han tornado académicos conforme a lo dispuesto en la OE-2021-019 (la cual eliminó el mandato de vacunación) y las Órdenes Administrativa Núm. 2022-533 y Núm. 2022-548 (las cuales eliminaron el uso de mascarillas e incluyó algunas excepciones a la vacunación de estudiantes menores de edad). De este modo, aunque la parte recurrida argumente que la controversia sobre la vacunación compulsoria para los estudiantes de 16 años o más sigue viva y el litigio no se ha tornado académico, este mandato de vacunación viene cobijado por las disposiciones de la Ley Núm. 25 de 25 de septiembre de 1983, *supra*, y no por el supuesto del manejo de una emergencia.

Particularmente, el Artículo 10 de la referida Ley, establece que el Secretario de Salud vendrá obligado a publicar anualmente, tres (3) meses antes del comienzo de cada curso escolar las enfermedades contra las cuales los estudiantes deben ser inmunizados. 24 LPRA sec. 182i. A tenor con las facultades que le confiere la ley, el Secretario de

Salud incluyó el COVID-19 entre la lista de enfermedades que requieren inmunización. Así pues, el Secretario de Salud hace uso de los poderes válidamente delegados en él por la Asamblea Legislativa para determinar cuáles serán los requisitos de vacunaciones requeridos para los estudiantes. Siendo este mandato de vacunación a estudiantes de 16 años o más el único asunto en controversia que se encuentra vivo y por encontrarse el mismo fundamentado y cobijado por las disposiciones de la Ley Núm. 25 de 25 de septiembre de 1983, *supra*, no nos queda otro asunto ante nuestra consideración por resolver.

**Todo lo antes discutido me conduce a concluir que los asuntos que en alguna instancia estuvieron en controversia y abrieron paso a la litigación de este caso, hoy son un asunto completamente académico.** Como Tribunal Supremo, es nuestro deber velar por la justiciabilidad de los casos ante nuestra consideración. **Somos nosotros quienes debemos dar el ejemplo a los foros inferiores y a la clase togada que los tribunales siempre actuarán con prudencia y nos limitaremos a intervenir solo en controversias genuinas, vivas, que tengan efecto sobre las relaciones jurídicas entre las partes.** *Lozada Sánchez et al. v. JCA*, 184 DPR 898 (2012); *Asoc. Fotoperiodistas v. Rivera Schatz*, supra; *Noriega v. Hernández Colón*, supra.

No podemos cegarnos y actuar desacertadamente, ignorando nuestra jurisprudencia y precedentes, para

expresarnos sobre una cuestión que en estos momentos no nos corresponde. Sabido es y ha sido hartamente discutido por este Tribunal que la propia doctrina de academicidad nos ofrece excepciones para que, en los casos que así lo ameriten, podamos intervenir conforme a derecho. Empero a esto, el caso ante nuestra atención **no** trata sobre una controversia recurrente que tienda a evadir revisión judicial. De igual forma, no ha sido modificada sin visos de permanencia. Además, tampoco subsisten consecuencias colaterales que tengan vigencia y actualidad. *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 933; *U.P.R. v. Laborde Torres y otros I*, supra; *Moreno v. Pres. U.P.R. II,* supra. En fin, no cumple con ninguna de las excepciones a la doctrina de academicidad.

Aún bajo el raciocinio de que la declaración de emergencia por el COVID-19 subsista y el Gobernador de Puerto Rico continúe promulgando directrices mediante Órdenes Ejecutivas, no es correcto determinar que este tipo de controversia evadirá revisión judicial en el futuro. El así hacerlo es una simple especulación de nuestra parte. Recordemos que los foros judiciales están facultados para atender reclamos referentes a medidas como las que hoy están en controversia. Más aún, el propio trámite judicial del caso de autos demuestra que los reclamos de ambas partes fueron atendidos en su momento conforme a derecho. Por lo que no es correcto, apuntalar que, en el futuro, de surgir

una controversia similar a la presente, no se proveerá un remedio judicial a tiempo. Así pues, ¿por qué empeñarse en intervenir en un asunto que no lo amerita?

**III.**

La Constitución de Puerto Rico consagra expresamente el principio de separación de poder entre las ramas constitucionales de gobierno. *Art. 1, Sec. 2, Const. PR, LPRA, Tomo 1*. La doctrina de separación de poderes "aspira a establecer las responsabilidades y enmarcar el ámbito de acción de las ramas constitucionales de gobierno". *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 802 (2014). Esto pues, con el propósito de asegurar que ninguna de las tres ramas de gobierno domine o interfiera indebidamente con la otra. *Dalmau Santiago v. Oronoz Rodríguez*, 208 DPR 115, 135 (2021). Sin embargo, esta doctrina no pretende delimitar de forma absoluta el poder que le corresponde a cada rama de gobierno. Íd. *A contrario sensu*, se trata en sí de un sistema de pesos y contrapesos que evita que las actuaciones de una rama de gobierno causen detrimento en otro. Íd. *Díaz Carrasquillo v. García Pailla*, 191 DPR 97, 110 (2014).

Por tal razón, al toparnos con una controversia que requiere un pronunciamiento sobre la aplicabilidad de la doctrina de separación de poderes, debemos de forma obligatoria analizar, en el contexto histórico, si el poder que ha sido delegado "tiende a desembocar en una concentración de poder indebida en una de las ramas".

*Nogueras v. Hernández Colón*, 127 DPR 405, 426 (1990). Para este análisis se requiere que examinemos: (1) si la función específica ha sido expresamente asignada por la Constitución de Puerto Rico a la rama gubernamental que trata de ejercerla, o (2) si su ejecución por tal rama es un incidente necesario para otras funciones que le fueron conferidas. *Misión Ind. P.R. v. J.P*, 146 DPR 64, 91 (1998).

Como he dispuesto en el pasado, la utilización de la doctrina de separación de poderes no es un ejercicio fácil pues, en ocasiones, conlleva a un cierto grado de tensión entre las ramas de gobierno. *Alvarado Pacheco y otros v. ELA*, 188 DPR 594, 628 (2013) (voto particular de conformidad emitido por la Jueza Asociada señora Pabón Charneco). No obstante, se presume existen funcionarios y ciudadanos valientes dispuestos a defender los poderes de las Ramas que le fueron encomendadas. Íd. Consecuentemente, este Tribunal no ha vacilado en el pasado en mantener un equilibrio constitucional cuando una rama irrumpe en las facultades intrínsecas de otra. Íd.

Como Tribunal de última instancia, es nuestra obligación y responsabilidad velar por el sagrado principio de la separación de poderes. *AAR, Ex Parte*, 187 DPR 835 (2013). Por esta razón, no debemos nunca tomar a la ligera o de forma liviana la mera apariencia de una violación a este principio. Así pues, nos corresponde utilizar nuestro nivel de juicio contundente y ecuánimemente. Esto, incluso,

ante la posible transgresión de esta doctrina por nuestra parte, en el ejercicio de proteger a otra rama de gobierno.

**IV.**

Ahora bien, es menester dejar claro que en el pasado esta Curia ha reconocido el uso de las Órdenes Ejecutivas como una actuación consustancial a las facultades delegadas por la Constitución de Puerto Rico al Poder Ejecutivo. *Hernández, Romero v. Pol. de P.R.*, 177 DPR 121, 138 (2009). En este sentido, estoy de acuerdo con los dispuesto por algunos compañeros de este Tribunal que correspondía validar las Órdenes Ejecutivas promulgadas por el Gobernador de Puerto Rico referente a la emergencia por el COVID-19. Esto pues, las Órdenes Ejecutivas "solo tienen fuerza de ley cuando descansan en una autoridad conferida por la Constitución o las leyes". *Vázquez Irizarry*, supra, pág. 1029. Enfocado en las circunstancias donde el Gobernador de Puerto Rico emite Órdenes Ejecutivas de conformidad a los poderes delegados por la Asamblea Legislativa, el caso de autos es un vivo ejemplo de estas instancias.

Primeramente, la Ley Núm. 157 de 10 de mayo de 1938, conocida como *Ley sobre la declaración de epidemias*, le delegó al Gobernador de Puerto Rico la facultad para actuar ante emergencias provocadas por epidemias. 24 LPRA sec. 354. En adición, dispuso que el Secretario de Salud estaría a cargo de la declaración de la epidemia. Íd.

No obstante, quizás el estatuto de mayor importancia y que mejor habilita al Primer Ejecutivo a manejar una emergencia o desastre en Puerto Rico es la Ley Núm. 20-2017, conocida como *Ley del Departamento de Seguridad Pública de Puerto Rico*. 25 LPRA sec. 3501. Mediante este estatuto la Asamblea Legislativa delegó en la figura del Gobernador poderes extraordinarios para responder a emergencias o desastres. Esta medida definió la palabra "emergencia" como "cualquier situación o circunstancia para la cual sean necesarios los esfuerzos estatales y municipales encaminados a salvar vidas y proteger propiedades, la salud y seguridad pública o para minimizar o evitar el riesgo de que ocurra un desastre en cualquier parte de Puerto Rico". 25 LPRA sec. 3643 (e). De forma complementaria, facultó al Gobernador de Puerto Rico a dictar, enmendar o revocar aquellos reglamentos, y emitir, enmendar y rescindir aquellas órdenes que estime convenientes para regir durante el estado de emergencia. 25 LPRA 3650 (b).

Cónsono con los poderes extraordinarios que le fueron delegados por la Asamblea Legislativa, el Gobernador de Puerto Rico ha emitido Órdenes Ejecutivas para controlar la propagación del COVID-19 en protección de los ciudadanos. La clara intención de la Asamblea Legislativa al delegar estos poderes fue facultar al Poder Ejecutivo a responder con prontitud y utilizando los mejores recursos a su disposición.

Ahora bien, esto de ninguna manera significa que la Asamblea Legislativa está impedida de utilizar sus poderes legislativos para atender los asuntos relacionados con la pandemia del COVID-19. De ninguna de las Órdenes Ejecutivas o Administrativas surge que el Poder Ejecutivo le haya impedido al Poder Legislativo ejercer su facultad de promulgar leyes con el fin de atender la emergencia provocada por el COVID-19. Por el contrario, resulta forzoso concluir que la Asamblea Legislativa avaló las actuaciones del Primer Ejecutivo.[5] Así pues, el Gobernador de Puerto Rico ha actuado dentro de las facultades que la Asamblea Legislativa le otorgó mediante ley y no en una usurpación de poderes que pudiera lacerar la separación de poderes entre las ramas de gobierno. Al analizar si una rama de gobierno ha usurpado los poderes de otra, debemos tomar en consideración si existe un dominio de una rama sobre otra, si las acciones de una rama resultan en el detrimento de la otra o si nos encontramos antes una concentración de poder indebida. Las actuaciones del Gobernador de Puerto Rico para manejar la pandemia del COVID-19, dentro de la histeria y el

---

[5] La Cámara de Representantes de Puerto Rico presentó un alegato en el caso de autos como *amicus curiae*, en el que planteó que la *Ley del Departamento de Seguridad Pública de Puerto Rico,* supra, adolece de vicios constitucionales. Sin embargo, expresaron que reconocían la autoridad del Gobernador para ordenar la vacunación compulsoria. No obstante, alegan que sus derechos fueron "entregados" por la Decimoctava Asamblea Legislativa cuando aprobó la *Ley del Departamento de Seguridad Pública de Puerto Rico,* supra. Aun así, no han presentado un recurso ante nuestros foros judiciales que nos ponga en posición de emitir una determinación a estos efectos.

desconocimiento, nos resultan cónsonas con el intento de velar por el mejor bienestar de la ciudadanía.

Por otra parte, lo expresado por algunos compañeros de este Tribunal al determinar que la emergencia del COVID-19 ha disminuido o cesado me parece no tan solo irrazonable e irresponsable sino una lesión a la doctrina de separación de poderes. Como bien dispuso el Gobernador mediante sus Órdenes Ejecutivas, es el Secretario de Salud de Puerto Rico quien mejor está facultado para concluir si la pandemia está controlada o extinguida, y que hasta tanto esta declaración no ocurra el estado de emergencia se mantendrá vigente. Así pues, ¿qué conocimiento de salud o seguridad ostentamos nosotros como Tribunal Supremo para realizar una determinación como esta? Es mi parecer que al sugerir esta actuación somos nosotros los que usurpamos los poderes que no nos fueron delegados. Más aún, cuando se pretende declarar que la emergencia ha disminuido o culminado mediante un caso que su controversia se ha tornado académica.

Basta con observar en las calles, centros comerciales, supermercados, escuelas, universidades y otros lugares públicos como la población aún toma medidas protectoras, practican el distanciamiento social, utilizan las mascarillas, entre otras cosas. Para muchos la pandemia aún es un asunto delicado, de preocupación que no ha terminado. De un simple vistazo al Informe del Departamento de Salud de Puerto Rico podemos apreciar que aún nos enfrentamos a

niveles de transmisión elevados. No pretendemos pasar por alto el avance y la mejoría que ha tenido Puerto Rico y el resto del mundo en el manejo de la pandemia. No obstante, nos parece una transgresión a la doctrina de separación de poderes el pretender determinar de manera simplista en una Opinión que esta emergencia ha disminuido o concluido, más aún cuando la entidad que fue designada para tomar esta decisión presentó evidencia que demuestra lo contrario.

De igual forma, difiero de lo sugerido por algunos compañeros de este Tribunal que pretenden impartirle instrucciones al Poder Ejecutivo de cómo atender prospectivamente los asuntos referentes a la emergencia del COVID-19. El Gobernador de Puerto Rico cuenta con un equipo de trabajo experto en el tema, el Departamento de Salud, que le brindará los consejos necesarios para atender la emergencia, como lo ha hecho hasta este momento. No obstante, como mencioné anteriormente, la Asamblea Legislativa no está impedida de ejercer sus poderes y legislar sobre el asunto. Por el contrario, ambas ramas de gobierno pueden estar trabajando conjuntamente para atender la emergencia del COVID-19. No le corresponde al Poder Judicial obligar a las ramas de gobierno a trabajar colectivamente.

**V.**

De este modo, estoy conforme con el proceder de este Tribunal de revocar el dictamen emitido por el Tribunal de

Apelaciones por considerar que las controversias ante nuestra consideración se han tornado académica.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lourdes Amadeo Ocasio; Miguel Marrero, ambos por sí y en representación de sus hijos A.M.A., M.M.A. y otros<br><br>Recurridos<br><br>v.<br><br>Pedro Pierluisi Urrutia en su capacidad como Gobernador del Gobierno de Puerto Rico; Departamento de Salud, por conducto de su Secretario, Dr. Carlos Mellado López<br><br>Peticionarios | AC-2022-0070 |

Opinión de conformidad emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 16 de febrero de 2023.

La controversia que hoy atiende este Tribunal representaba el escenario ideal para que ejerciéramos nuestro rol y pautáramos normas claras en torno a la validez de las órdenes ejecutivas emitidas por el Gobernador de Puerto Rico durante una de las emergencias de salud pública de mayor envergadura en nuestra historia reciente.

En ese sentido, resultaba imperativo que precisáramos, de una vez y por todas, que el Gobernador de Puerto Rico posee la facultad de promulgar órdenes ejecutivas relacionadas con la emergencia del COVID-19 en aras de proteger el bienestar, la salud y la seguridad de las y los puertorriqueños. Además, correspondía que afirmáramos que,

en virtud de los poderes delegados y las leyes vigentes, el Ejecutivo puede encomendar válidamente ciertas facultades en el Secretario de Salud para que sea este quien recomiende las medidas apropiadas para combatir la pandemia del COVID-19 y sus variantes.

Empero, al prevalecer una perspectiva conservadora sobre la justiciabilidad y la academicidad de la controversia, la determinación de este Tribunal no alcanzó a validar la forma en que se promulgaron las órdenes ejecutivas en cuestión, así como tampoco su contenido sustantivo. En cambio, a la luz de mi visión liberal con respecto al principio de justiciabilidad, soy del criterio de que los cambios fácticos y jurídicos acaecidos en este caso no hacen de este recurso uno académico. Como veremos, estamos frente a una controversia viva y presente que exigía brindar certeza en nuestro ordenamiento jurídico en cuanto al requisito de vacunación compulsoria y el uso obligatorio de mascarillas como medidas para combatir la pandemia del COVID-19 y propiciar el retorno presencial a los centros educativos públicos y privados en Puerto Rico.

A pesar de esta divergencia de criterios, estoy de acuerdo con el efecto ulterior de la determinación a la que hoy arribamos, esto es, dejar sin efecto el dictamen del Tribunal de Apelaciones mediante el cual se concluyó que el Gobernador no tiene la capacidad de emitir orden alguna relacionada con la pandemia provocada por el COVID-19 que afecte los derechos y las obligaciones de la ciudadanía.

No obstante, toda vez que se mantienen en vilo las órdenes ejecutivas que el Primer Ejecutivo ha promulgado de tiempo en tiempo para atender la emergencia del COVID-19, me veo en la obligación de hacer constar que este Tribunal debió emitir una Opinión y ejercer su rol de pautar el Derecho y no limitarse a emitir una Sentencia. Me explico.

**I**

El 29 julio de 2021, un grupo compuesto por madres y padres de estudiantes de edad escolar, estudiantes universitarios y maestras y maestros de escuelas públicas y privadas (Demandantes) cuestionó la validez de la Orden Ejecutiva Núm. OE-2021-054 promulgada por el Gobernador de Puerto Rico, Hon. Pedro Pierluisi Urrutia (Gobernador), y de las Órdenes Administrativas Núm. OA-2021-508, OA-2021-508A y OA-2021-509, emitidas por el Secretario del Departamento de Salud de Puerto Rico, Dr. Carlos Mellado López (Secretario de Salud o Secretario).

En particular, los Demandantes plantearon que los mandatos establecidos a través de estas órdenes restringían el derecho constitucional de estos y sus hijos a la dignidad, a la integridad corporal, a la autodeterminación y al disfrute de la vida sin sujeción a coacción gubernamental. Además, arguyeron que a esa fecha no se justificaba que el Gobierno continuara imponiendo restricciones relacionadas al COVID-19 a través de decretos, sino que este debía acudir a la Asamblea Legislativa por imperativo del principio de la separación de poderes.

Para un mejor entendimiento de la controversia, examinemos brevemente el contenido de tales órdenes.

**A. Orden Ejecutiva Núm. OE-2021-054**

En esencia, mediante la Orden Ejecutiva Núm. OE-2021-054, se expuso que los estudios científicos validaban que las vacunas eran efectivas contra el COVID-19. Así las cosas, el Gobernador delegó en el Secretario de Salud "el poder de establecer las guías, directrices, protocolos y recomendaciones para atender —de forma particularizada por cada servicio, negocio, actividad o área, según sea necesario según el riesgo de contagio— la emergencia del COVID-19" y estableció que "las medidas adoptadas por el Secretario de Salud aplicarán a la población en general".[1] Lo anterior se fundamentó en que "aún continúa el estado de emergencia en todo Puerto Rico decretado para atender la pandemia, según declarado en el Boletín Administrativo Núm. OE-2020-020", por lo que, hasta que el Secretario determinara que la

_____

[1] Véase, Orden Ejecutiva Núm. OE-2021-054, pág. 3. Nótese que el Boletín Administrativo Núm. OE-2020-020 de 12 de marzo de 2020 continúa en vigor y, a su amparo, se decretó el primer "estado de emergencia" en todo Puerto Rico para atender el brote del COVID-19. Según surge de esta orden ejecutiva, tal actuación encontró apoyo en lo dispuesto en la Ley del Departamento de Seguridad Pública de Puerto Rico, infra, estatuto mediante el cual la Asamblea Legislativa le delegó al Gobernador la facultad para decretar un estado de emergencia o desastre. A raíz del estado de emergencia decretado, se facultó al gobierno a llevar a cabo todos los esfuerzos e implementar todas aquellas medidas necesarias para salvaguardar la salud pública ante la pandemia del COVID-19. Íd., pág. 1.

pandemia cesó o estaba controlada "dicha declaración de estado de emergencia se mantendrá vigente".[2]

**B. Órdenes Administrativas Núm. OA-2021-508, OA-2021-508A y OA-2021-509**

En virtud del poder delegado, el Secretario de Salud aprobó las Órdenes Administrativas Núm. OA-2021-508, OA-2021-508A y OA-2021-509 (Directrices de Salud) que aquí se impugnan. **Mediante estas, se ordenó, entre otros asuntos, el uso de mascarillas y la vacunación compulsoria contra el COVID-19 como requisitos para que el estudiantado mayor de doce (12) años y el personal docente regresaran de forma presencial a las escuelas o universidades.**

Es, pues, por razón de la Orden Ejecutiva Núm. OE-2021-054 y las Directrices de Salud que los Demandantes arguyeron que los mandatos instaurados mediante estas restringían sus derechos constitucionales. Además, alegaron que tales restricciones debían ser promulgadas por la Asamblea Legislativa, no por el Gobernador.

Con posterioridad a la Orden Ejecutiva Núm. OE-2021-054 y las Directrices de Salud, se promulgó la Orden Ejecutiva Núm. OE-2022-19 de 7 de marzo de 2022 y las Órdenes Administrativas Núm. OA-2022-53 de 8 de marzo de 2022 (Directriz 533)[3] y OA-2022-548 de 13 de septiembre de 2022

---

[2]Véase, Orden Ejecutiva Núm. OE-2021-054, pág. 3.

[3]Véase, http://www.salud.pr.gov/CMS/DOWNLOAD/5952 (última visita, 14 de febrero de 2023).

(Directriz 548),[4] las cuales eliminaron la política de vacunación y el uso de las mascarillas impugnado.

A la luz de estas, un sector de este Tribunal concluye que el recurso se tornó académico casi en su totalidad por motivo de la aprobación de esas normas.[5] **Difiero de esta conclusión.**

**II**

**A.**

Como es conocido, la academicidad es una de las doctrinas que autolimita la intervención judicial en una controversia. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011). Generalmente, se invoca la doctrina

---

[4]Véase, https://www.salud.gov.pr/CMS/DOWNLOAD/6576 (última visita, 14 de febrero de 2023).

[5]Además, aunque algunos miembros de este Tribunal correctamente reconocen la legitimación activa de los Demandantes para cuestionar la validez procesal y sustantiva de las órdenes ejecutivas en cuestión, se proyecta una visión limitante a esta doctrina. Discrepo de ello, principalmente, pues, desde la perspectiva de los Demandantes, existe un peligro potencial de que el Estado interfiera ilegítimamente con sus garantías constitucionales. Independientemente de la validez en los méritos de tal reclamo, el mecanismo de la sentencia declaratoria habilita **la impugnación de su faz** de las órdenes ejecutivas cuestionadas, controversia que venimos llamados a atender los tribunales. Véase, Senado de PR v. ELA, 203 DPR 62 (2019) (disponiéndose que la sentencia declaratoria es un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita"). (Negrillas suplidas). Íd., pág. 71 (citas omitidas); Rámos, Méndez v. García García, 203 DPR 379, 394 (2019) (estableciéndose que "[c]uando la causa de acción de presenta **en contra** de agencias y **funcionarios gubernamentales**, los tribunales interpretarán los criterios de la legitimación activa de manera más flexible y liberal"). (Negrillas y énfasis suplidos en el original). Íd., pág. 395.

como una norma que limita la intervención judicial en aras de "evitar el uso innecesario de los recursos judiciales e impedir precedentes que resulten superfluos". Íd.

Específicamente, la academicidad de una controversia surge cuando los cambios fácticos o judiciales ocurridos tornan ficticia su solución. Super Asphalt v. AFI y otro; 206 DPR 803, 816 (2021); Asoc. Fotoperiodistas v. Rivera Schatz, supra, págs. 932-933; Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 724-725 (1980). Dicho de otro modo, un caso no es justiciable —o sea, académico— en ausencia de una controversia real, o cuando, por alguna razón, el dictamen a emitirse no tendría efectos prácticos sobre el pleito existente. San Gerónimo Caribe Project v. A.R.Pe., 174 DPR 640, 652 (2008).

En ese sentido, una controversia puede tornarse académica cuando su condición viva cesa por el transcurso del tiempo, por lo que se hace innecesario el uso de los recursos judiciales en la emisión de un precedente superfluo que no provocará diferencia alguna en los intereses legales de las partes. U.P.R. v. Laborde Torres y otros I, 180 DPR 253, 281 (2010); Asoc. Fotoperiodistas v. Rivera Schatz, supra. Ahora bien, al evaluar la academicidad de un pleito, hay que centrarse en la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente. Véase, Super Asphalt v. AFI y otro, supra; Asoc. Fotoperiodistas v. Rivera Schatz, supra.

Además, "[e]n vista de que la justiciabilidad es una doctrina autoimpuesta, los propios tribunales deben preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permit[a] ejercer su discreción en cuanto al límite de su poder constitucional". Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 931 (citando a Smyth, Puig v. Oriental Bank, 170 DPR 73, 76 (2007) (Voto de conformidad del Juez Presidente Hernández Denton)).

Precisamente, esa introspección y evaluación debe ser constante. Por tanto, reitero que, bajo mi prisma liberal en torno a la autolimitación judicial por razones de justiciabilidad, es menester no perder de perspectiva las siguientes realidades: (1) que "[a]lgunos estados de Estados Unidos […], **al igual que Puerto Rico**, no tienen un requisito textual de caso o controversia en sus respectivas constituciones estatales"; (2) que algunos estados de los Estados Unidos "han rechazado incorporar las normas federales de justiciabilidad", y (3) que "las diferencias textuales, estructurales, históricas y funcionales entre nuestro ordenamiento jurídico y el federal" no pueden ser ignoradas totalmente al realizar una evaluación sobre justiciabilidad.[6] A fin de cuentas, tal autolimitación judicial se trata, más que todo, de una **norma de prudencia**

---

[6](Negrillas suplidas y énfasis en el original omitido). J. M. Farinacci Fernós, Cualquier persona: La facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria, 84 Rev. Jur. UPR 359, 366 (2015).

en cuanto a la intervención judicial en una controversia en particular.

Establecido lo anterior, resalto que el pleito ante nuestra consideración presenta controversias que tendrán un efecto real en el interés legal de las partes. **En consecuencia, esta controversia no es académica como interpreta un sector de este Tribunal.**

Por una parte, si bien a través de la Orden Ejecutiva Núm. OE-2022-019 y la Directriz 533 se eliminó el mandato de vacunación, esto no aplica a toda la población estudiantil en iguales términos.[7] A consecuencia de la Directriz 533, únicamente "[l]os estudiantes entre los cinco (5) a quince (15) años quedan exceptuados del requisito de vacunación compulsoria".[8] Esto, por sí solo, demuestra que la controversia ante nuestra consideración, en lo que respecta al mandato de vacunación compulsoria en aquellos estudiantes con 16 años o más, no es académica. En apoyo a lo que antecede, adviértase que en un Aviso importante [sobre los r]equisitos de vacunación para el curso escolar 2022-2023

---

[7]Según se indicó, la Directriz 548 eliminó el requisito del uso obligatorio de mascarillas. Tal y como expondremos más adelante, sostengo que el hecho de que ahora el uso de las mascarillas sea opcional no hace académica esta controversia en particular, pues son de aplicabilidad algunas de las excepciones a tal doctrina. Para una discusión al respecto, véase las págs. 11 a la 19 de esta Opinión de conformidad.

[8]Al igual que las órdenes y directrices predecesoras, se mantuvo la norma de que los estudiantes que tengan una excepción médica o religiosa no están obligados a cumplir con el requisito de vacunación compulsoria.

emitido por el Departamento de Salud, se reitera que "todos los estudiantes que se matriculen en cualquier institución del país pública o privada, deben tener administradas "[d]os (2) dosis de la vacuna contra el Covid-19 a partir de los 16 años en adelante".[9] Por tal razón, además, existe una controversia viva con respecto a aquellos estudiantes de 16 años o más que continúan con la obligación de cumplir con el mandato vigente de vacunación compulsoria. **Contrario al razonamiento de un sector de este Tribunal, esta no es la única controversia que mantiene su vigencia.**

Ello, pues, esta disputa tampoco se ha tornado académica en cuanto al cuestionamiento de los Demandantes sobre la validez de la facultad y la forma en que el Gobernador y el Secretario promulgaron la Orden Ejecutiva Núm. OE-2021-054 y las Directrices de Salud en cuestión. Ello, máxime, por razón de que, posterior a que se iniciara este pleito, se han aprobado una multiplicidad de órdenes análogas con el fin de modificar las medidas dirigidas a atender la emergencia del COVID-19. Lo expuesto contrasta directamente con la determinación del Tribunal de Apelaciones a los fines de que:

> [1] el Gobernador no está autorizado por [ley] para emitir orden alguna, relacionada con la pandemia provocada por el COVID-19, que afecte los derechos y obligaciones de terceros[,] y [2] el Secretario de Salud, en cuanto disponga sobre medidas que afecten los derechos y obligaciones de

---

[9]Véase, Aviso importante [sobre los] Requisitos de vacunación para el curso escolar 2022-2022, https://www.salud.gov.pr/CMS/DOWNLOAD/6220 (última visita, 14 de febrero de 2023).

terceros, deberá actuar de conformidad con el proceso dispuesto en la [Ley de Procedimiento Administrativo Uniforme, infra] sobre adopción de reglamentos.[10]

**Por ende, se mantiene vigente la interrogante relacionada con el poder que tiene el Gobernador para emitir órdenes ejecutivas en el contexto de la emergencia del COVID-19 y, si a la luz del poder conferido, este puede delegar ciertas facultades en el Secretario de Salud.**

**B.**

Por otra parte, ante el planteamiento de que algunas de las controversias se tornaron ficticias por el transcurso del tiempo, valga recordar que la doctrina de la academicidad no limita nuestras facultades revisoras absolutamente. En ese sentido, la academicidad en sí misma reconoce una serie de excepciones que nos permiten atender un caso que, de otro modo, técnicamente sería académico en cuanto a su resultado o efecto inmediato. P.P.D. v. Gobernador I, 139 DPR 643, 676 (1995).

Expuesto lo anterior, puntualizo que en la controversia de autos se configuran, a lo menos, dos (2) de las excepciones a la doctrina de la academicidad. Estas son, cuando: (1) la controversia es una cuestión recurrente o susceptible de volver a ocurrir, y (2) la situación de hechos ha sido cambiada por el demandado, pero no tiene visos de permanencia. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184

---

[10]Véase, Sentencia [del Tribunal de Apelaciones], pág. 30.

DPR 133, 151 (2011); U.P.R. v. Laborde Torres y otros I, supra.

Veamos, entonces, la aplicación de estas excepciones a los hechos de este caso.

### i. Cuestión recurrente

Primeramente, es norma reiterada por este Tribunal que la excepción de cuestión recurrente aplica si están presentes los requisitos siguientes: (1) la probabilidad de la recurrencia; (2) la identidad de las partes involucradas, y (3) la probabilidad de que el asunto sea capaz de evadir la revisión judicial. Véase, IG Builders et al. v. BBVAPR, 185 DPR 307, 334-335 (2012); Asoc. Fotoperiodistas v. Rivera Schatz, supra, pág. 934.

Si bien estos elementos se interrelacionan, "la probabilidad de la recurrencia […] es el **factor primario** en el proceso de concluir si una determinación afirmativa de academicidad promoverá la finalidad de la economía o autolimitación judicial".[11] Con menor prelación, le sigue el factor que exige la probabilidad de que el asunto sea capaz de evadir la revisión judicial, lo cual se manifiesta "con mayor frecuencia en aquellas controversias que son de por sí de muy corta duración".[12] Por último, y en cuanto a la identidad de las partes, basta con que sea "susceptible de surgir nuevamente aunque no sea entre los mismos

---

[11](Negrillas suplidas). Asoc. de Periodistas v. González, 127 DPR 704, 721 (1991) (citas omitidas).

[12]Íd.

protagonistas".[13] De concurrir estos factores, la excepción de cuestión recurrente salvaría un reclamo de un desafío de academicidad.

Bajo este marco, destaco que existe una probabilidad razonable de que el Gobernador o el Secretario de Salud, a la luz del surgimiento de nuevas variantes o de un alza exponencial en los contagios o fatalidades causadas por el COVID-19, reinstale una directriz relacionada con el uso obligatorio de la mascarilla en el plantel escolar y, entonces, se repita la controversia.[14] A tal efecto, existe una expectativa legítima de que los aquí Demandantes, el padre de un menor o algún maestro, se afecten por la imposición de las órdenes ejecutivas cuestionadas o aquellas de similar naturaleza que se implementen posteriormente.[15] Asimismo, toda vez que la reimposición del uso obligatorio de mascarillas puede responder a una estrategia a corto plazo del Ejecutivo dirigida a evitar la propagación de la pandemia

---

[13]Íd. (Énfasis suplido en el original omitido) (cita omitida).

[14]Para una referencia actualizada sobre el COVID-19 y sus nuevas variantes a nivel mundial, véase, Rastreador de datos del COVID de los Centros para el Control y la Prevención de Enfermedades, https://espanol-covid.cdc.gov/covid-data-tracker/#variant-summary (última visita, 14 de febrero de 2023).

[15]Dado el alto interés público y la estrecha relación entre lo cuestionado y ciertas garantías constitucionales de la más alta jerarquía, no es necesaria la observancia estricta de tal identidad. Lozada Tirado et al. v. Testigos Jehova, 177 DPR 893, 909 (2010) (citando a P.N.P. v. Carrasquillo, 166 DPR 70, 77 (2005)).

del COVID-19, es razonablemente plausible que esta se torne académica antes de que sea revisada por los tribunales.

Sobre el cumplimiento con este último requisito, adviértase que la pandemia del COVID-19 **ha requerido una modificación constante de las medidas implementadas,** lo cual potencializa que la polémica en torno al uso compulsorio de mascarillas eluda la adjudicación o revisión judicial. Como evidencia de lo anterior, destáquese que, en un periodo entre los dos (2) y tres (3) años desde que se decretó la primera orden ejecutiva relacionada con el COVID-19, **el Ejecutivo ha promulgado más de 60 órdenes** adicionales con fines análogos.[16]

**Siendo ello así, resulta indudable que la controversia relacionada con el uso de las mascarillas representa una cuestión susceptible de volver a ocurrir, por lo que esta no se ha tornado académica.**

### ii. Cesación voluntaria

Por su parte, la excepción de la cesación voluntaria sin visos de permanencia se fundamenta en que un caso es académico solo si: (1) puede asegurarse que la infracción alegada no volverá a ocurrir, y (2) los eventos ocurridos han erradicado completa e irrevocablemente los efectos de la infracción alegada. Véase, U.P.R. v. Laborde Torres y otros, supra, pág. 283. Ello se logra requiriendo a quien alegue la

---

[16]Véase, Órdenes Ejecutivas, Departamento de Estado, https://www.estado.pr.gov/en/executive-orders/ (última visita, 14 de febrero de 2023).

academicidad que demuestre afirmativamente que el cese de la conducta tiene un carácter permanente. Véase, <u>Asoc. Fotoperiodistas v. Rivera Schatz</u>, supra, pág. 938; <u>El Vocero v. Junta de Planificación</u>, 121 DPR 115, 124 (1988).[17]

A esos efectos, en <u>Tandon v. Newsom</u>, 141 S. Ct. 1294 (2021), el Tribunal Supremo federal precisó que el hecho de que una restricción del Estado por razón del COVID-19 sea dejada sin efecto durante el curso de un litigio "no necesariamente hace que el caso sea académico". Ello, pues, si la parte afectada "sigue estando bajo la constante amenaza de que los funcionarios gubernamentales usarán su poder para reinstaurar las restricciones cuestionadas", el reclamo puede superar la academicidad de la controversia.[18]

---

[17]Recuérdese que:

> El peso de la prueba recae en la parte que alega que el pleito es académico. Es decir, corresponde a ésta demostrar que el cambio de conducta para culminar la controversia es permanente y no es razonable esperar que revierta. En ese sentido, si la parte demandada puede probar que no existe una expectativa razonable de que la conducta impugnada se repita, entonces el caso es académico.

<u>U.P.R. v. Laborde Torres y otros I</u>, supra, págs. 283-284 (cita depurada).

[18](Traducción suplida). El texto íntegro lee como sigue:

> [E]ven if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case. And so long as a case is not moot, litigants otherwise entitled to emergency injunctive relief remain entitled to such relief where the applicants "remain under a constant threat" that government

Bajo este contexto, afirmo que, a pesar del levantamiento de la obligatoriedad en el uso de la mascarilla, este no tiene visos de permanencia. Como muestra de que la reimposición del uso de la mascarilla puede ocurrir en cualquier momento, detallo, primeramente, que el Departamento de Salud mantiene un Sistema de vigilancia de COVID-19 en instituciones educativas: Informe de casos activos de COVID-19 entre los miembros de las comunidades escolares y de las pruebas para la detección de COVID-19 en las escuelas K-12 (Sistema de Vigilancia o Informe de COVID-19 Escolar).[19]

Mediante este Informe de COVID-19 Escolar, el cual ha sido realizado desde etapas tempranas de la pandemia y se continúa preparando hasta el día de hoy, se contabiliza bisemanalmente el total de: (1) casos confirmados; (2) casos probables; (3) casos detectados por el sistema de vigilancia; (4) instituciones con brotes K-12; (5) brotes K-12 activos, y (6) casos asociados a brotes K-12. **Nótese que el último Informe de Covid-19 Escolar fue publicado tan reciente como el 20 de enero de 2023 y recopila las Semanas Epidemiológicas**

_____

officials will use their power to reinstate the challenged restrictions. Roman Catholic Diocese [of Brooklyn v. Cuomo], 592 U. S., at ----, 141 S.Ct. [63], at 68; see also High Plains Harvest Church *v.* Polis, 592 U. S. ----, 141 S.Ct. 527, 208 L.Ed.2d 503 (2020).

Íd., pág. 1297.

[19]Véase,    https://www.salud.gov.pr/CMS/DOWNLOAD/7221 (última visita, 14 de febrero de 2023).

**del 1 al 7 de enero de 2023 y del 8 al 14 de enero de 2023.**

**Ello, sin duda alguna, es prueba fehaciente de que el**

**Departamento de Salud continúa con "la recolección**

**sistemática, continua, oportuna y confiable de los datos, y**

**el análisis e interpretación de estos, para la toma de**

**decisiones y su diseminación".[20]**

Lo anterior, junto con el hecho de que aún se mantiene vigente la declaración de emergencia del COVID-19,[21] propende a que, ante un repunte exponencial en los casos de COVID-19, se reinstale fácilmente la obligatoriedad del uso de la mascarilla para prevenir y detener la propagación del virus. Máxime cuando la flexibilización del uso de la mascarilla entró en vigor el pasado 13 de septiembre de 2022 y, según surge de la propia orden administrativa, fue producto de la baja tasa porcentual de contagiados en ese entonces.[22]

---

[20](Negrillas y énfasis suplidos). Íd., pág. 3.

[21]Refiérase al esc. 1 de esta Opinión de conformidad (haciéndose alusión a la Orden Ejecutiva Núm. OE-2020-020, la cual sigue vigente y constituyó la primera declaración de emergencia del COVID-19. Tal declaración de emergencia, incluso, ha sido reafirmada consecuentemente hasta la actualidad).

[22]Específicamente, la Directriz 548 dispuso lo siguiente:

> Con la presente Orden Administrativa, enmendamos la OA Núm. 2020-533, para eliminar la obligatoriedad del uso de la mascarilla en las instituciones educativas en la Isla. Entendemos que **las iniciativas a favor de la vacunación, así como el porciento de personas que ha sido contagiada durante los pasados meses,** permite que se pueda flexibilizar este requisito.

(Negrillas suplidas). Íd., pág. 4.

Lo que es más, el Ejecutivo no rebatió el peso de la prueba en cuanto a que el uso de la mascarilla en las escuelas o universidades no volverá a ser requerido porque la reinstauración de tal restricción, tal y como ha sido siempre, dependerá de que las circunstancias particulares del COVID-19 y su evolución lo exijan.

**Ante la imposibilidad de que exista garantía alguna con respecto a la no reimposición del uso de mascarillas mientras subsista la emergencia del COVID-19, el cese acaecido no hace académica esta controversia. No puede ser de otra forma.**

Recordemos que las excepciones a la doctrina de la academicidad adquieren una prominencia mayor cuando se trata de controversias como la de autos en las que existe un alto interés público, se pretende proteger los intereses de la justicia y están en juego cuestiones constitucionales de la más alta jerarquía. Rosa Lydia Vélez v. Departamento de Educación, 209 DPR 79, 98 (2022) (citando a Consejo de Titulares v. Chamah Martínez, 202 DPR 173, 218 (2019) (Voto particular disidente del Juez Asociado Señor Estrella Martínez); Pueblo v. Jorge Moreu, 201 DPR 799, 812 (2019) (Voto particular disidente del Juez Asociado Señor Estrella Martínez); Com. de la Mujer v. Srio. de Justicia, supra, pág. 725).

Así las cosas, afirmo nuevamente que las normas de autolimitación judicial constituyen un ejercicio de prudencia, pero estas no pueden servir de impedimento, y

mucho menos de excusa, para otorgar remedios judiciales adecuados, completos y oportunos en controversias como la que nos ocupa. Máxime cuando su aplicabilidad errónea provoca la activación de las consecuencias negativas que precisamente persiguen evitar las excepciones de la doctrina de la academicidad.

Procedía, entonces, que declaráramos que la controversia era justiciable y, consecuentemente, la atendiéramos en sus méritos. Toda vez que no se adoptó ese curso de acción correcto, expongo las razones por las que, de forma fundamentada, revocaría el dictamen del foro apelativo intermedio.

## III

Según adelantado, el Tribunal de Apelaciones invalidó la forma en que las órdenes ejecutivas y directrices administrativas fueron promulgadas por el Gobernador y el Secretario de Salud, respectivamente. El foro apelativo intermedio razonó que la fuente de ley en la que se apoyaron tales órdenes —esto es, la Ley del Departamento de Seguridad Pública de Puerto Rico, infra,— no contiene un principio inteligible, por lo que el Gobernador no está autorizado a emitir orden alguna que afecte derechos de terceros al amparo de esta ley. De este modo, concluyó que toda reglamentación de aplicación a la ciudadanía debía realizarse mediante la aprobación de un reglamento conforme a Derecho. **Discrepo de este raciocinio.**

**A.**

Como parte del principio de separación de poderes que rige en nuestro ordenamiento jurídico, al Primer Ejecutivo se le delegó, entre otros deberes, funciones o atribuciones, el poder de "[c]umplir y hacer cumplir las leyes". Art. IV, Secc. 4, Const. PR, LPRA, Tomo 1. En la práctica, una de las herramientas utilizadas por el Gobernador para instrumentar tales poderes delegados son las órdenes ejecutivas.[23]

En ese sentido, resulta incuestionable la facultad que posee el Gobernador para emitir órdenes ejecutivas. Rodríguez Ramos et al. v. ELA et al., 190 DPR 448, 463-464 (2014); Otero de Ramos v. Srio. de Hacienda, 156 DPR 876, 892 (2002) (disponiéndose que "un gobernador tiene el poder inherente de emitir órdenes ejecutivas"). Ahora bien, la promulgación de tales órdenes tiene que realizarse a tenor con los poderes conferidos por la Constitución o una ley.[24]

Cónsono con ello, la Asamblea Legislativa históricamente ha delegado debidamente en el Poder Ejecutivo poderes de naturaleza cuasilegislativa para la atención de

---

[23]J. M. Farinacci Fernós, Las órdenes ejecutivas, el poder legislativo y las emergencias, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR 190, 192 (2020).

[24]Para un análisis detallado sobre los poderes del gobernador y el uso de las órdenes ejecutivas como instrumento de acción del Ejecutivo, véase, W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. UPR 951 (2007).

ciertas emergencias, las cuales, dicho sea de paso, suelen ser atendidas mediante órdenes ejecutivas.[25]

De hecho, tan reciente como en el 2017, se aprobó la Ley del Departamento de Seguridad Pública de Puerto Rico, Ley Núm. 20-2017, 25 LPRA sec. 3501 et seq. (Ley del Departamento de Seguridad Pública). En virtud de esta ley se facultó al Gobernador para que, en situaciones de emergencia,[26] este así pueda decretarlo mediante orden ejecutiva. Específicamente, se estableció que, "[e]n situaciones de emergencia o desastre, **el Gobernador de Puerto Rico podrá decretar**, **mediante proclama**, **que existe un estado de emergencia** o desastre, según sea el caso, en todo el territorio de Puerto Rico o en parte del mismo".[27]

_____

[25]Véase, a modo de ejemplo, la **Ley sobre declaración de epidemias**, infra. Asimismo, refiérase a la **Ley de procedimientos para situaciones o eventos de emergencia**, Ley Núm. 76-2000, 3 LPRA sec. 1941 (disponiéndose la flexibilización de ciertas medidas "**[d]urante el periodo de tiempo que dure una emergencia así declarada mediante Orden Ejecutiva por el Gobernador de Puerto Rico**" en aras de salvaguardar la vida, la salud y el bienestar de la ciudadanía). (Negrillas suplidas). Íd.

[26]Esta ley define emergencia como sigue:

> Significa cualquier situación o circunstancia para la cual sean necesarios los esfuerzos estatales y municipales encaminados a salvar vidas y proteger propiedades, la salud y seguridad pública, o para minimizar o evitar el riesgo de que ocurra un desastre en cualquier parte de Puerto Rico.

25 LPRA sec. 3643(e). Para la definición de desastre, refiérase a la sec. 3643(c).

[27](Negrillas suplidas). 25 LPRA sec. 3650.

Por medio del Art. 5.10 de la Ley del Departamento de Seguridad Pública, supra, se dotó al Ejecutivo de ciertos poderes extraordinarios para atender la emergencia así declarada.[28] Así pues, la intención clara de la Asamblea Legislativa es, y siempre ha sido, facultar al Gobernador para que este pueda actuar con mayor flexibilidad y eficiencia en aquellas circunstancias que motivan la promulgación de una orden ejecutiva decretando una emergencia.

No cabe duda de que la pandemia del COVID-19 está cobijada por la definición de emergencia estatuida en la Ley del Departamento de Seguridad Pública, supra. Más allá de la amplitud de su definición, la intención de la Asamblea Legislativa ha sido tan evidente que, el 5 de abril de 2020, aprobó la Ley Núm. 35-2020 con el propósito de penalizar el incumplimiento de la ciudadanía a una orden ejecutiva del Gobernador estableciendo un decreto de emergencia o desastre. Véase, 25 LPRA sec. 3654(e). Según surge de la Exposición de Motivos, la enmienda aludida respondió al interés del Estado de que no se "obvi[en] las medidas dispuestas por el Gobierno de Puerto Rico en protección de sus ciudadanos **con el fin de evitar la propagación del virus**".[29]

---

[28]Véase, Íd., sec. 3650.

[29](Negrillas suplidas). Íd., pág. 1.

Evidentemente, contrario a lo resuelto por el Tribunal de Apelaciones, la Asamblea Legislativa, en virtud de la Ley del Departamento de Seguridad Pública, supra, facultó válidamente al Gobernador para que este emita una orden ejecutiva declarando una emergencia y le confirió ciertos poderes extraordinarios para atenderla. Ello, con el fin de que "los ciudadanos [tengan] la confianza de que, en caso de una emergencia, el Gobierno estatal estará disponible y listo para prestarle **auxilio inmediato y adecuado** para salvar su vida, su salud, su familia y su propiedad".[30]

Aclarado este extremo, procedo a exponer porqué las órdenes ejecutivas promulgadas por el Gobernador se ubican dentro de la facultad que se le delegó a través de la Ley del Departamento de Seguridad Pública, supra.

**B.**

En el pasado, este Tribunal ha examinado controversias relacionadas con la validez de los poderes cuasilegislativos delegados al Ejecutivo en virtud de una ley bajo la doctrina de la delegación de poderes.[31]

Al así hacerlo, reiteradamente se ha validado la delegación de poderes por parte de la Asamblea Legislativa al Ejecutivo siempre y cuando: (1) medie un principio

---

[30] (Negrillas suplidas). Exposición de Motivos de la Ley del Departamento de Seguridad Pública, supra, pág. 2.

[31] Nótese que este análisis es independiente, y sin perjuicio, de los criterios establecidos en la esfera federal a partir de Youngstown Sheet & Tube Co. V. Sawyer, 343 US 579 (1952).

inteligible; (2) el Poder Ejecutivo actúe dentro de los parámetros conferidos en la ley habilitadora, y (3) las actuaciones ejecutivas no resulten arbitrarias o caprichosas. Sánchez et al. v. Depto. Vivienda et al., 184 DPR 95, 119-122 (2011); Domínguez Castro et al. v. E.L.A. I, 178 DPR 1, 93 (2010).[32]

La determinación de si cierta legislación en cuestión contiene un principio inteligible requiere un "análisis caso a caso en el que se ausculte la delegación conferida y los criterios establecidos por el legislador". Sánchez et al. v. Depto. Vivienda et al., supra, pág. 122. Ahora bien, reitérese que:

> [N]ada impide que la Legislatura apruebe una ley con unas "normas generales que sean amplias y que dejen al [Ejecutivo] un adecuado margen de libertad para complementar las normas legislativas mediante la utilización de un juicio especializado, que se pueda desarrollar conforme a un análisis, apreciación y

---

[32]Al respecto, el profesor Jorge M. Farinacci Fernós, expone lo siguiente:

> Para que una delegación sea constitucionalmente válida, esta debe cumplir con ciertas exigencias. Entre estas podemos identificar: (1) que se trate de un poder delegable, (2) que, en efecto, se haya llevado a cabo la delegación, (3) que se acompañen suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado, (4) que la entidad a la que se le otorga el poder actúe dentro de los límites establecidos por la ley, y (5) que el ejercicio de dicho poder no sea arbitrario o caprichoso.

J. M. Farinacci Fernós, Las órdenes ejecutivas, el poder legislativo y las emergencias, supra.

discreción [ejecutiva] que tenga una base de razonabilidad.[33]

Es por esto que, consecuentemente, hemos dispuesto que los criterios del principio inteligible "no tienen que ser expresos, pueden surgir, inclusive, del historial legislativo y pueden ser amplios y generales; si tiene un fin o interés público, por lo general es suficiente justificación para que se sostenga la delegación". (Énfasis suplido en el original). Domínguez Castro et al. v. E.L.A. I, supra (citando a Viajes Gallardo v. Clavell, 131 DPR 275 (1992); M. & B.S., Inc. V. Depto. de Agricultura, 118 DPR 319 (1987); Hernández Montero v. Cuevas, 88 DPR 785 (1963); López v. Junta de Planificación, 80 DPR 646 (1958); Hiltons Hotels v. Junta de Salario Mínimo, 74 DPR 670 (1953); Luce & Co. v. Junta de Salario Mínimo, 62 DPR 452 (1944)).

Generalmente, la delegación al Ejecutivo de poderes cuasilegislativos culmina con la aprobación de un reglamento legislativo con fuerza de ley y de aplicación general. Sin embargo, nada impide que, "[s]i, en efecto, la Asamblea Legislativa ha delegado debidamente [al Gobernador] poderes cuasi-legislativos, [este] pued[a] ejercerlos a través de

---

[33]Domínguez Castro et al. v. E.L.A. I, supra, pág. 94. Apréciese que el planteamiento sobre la alegada delegación inconstitucional de poderes en Domínguez, según el profesor William Vázquez Irizarry, fue resuelto "de manera cónsona con la práctica de dar una lectura en extremo generosa al estatuto impugnado para así identificar los principios **inteligibles** que validan la delegación". (Negrillas en el original). W. Vázquez Irizarry, Derecho administrativo, 80 Rev. Jur. UPR 637, 663 (2011) (citando a Demetrio Fernández Quiñones, Derecho administrativo y ley de procedimiento administrativo uniforme 33-54 (2da ed. 2001)).

una orden ejecutiva. Se trata del equivalente de un reglamento legislativo adoptado por una agencia administrativa".[34] **Eso, precisamente, fue lo que ocurrió en el caso de autos.**

Nos corresponde, entonces, evaluar si la actuación del Gobernador al delegar en el Secretario de Salud la imposición del mandato de vacunación compulsoria y el uso obligatorio de la mascarilla como medidas para atender la emergencia del COVID-19 en las escuelas y universidades, encuentra apoyo en los poderes delegados por la Asamblea Legislativa al Ejecutivo. Adelanto que sí. Veamos.

**IV**

Según expuesto, a través de la Ley del Departamento de Seguridad Pública, _supra_, se delegó en el Gobernador la facultad de, mediante orden ejecutiva, declarar un estado de emergencia.

De conformidad con la Orden Ejecutiva Núm. OE-2021-054 impugnada por los Demandantes, su promulgación se realizó al amparo del Art. 5.10, de la Ley del Departamento de Seguridad Pública, _supra_, la cual dota al Ejecutivo para que, en momentos de emergencia, cuente con los poderes siguientes:

> b) **Podrá dictar**, enmendar y revocar **aquellos reglamentos y emitir**, enmendar y rescindir **aquellas órdenes** que estime convenientes

---

[34]J. M. Farinacci Fernós, Las órdenes ejecutivas, el poder legislativo y las emergencias, supra, pág. 193. Véase, además, W. Vázquez Irizarry, Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas, supra, pág. 1052 (estableciéndose que "[l]a orden ejecutiva emitida conforme a una facultad dispuesta en ley constituye, al igual que la adopción de un reglamento por una agencia, un ejercicio de poderes delegados por la Asamblea Legislativa").

**para regir durante el estado de emergencia** o desastre. **Los** reglamentos dictados **u órdenes emitidas durante un estado de emergencia** o desastre **tendrán fuerza de ley mientras dure dicho estado de emergencia** o desastre.
(c) Podrá darle vigencia a aquellos reglamentos, órdenes, planes o medidas estatales para situaciones de emergencia o desastre o variar los mismos a su juicio.[35]

De lo anterior surge diáfanamente que la Asamblea Legislativa actuó para otorgar al Gobernador el poder de emitir, modificar y revocar reglamentos y órdenes durante un estado de emergencia. 25 LPRA sec. 3650(b). Asimismo, predispuso que aquellos reglamentos u órdenes promulgados a tenor con la facultad conferida en el estatuto antes citado, tendrán fuerza de ley entre las partes. Íd.

Los parámetros provistos por la Asamblea Legislativa fueron amplios. Al examinar la Ley del Departamento de Seguridad Pública, _supra_, vemos que se facultó al Gobernador para que emitiera aquellas órdenes "que estime convenientes" durante una emergencia, así decretada mediante orden ejecutiva, y lo habilitó para modificarlas a su discreción. 25 LPRA sec. 2650 (b)-(c).

Ahora bien, recordemos que la Ley del Departamento de Seguridad Pública, _supra_, se promulgó con el propósito de que "el Gobierno estatal est[é] disponible y listo para prestarle auxilio inmediato y adecuado para salvar [la] vida [y] [la] salud" de la ciudadanía en casos de _emergencia_ o

---

[35] (Negrillas y énfasis suplidos). 25 LPRA 3650.

desastre.[36] La propia definición de emergencia también fue construida en términos amplios, ya que aplica a "cualquier situación o circunstancia para la cual sean necesarios los esfuerzos estatales y municipales encaminados a salvar vidas y proteger propiedades, la salud y seguridad pública […]". 25 LPRA sec. 3643(e).

Indubitablemente, el COVID-19 se ubica entre ese tipo de situaciones de emergencia que requieren esfuerzos por parte del Ejecutivo para salvaguardar vidas y proteger la salud y seguridad pública. **Si bien sería deseable una mayor especificidad en este principio inteligible, se sostiene su validez dado a la preeminencia del interés público que se pretende proteger mediante la política general legislativa contenida en la Ley del Departamento de Seguridad Pública, supra.** Lo contrario —es decir, exigir un marco legislativo detallado como condición para validar las acciones tomadas— potencialmente ataría de manos al Ejecutivo en la atención de la multiplicidad de emergencias que pueden surgir, atentándose así contra el auxilio inmediato y adecuado que procura brindar la ley.

Así pues, en virtud de la Orden Ejecutiva Núm. OE-2021-054 impugnada, la cual fue debidamente promulgada en virtud de la Ley del Departamento de Seguridad Pública, supra, se continuó con la política de la adopción de medidas compulsorias y, además, se delegó en el Secretario de Salud

---

[36]Exposición de Motivos de la Ley del Departamento de Seguridad Pública, supra, pág. 2.

la promulgación de directrices específicas para combatir la pandemia del COVID-19. A tenor con ello, el Secretario de Salud emitió la Orden Administrativa Núm. OA-2021-509, la cual dispone que para que un algún estudiante de doce (12) años o más pueda asistir de forma presencial a la escuela o universidad, este tendrá que estar vacunado contra el COVID-19 y usar mascarilla.

Sin embargo, el Tribunal de Apelaciones sostuvo que el Secretario de Salud no contaba con esta facultad por razón de que su promulgación no se hizo conforme a los parámetros de reglamentación tradicionales delineados en la Ley de procedimiento administrativo uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9601 et seq. (LPAU).

Empero, esta conclusión pasa por alto que la autoridad del Ejecutivo para delegar en el Secretario de Salud ciertas particularidades en el manejo de la epidemia del COVID-19 emana tanto del poder horizontal que tiene el Gobernador para instrumentar su poder constitucional de cumplir y hacer cumplir las leyes, como también de múltiples leyes debidamente aprobadas por la Asamblea Legislativa. Véase, Art. IV, Secc. 4, Const. PR, LPRA, Tomo 1.

En ese sentido, según expone la propia Orden Ejecutiva Núm. OE-2021-054, tal delegación también está autorizada por la Ley sobre declaración de epidemias, Ley Núm. 157 de 10 de mayo de 1938, 24 LPRA sec. 354 et seq., y la Ley orgánica del Departamento de Salud, Ley Núm. 81 de 14 de marzo de 1912, 3 LPRA sec. 171 et seq.

Así pues, la Ley sobre declaración de epidemias, supra, reconoce el poder del Gobernador para actuar mediante órdenes ejecutivas en caso de una epidemia y, específicamente, designa al Secretario de Salud como el funcionario que tendrá a cargo la respuesta del Estado mientras dure la emergencia.[37]

Además, las Secs. 5 y 6 del Art. V de la Constitución de Puerto Rico y la Ley orgánica del Departamento de Salud, supra, disponen que el Secretario de Salud es el oficial ejecutivo a cargo del Departamento de Salud y tiene a su cargo todos los asuntos que por ley se le encomienden relacionados con la salud, sanidad y beneficencia pública. Particularmente, el Art. 5 de la ley antes citada dispone que, en caso de que alguna emergencia amenace la salud en Puerto Rico, "el Secretario de Salud tomará las medidas que juzgue necesarias para combatirla". 3 LPRA sec. 175. Como parte de estas medidas, la Ley orgánica del Departamento de Salud, supra, específicamente reconoce el poder del Secretario de emitir, derogar y enmendar reglamentos con el fin de, entre otros, prevenir epidemias y proteger la salud pública. Íd., sec. 179. Consecuentemente, también reconoce la vacunación obligatoria como una medida para combatir una epidemia. Id., sec. 353.

---

[37]Véase, Orden Ejecutiva Núm. OE-2021-054, pág. 2. En síntesis, la **Ley sobre declaración de epidemias**, supra, dispone que, "**[c]uando una epidemia sea declarada en uno o varios municipios, mediante proclama del Gobernador de Puerto Rico, el Secretario de Salud se hará cargo inmediatamente de la declaración de la epidemia** […]". (Negrillas supplidas). Íd.

Por su parte, la Ley de inmunizaciones a niños preescolares y estudiantes, Ley Núm. 25 de 25 de septiembre de 1983, 24 LPRA sec. 182 et seq., establece el requisito de vacunación compulsoria para todos los estudiantes en los centros educativos del País como condición para la asistencia a clases presenciales y delega en el Secretario la autoridad y el deber de establecer para cuáles enfermedades se exigirá la inoculación obligatoria. 24 LPRA secs. 182, 182a, 182i.

**Apréciese que, más allá del poder de razón del Estado inherente al Gobernador para manejar una emergencia de salud pública en circunstancias extraordinarias, consecuentemente la Asamblea Legislativa le ha conferido amplios poderes al Ejecutivo a través de la aprobación de, entre otras, las diversas leyes antes discutidas.**

Evidentemente, la delegación realizada por el Gobernador en la figura del Secretario de Salud para que sea este último quien —con su juicio especializado y en virtud de la data científica disponible— precise la razonabilidad del uso de mascarilla y la vacunación compulsoria como medidas para combatir el COVID-19, constituyó un ejercicio válido de los amplios poderes conferidos al Ejecutivo mediante la Ley del Departamento de Seguridad Pública, supra. Recordemos, pues, que, para propósitos de la doctrina de la delegación de poderes, es el Ejecutivo quien, con su

experiencia y conocimientos especiales, puede implementar la política general que inspira la ley antes citada.[38]

Para ello, contrario a lo dispuesto por el foro apelativo intermedio, **resulta deseable, mas no indispensable**, la promulgación de un reglamento conforme a Derecho. En ese sentido, sujetar al Gobernador al cumplimiento obligatorio con un reglamento similar a lo exigido por la LPAU, supra, o a que los poderes políticos aprueben una ley en específico, podría causar consecuencias nefastas para la salud pública. Ello, además, atentaría contra la intención legislativa de la Ley del Departamento de Seguridad Pública, supra, a los efectos de que el Gobernador pueda brindar una respuesta rápida ante la emergencia existente, sin sujeción al requerimiento de la

---

[38]Refiérase a lo dispuesto por este Tribunal al analizar la doctrina de la delegación de poderes:

> [L]a legislatura está imposibilitada de anticipar legislativamente, en forma detallada, minuciosa o específica, la multiplicidad de situaciones que puedan surgir de esas relaciones complejas, siendo suficiente el que la ley en cuestión señale o establezca normas amplias y generales que sirvan de guía o dirección a entidades administrativas expertas, para que éstas, con su experiencia y conocimientos especiales, apliquen esas normas concretamente a los hechos que puedan surgir y ultimen los detalles que implementen la política general legislativa.

Hiltons Hotels v. Junta de Salario Mínimo, supra, págs. 692-693. Nótese que estos pronunciamientos fueron reiterados tan recientes como en el 2011 en Sánchez et al. v. Depto. Vivienda et al., supra, págs. 119-122 (2011).

aprobación de un reglamento de conformidad con lo dispuesto

en la LPAU, supra.[39]

_____

[39]Adviértase que, pocos meses después del inicio de la emergencia del COVID-19, el entonces Secretario de Salud, Dr. Lorenzo González Feliciano, promulgó el Reglamento para establecer medidas preventivas para el manejo de la pandemia del COVID-19 y multas administrativas por incumplimiento, Reglamento Núm. 9210 de 21 de agosto de 2020. Mediante este, entre otras medidas preventivas, se dispuso que "toda persona natural deberá" cubrir "su nariz y su boca en todo momento mediante el uso de mascarillas mientras se encuentre fuera del hogar". Íd., pág. 3. El cuerpo normativo antes aludido fue aprobado como un reglamento de emergencia, a tono con lo dispuesto en la Sec. 2.13 de la LPAU, supra, por lo que su entrada en vigor empezó a regir sin dilación alguna.                                    Véase, https://cfpr.org/files/Reglamento%20Num.%209210.pdf (última visita, 14 de febrero de 2023).

Luego de que se cumpliera con los requisitos tradicionales exigidos al aprobarse un reglamento dispuestos en la LPAU, se aprobó un nuevo reglamento que derogó al anterior, y el cual entró en vigor el verano pasado. Véase, Reglamento para establecer las medidas preventivas para el manejo de la pandemia del COVID-19 y multas administrativas por incumplimiento con las mismas, Reglamento Núm. 9376 de 30 de mayo de 2022, https://www.salud.gov.pr/CMS/DOWNLOAD/5882 o https://aldia.microjuris.com/wp-content/uploads/2022/05/9376.pdf (última visita, 14 de febrero de 2023).

Si bien una búsqueda en la página digital del Departamento de Salud demuestra que el Reglamento Núm. 9376 sigue en vigor, el actual Secretario de Salud, mediante la Declaración de política pública sobre el reglamento 9376 para establecer las medidas preventivas para el manejo de la pandemia del covid-19 y multas administrativas por incumplimiento con las mismas, Carta Circular Núm. 2022-010 de 6 de mayo de 2022, aclaró que "no se estará ejecutando el presente reglamento" por haber cesado las circunstancias que propiciaron su promulgación. Refiérase a, https://www.salud.gov.pr/menuInst/download/1318 (última visita, 14 de febrero de 2023).

No obstante, no consta ante nos certeza de su derogación, pues el último registro encontrado se limita a un Aviso al público con el fin de anunciar que el 27 de mayo de 2022 se celebraría una vista pública para atender la derogación del Reglamento Núm. 9376. Accédase vía,

En ese sentido, la imposición del mandato de vacunación y el uso de mascarillas como requisitos de admisión presencial escolar o universitario constituyen medidas para contrarrestar la propagación del virus COVID-19 y garantizar el bienestar, la seguridad y la salud de la ciudadanía. Dicho de otro modo, corresponden a un interés apremiante del Estado. Toda vez que, según surge de la Orden Ejecutiva Núm. OE-2021-054 y las Directrices de Salud impugnadas estuvieron basadas en la evidencia científica disponible en ese momento, estas no son arbitrarias ni caprichosas.

**Sobre esto último, adviértase que la implantación de órdenes para controlar la emergencia del COVID-19 tiene que guardar una relación estricta con el interés que se persigue lograr.**

Por su pertinencia, hacemos eco de las expresiones realizadas por el Magistrate Judge del Tribunal Federal para el Distrito de Puerto Rico, Hon. Marcos E. López, al emitir un Report and Recommendation en un caso relacionado con, entre otros asuntos, la impugnación de unas órdenes ejecutivas y administrativas relacionadas al COVID-19 emitidas en virtud de la Ley del Departamento de Seguridad Pública, supra. Específicamente, en Tropical Chill Corp. v. Pierluisi Urrutia, 2022 WL 2374976, (D. P.R. 2022), tras analizar la delegación de poderes estatuida en la ley antes citada, el Magistrate Judge expresó lo siguiente:

---

https://www.salud.gov.pr/CMS/DOWNLOAD/6110 (última visita, 14 de febrero de 2023).

> A word of caution, however, is in order. **The grant of power to the Governor must be closely tied to the scientific and factual evidence triggering the state of emergency.** Where "local officials are actively shaping their response to changing facts on the ground" and "[w]hen those official undertake [] to act in areas fraught with medial and scientific uncertainties, their latitude must be especially broad." S. Bay United Pentecostal Church, 140 S. Ct. at 1613 (Roberts, C.J., concurring). We now know much more about COVID-19 and the virus that causes it than when S. Bay Pentecostal Church was decided in May 2020. As more knowledge is gained about the pandemic, scientific uncertainty may become less of a justification for expansive government powers and the curtailing of rights.[40]

Ciertamente, para que se sostenga la validez de las restricciones o los mandatos impuestos por el Gobernador estos deben estar estrechamente relacionados con la evidencia científica y factual que generan el estado de emergencia.

A pesar de lo aquí expuesto, nada impide que la Asamblea Legislativa promueva la legislación que estime adecuada y necesaria bajo los métodos de aprobación ordinarios y extraordinarios reconocidos por la Constitución de Puerto Rico. Ahora bien, la ausencia de esa aprobación no puede conducirnos a pautar un limbo jurídico en una situación que persiste a nivel mundial y local con la consecuencia de que se nulifiquen los poderes legítimamente delegados por la Asamblea Legislativa al Ejecutivo para una ágil atención de

---

[40] (Negrillas suplidas). Íd., pág. 25. Destáquese que, posteriormente, tal Report and Recommendation fue adoptado y validado por el Chief Distric Judge, Hon. Raúl M. Arias-Marxuach. Véase, Tropical Chill Corp. v. Pierluisi Urrutia, 2022 WL 2712538, (D. P.R. 2022).

la emergencia del COVID-19. Ello operaría en detrimento de la Ley del Departamento de Seguridad Pública, <u>supra</u>, y, peor aún, daría un golpe en la médula de los poderes del Gobernador para atender una emergencia y promulgar aquellas medidas necesarias en protección de la seguridad, el bienestar y la salud de la ciudadanía.

**V**

**Ante ese cuadro, los fundamentos expuestos en esta <u>Opinión de conformidad</u> evidencian que estamos ante una controversia justiciable y un asunto de alto interés público que amerita revocar al Tribunal de Apelaciones. En ese aspecto estoy conforme. Ahora bien, consigno el <u>caveat</u> de que también debimos ejercer nuestro rol de pautar el Derecho y revocar en los méritos al Tribunal de Apelaciones, mediante una Opinión fundamentada. Al no ser ese el curso de acción, se abona a que la única certeza sobre los poderes del Ejecutivo y el curso futuro de la pandemia del COVID-19 es, hasta el día de hoy, la incertidumbre.**

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Lourdes Amadeo Ocasio; Miguel
Marrero, ambos por sí y en
representación de sus hijos
A.M.A., M.M.A. y otros

      Recurridos

        v.

Pedro Pierluisi Urrutia en su
capacidad como Gobernador del
Gobierno de Puerto Rico;
Departamento de Salud, por
conducto de su Secretario, Dr.
Carlos Mellado López

      Peticionarios

AC-2022-0070

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 16 de febrero de 2023.

Estamos conformes con la *Sentencia* que hoy emite este Tribunal, en la cual se revoca el dictamen suscrito por el foro apelativo intermedio. Ahora bien, dada la importancia de los asuntos ante nuestra consideración, entendemos necesario emitir la presente *Opinión de Conformidad*.

Y es que, en esta ocasión nos correspondía delimitar el alcance de las facultades que tiene un gobernante para promulgar determinadas órdenes ejecutivas. Ello, en el contexto de cierta emergencia que se vivió en el País como consecuencia de la pandemia del COVID-19.

Cuál es la naturaleza del documento que se conforma a esos fines; cómo se llega a la aprobación de éste; por cuánto tiempo se extiende su vigencia; cuáles son los potenciales conflictos que, tras su aprobación, -- y en virtud de la doctrina de separación de poderes --, se pueden generar con las otras ramas de gobierno; son las consideraciones que, a nuestro juicio, estábamos llamados a atender para, con ello, adjudicar correctamente los asuntos traídos ante nuestra consideración en el presente caso. Veamos.

I.

Allá para el 29 de julio de 2019, la Sra. Lourdes Amadeo Ocasio y el Sr. Miguel Marrero, -- por sí y en representación de sus hijos menores de edad A.M.A. y M.M.A. -- y otros (en conjunto, "matrimonio Marrero Amadeo") instaron ante el Tribunal de Primera Instancia una demanda en contra del Hon. Pedro Pierluisi Urrutia, en su capacidad oficial como Gobernador del Estado Libre Asociado de Puerto Rico (en adelante, "Gobernador de Puerto Rico"), y del Dr. Carlos Mellado López, en su capacidad de Secretario del Departamento de Salud de Puerto Rico (en adelante, "Secretario de Salud" y, en conjunto, "ELA"). En esta, a grandes rasgos, el matrimonio Marrero Amadeo cuestionó la constitucionalidad de la Orden Ejecutiva OE-2021-054 y de las Órdenes Administrativas Núm. OA-2021-508, OA-2021-508A y OA-2021-509, mediante las cuales el Primer Ejecutivo

implementó ciertas medidas restrictivas en respuesta a la situación de salud pública que se vivía en el País como consecuencia de la pandemia del COVID-19.

En específico, el matrimonio Marrero Amadeo señaló que, mediante la Orden Ejecutiva OE-2021-054, el Gobernador de Puerto Rico le delegó al Secretario de Salud amplios poderes para adoptar aquellas medidas necesarias **-- las cuales vincularían a toda la población --** con el fin de atender la pandemia del COVID-19. Precisó que, en virtud del mencionado poder delegado, el Secretario de Salud ordenó la vacunación compulsoria en contra del COVID-19 para el estudiantado mayor de 12 años, así como para el personal docente y no docente, como medida para combatir la pandemia y propiciar el retorno presencial a las escuelas, universidades y centros educativos públicos y privados.

En ese contexto, el matrimonio Marrero Amadeo arguyó, entre otras cosas, que el Gobernador de Puerto Rico, mediante sus continuas actuaciones, -- en particular, al implementar una política pública sobre vacunación compulsoria --, infringió el principio de separación de poderes consagrado en la Constitución del Estado Libre Asociado de Puerto Rico. Ello, pues, a su juicio, -- en el momento en que se emitían tales directrices -- habían cesado las circunstancias extraordinarias que justificaban prescindir de la intervención de la Asamblea Legislativa

en la emergencia. En igual tono, el referido matrimonio señaló que dichas actuaciones eran contrarias a lo dispuesto en la *Federal Food, Drug, and Cosmetic Act* (FDAC), 21 U.S.C. sec. 301 *et seq.*, la cual, a su entender, ocupaba el campo y transgredían derechos constitucionales fundamentales como, por ejemplo, el derecho a la dignidad, a la integridad corporal, a la autodeterminación, a la educación y al disfrute de la vida en sociedad sin sujeción a coacción gubernamental alguna.

Es, pues, por todo ello, que el matrimonio Marrero Amadeo solicitó al foro primario que se emitiera una sentencia declaratoria en la que se decretara la inconstitucionalidad de la Orden Ejecutiva OE-2021-054 y, en consecuencia, mediante el mecanismo de interdicto se paralizaran los efectos de las directrices emitidas por el Gobernador de Puerto Rico por virtud de las referidas órdenes ejecutivas, específicamente, el requisito de vacunación compulsoria como condición para lograr acceso a determinados servicios. Asimismo, requirió que se ordenara al Secretario de Salud el cese y desista de la implementación de dicha política pública, y que se le compensara con una suma no menor de $70,000.00 por concepto de daños morales, angustias mentales, violación de derechos civiles, más honorarios de abogado.

Evaluada la demanda presentada por el matrimonio Marrero Amadeo, el 29 de julio de 2021 el Tribunal de

Primera Instancia notificó una *Orden y Citación* mediante la cual señaló una vista para el 3 de agosto de 2021, en la cual se dilucidaría si procedía o no el remedio interdictal solicitado. Entretanto, el foro primario emitió una *Resolución y Orden* mediante la cual denegó la petición de cierta orden de entredicho provisional presentada por el matrimonio Marrero Amadeo.

Así las cosas, el 3 de agosto de 2021 -- fecha en que se celebró la vista de interdicto -- el ELA -- en representación del Gobernador de Puerto Rico y el Secretario de Salud -- presentó una *Moción de desestimación*. En síntesis, sostuvo que las controversias pendientes ante el Tribunal de Primera Instancia no eran justiciables. Sustentó dicha alegación en que el matrimonio Marrero Amadeo carecía de legitimación activa para incoar la demanda, pues no había demostrado haber sufrido un daño particular, claro y palpable como consecuencia de lo dispuesto en la Orden Ejecutiva OE-2021-054 y su progenie. Por lo tanto, el ELA arguyó que, como cuestión de derecho, era improcedente el remedio extraordinario del interdicto solicitado por el referido matrimonio.

En la alternativa, el ELA rechazó la contención del matrimonio Marrero Amadeo a los efectos de que la Orden Ejecutiva OE-2021-054 era inconstitucional por infringir el principio de separación de poderes. Al respecto, indicó que, debido a que Puerto Rico aún se encontraba bajo el

estado de emergencia decretado para atender la pandemia del COVID-19, el Gobernador de Puerto Rico había actuado dentro de sus prerrogativas estatutarias al promulgar la referida Orden Ejecutiva, es decir, de conformidad con las facultades que le fueron delegadas mediante la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*. En esa línea, sostuvo la razonabilidad de las medidas implementadas ante el interés apremiante del Estado en salvaguardar y proteger la salud, seguridad y vida de la ciudadanía.

Enterado de lo anterior, el matrimonio Marrero Amadeo presentó una *Oposición a moción de desestimación*. En esencia, sostuvo que la vigencia del requisito de vacunación compulsoria impuesto mediante decreto representaba una amenaza a varios de sus derechos fundamentales consagrados en nuestra Carta Magna, lo que suponía un daño real, concreto y no especulativo, por lo que ostentaba legitimación activa para incoar la demanda. En consonancia, el matrimonio Marrero Amadeo aseguró que concurrían los elementos necesarios para que el foro primario expidiera el remedio interdictal solicitado.

Evaluados los planteamientos de ambas partes, el Tribunal de Primera Instancia dictó una *Sentencia* mediante la cual desestimó la demanda instada por el matrimonio Marrero Amadeo. Lo anterior, tras razonar que éste no logró acreditar el haber sufrido, o que sufriría, un daño

particularizado e irreparable como consecuencia de lo dispuesto en las órdenes impugnadas.

En particular, el foro primario concluyó que la Orden Ejecutiva OE-2021-054 emitida por el Gobernador de Puerto Rico y las Órdenes Administrativas OA-2021-508, OA-2021-508A y OA-2021-509 promulgadas por el Secretario de Salud constituyeron un ejercicio válido de la autoridad delegada por la Asamblea Legislativa a dichos funcionarios públicos para atender y mitigar la emergencia del COVID-19. Precisó, además, que la autoridad del Poder Ejecutivo para emitir las referidas órdenes dimana de lo dispuesto en el Artículo IV, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico, *infra*, el Art. 6.10 de la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*, la Ley Núm. 157 de 10 de mayo de 1938, *infra*, la *Ley Orgánica del Departamento de Salud*, *infra*, y la Ley Núm. 25 del 25 de septiembre de 1983, *infra*.

Así pues, tras aplicar un escrutinio estricto, el Tribunal de Primera Instancia, en ese momento, determinó que el mandato de vacunación compulsoria para el estudiantado y el personal de las instituciones educativas en el País -- incluyendo el uso de mascarillas, lavado frecuente de manos, distanciamiento físico, entre otras -- constituyó una medida necesaria para adelantar el interés apremiante del Estado de proteger la salud pública, garantizar efectivamente la educación, mitigar los efectos

nocivos de la pandemia del COVID-19 y alcanzar -- finalmente -- la inmunidad de rebaño en nuestra jurisdicción. Además, -- y luego de advertir que el poder del gobierno no es irrestricto ni tan siquiera en un estado de emergencia como el provocado por la pandemia del COVID-19 --, el foro primario sentenció que el mandato de vacunación compulsoria era el medio menos oneroso para alcanzar los objetivos gubernamentales antes mencionados. Consecuentemente, dispuso que no existían razones que justificaran expedir el remedio extraordinario del interdicto.

Inconforme con el proceder del Tribunal de Primera Instancia, el matrimonio Marrero Amadeo acudió al Tribunal de Apelaciones. En resumen, adujo que el foro primario había errado al concluir, en clara abstracción del principio de separación de poderes, que las actuaciones del Gobernador de Puerto Rico y del Secretario de Salud constituían un ejercicio válido de la autoridad delegada por ley. Asimismo, impugnó la determinación del Tribunal de Primera Instancia respecto a la validez de la política de vacunación obligatoria impuesta por el ELA.

Vista la comparecencia del matrimonio Marrero Amadeo, el 18 de marzo de 2022 el ELA solicitó la desestimación del recurso de apelación. En resumen, explicó que la política de vacunación compulsoria se había eliminado mediante la aprobación de la Orden Ejecutiva OE-2022-019 y

la Orden Administrativa OA-2022-533. Así pues, sostuvo que las controversias relacionadas con el presente litigio se habían tornado académicas.

Oportunamente, el matrimonio Marrero Amadeo se opuso a la petición del ELA. En su escrito, indicó que las controversias no se habían tornado académicas ya que, al amparo de la Orden Ejecutiva OE-2022-019, aún subsistía un estado de emergencia en Puerto Rico y, por consiguiente, se mantenían vigentes ciertas medidas dirigidas a evitar la propagación del COVID-19 como, por ejemplo, el mandato del uso de mascarillas. Además, apuntó que el Artículo 5.10 de la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*, -- disposición legal en la cual el Gobernador de Puerto Rico apoyaba su autoridad para emitir las referidas órdenes ejecutivas -- era inconstitucional por adolecer de vaguedad y amplitud. Lo anterior, pues, a juicio del referido matrimonio, la mencionada disposición estatutaria le otorgó poderes irrestrictos al Primer Ejecutivo en situaciones de emergencia y le permitió continuar gobernando por decreto sin la intervención de la Asamblea Legislativa.

Posteriormente, el ELA presentó su alegato en oposición al recurso de apelación. En suma, reiteró sus planteamientos anteriores a los efectos de que las órdenes ejecutivas impugnadas fueron promulgadas por el Gobernador de Puerto Rico y el Secretario de Salud de conformidad con

la autoridad que le fue delegada por la Asamblea Legislativa para atender el estado de emergencia provocado por la pandemia del COVID-19.

Tras analizar los alegatos de ambas partes, el Tribunal de Apelaciones notificó una *Sentencia.* En primer lugar, descartó que la controversia se hubiese tornado académica. Ello, al sentenciar que, en la demanda, se impugnó la forma -- mediante órdenes ejecutivas y órdenes administrativas -- en que el Poder Ejecutivo había promulgado las directrices para atender la emergencia desde el inicio de la pandemia del COVID-19, así como el contenido de éstas -- en particular, el requisito de vacunación compulsoria --, controversias que no habían advenido académicas.

En segundo lugar, el foro apelativo intermedio señaló que el Tribunal de Primera Instancia actuó correctamente al desestimar las causas de acción sobre interdicto y daños. Esto, pues, a juicio del foro de referencia, el matrimonio Marrero Amadeo no alegó haber sufrido un daño irreparable que justificara la concesión del mencionado remedio extraordinario ni ningún daño específico y concreto que pudiese ser resarcible.

No obstante, el Tribunal de Apelaciones dispuso que el foro primario erró al concluir que la controversia de epígrafe no era justiciable y, con ello, denegar la solicitud sobre sentencia declaratoria presentada por el

matrimonio Marrero Amadeo. Dicho foro razonó que existían intereses legales adversos entre las partes objeto del presente litigio con relación al requisito de vacunación y al uso obligatorio de mascarillas. Por lo tanto, resolvió que el matrimonio Marrero Amadeo ostentaba legitimación activa para presentar una petición de sentencia declaratoria como la que aquí nos ocupa.

En tercer lugar, y ya aclarados los asuntos jurisdiccionales, el Tribunal de Apelaciones validó la política sobre vacunación compulsoria impuesta por el ELA para atender la pandemia del COVID-19. Al así hacerlo, apuntó que las medidas cuestionadas no lesionaban ningún derecho fundamental y adelantaban el interés legítimo del Estado de mitigar la propagación del COVID-19.

Sin embargo, y no empece a lo antes sentenciado, el foro apelativo intermedio determinó que las directrices promulgadas por el Poder Ejecutivo, las cuales inciden en la conducta de toda la ciudadanía y de terceras personas, no fueron decretadas conforme a derecho. Sobre el particular, subrayó que el Artículo 5.10 de la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*, el cual faculta al Gobernador de Puerto Rico a decretar un estado de emergencia mediante una proclama y a dictar, enmendar y revocar aquellos reglamentos que estime convenientes para atender dicha emergencia, es sumamente amplio y no limita de forma alguna el poder del Primer

Ejecutivo. Al respecto, resolvió que el artículo de referencia suponía una total e inválida abdicación del Poder Legislativo a favor del Gobernador en completo detrimento del principio de separación de poderes consagrado en nuestra Constitución.

En esa línea, el Tribunal de Apelaciones apuntó que, "a dos años y medio de haber comenzado la pandemia", el tipo de emergencia que justificaba las actuaciones del Poder Ejecutivo mediante decreto y sin la intervención de la Asamblea Legislativa había culminado. Véase, Apéndice del recurso de apelación, pág. 1157. En consecuencia, concluyó que, pasada la emergencia, la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*, no faculta al Gobernador de Puerto Rico a emitir órdenes ejecutivas relacionadas con la pandemia del COVID-19 que afecten los derechos y las obligaciones de terceras personas.

En esa dirección, el foro apelativo intermedio sentenció que aquellas órdenes ejecutivas que hubiesen sido promulgadas de forma contraria a lo previamente dispuesto no tendrían efecto alguno a partir del domingo, 31 de julio de 2022.

Insatisfecho con el dictamen del Tribunal de Apelaciones, el ELA compareció ante nos mediante un *Recurso de Apelación* y *Urgente moción en auxilio de jurisdicción*. En suma, además de cuestionar la jurisdicción del foro *a quo*, señaló que éste incidió al concluir que el Artículo

5.10 de la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra*, no faculta al Gobernador de Puerto Rico a emitir órdenes ejecutivas para atender la emergencia provocada por la pandemia del COVID-19.

El 22 de julio de 2022 una Sala de Verano de este Tribunal acogió la apelación presentada por el ELA como un recurso de *certiorari*, por ser el vehículo procesal adecuado.[1] Así las cosas, declaró ha lugar la *Urgente moción en auxilio de jurisdicción* presentada también por el ELA y, en consecuencia, ordenó la paralización de los efectos de la *Sentencia* emitida por el Tribunal de Apelaciones, hasta que esta Curia tuviera la oportunidad de expresarse sobre los méritos de los asuntos traídos ante nuestra consideración.

En el interín, el 17 de agosto de 2022, en ánimo de vindicar sus prerrogativas legislativas, la Cámara de Representantes de Puerto Rico presentó ante este Tribunal una *Moción para solicitar autorización para comparecer como amicus curiae*. A juicio del referido cuerpo legislativo, las órdenes ejecutivas que desde marzo de 2020 pretenden regular la conducta de personas privadas -- naturales y jurídicas --, exceden los límites de ese mecanismo y genera una genuina controversia sobre separación de poderes que amerita nuestra intervención.

---

[1] Sala de verano compuesta por el Juez Asociado señor Martínez Torres, la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señores Rivera García y Colón Pérez.

En específico, la Cámara de Representantes de Puerto Rico alega que, si bien concurre con el Poder Ejecutivo respecto a la necesidad de establecer esquemas regulatorios para proteger a la ciudadanía de los efectos de la primera pandemia decretada en más de un siglo, no está de acuerdo con utilizar las órdenes ejecutivas para tales fines. Lo anterior, por entender que dicha actuación invade las prerrogativas de la Asamblea Legislativa. En esa dirección, el referido cuerpo legislativo apunta que, superada la etapa más crítica de la emergencia de salud, el presente recurso presenta una acción justiciable para reiterar los linderos firmemente establecidos entre el Poder Ejecutivo y el Poder Legislativo.

Evaluada la referida solicitud, el 28 de octubre de 2022 emitimos una *Resolución* mediante la cual declaramos con lugar la *Moción para solicitar autorización para comparecer como amicus curiae* presentada por la Cámara de Representantes de Puerto Rico. Además, en la referida resolución le concedimos al matrimonio Marrero Amadeo un término de veinte (20) días para que mostrara causa por la cual no debíamos revocar la *Sentencia* del Tribunal de Apelaciones.

En cumplimiento con lo ordenado, el 30 de noviembre de 2022 el matrimonio Marrero Amadeo compareció ante nos mediante *Alegato en oposición a recurso de apelación*. En éste, en primer lugar, descarta la contención del ELA

respecto a que carece de legitimación activa para instar la acción de sentencia declaratoria. Sobre el particular, el matrimonio Marrero Amadeo arguye que desde el inicio del presente litigio ha impugnado los poderes que le otorga la *Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra,* al Gobernador de Puerto Rico para gobernar por decreto sin la intervención de la Asamblea Legislativa.

En específico, insiste en que la delegación de poderes irrestricto al Gobernador de Puerto Rico mediante el estatuto de referencia ha permitido que éste continúe emitiendo órdenes ejecutivas que han incidido y que mantienen su capacidad de incidir sobre la vida privada y los derechos fundamentales de la ciudadanía. Lo anterior pues, a juicio del matrimonio Marrero Amadeo, aun cuando se eliminó el mandato de vacunación, subsiste la declaración de emergencia. "[P]or lo tanto, [a su modo de ver] queda abierta la puerta para que puedan decretarse órdenes futuras a esos fines: ya sea por un aumento significativo de casos, por el surgimiento de nuevas variantes del virus o por cualquier otra consideración que el Gobernador [de Puerto Rico] estime necesaria para 'enfrentar' la 'emergencia', según reza la [*Ley del Departamento de Seguridad Pública de Puerto Rico*, *infra]*". Véase, Alegato en oposición a recurso de apelación, pág. 3.

Trabada así la controversia, este Tribunal expidió el recurso ante nos y, con el beneficio de la comparecencia de todas las partes con interés en el litigio, revocó el dictamen emitido por el foro apelativo intermedio. Como ya adelantamos, estamos conformes con dicho proceder. Explicamos por qué.

## II.

Como cuestión de umbral, y previo a disponer del caso que nos ocupa, debíamos, en primer lugar, atender aquellos posibles señalamientos relacionados a la justiciabilidad de este asunto, para así determinar: 1) si la controversia ante nuestra consideración se había tornado académica[2] y 2) si el matrimonio Marrero Amadeo poseía, o no, legitimación activa para presentar la petición de sentencia declaratoria objeto del presente litigio.

Como es sabido, en nuestra jurisdicción los tribunales estamos llamados a atender únicamente aquellas controversias que sean justiciables. *P.I.P. v. E.L.A. et al.*, 186 DPR 1, 11 (2012); *Lozada Sánchez et al. v. JCA*, 184 DPR 898, 916 (2012); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 931 (2011). Es decir, conforme a esta doctrina adoptada por vía jurisprudencial, los tribunales

---

[2] Si bien ninguna de las partes del presente litigio ha argumentado que el mismo se ha tornado académico, es norma bien establecida que "los propios tribunales debe[mos] preguntar[nos] y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que [nos] permita ejercer [nuestra] discreción en cuanto al límite de [nuestro] poder constitucional". *Smyth, Puig v. Oriental Bank*, 170 DPR 73, 76 (2007).

sólo debemos intervenir en controversias genuinas y vivas, donde existan intereses opuestos y que, al resolverse, tengan efecto sobre las relaciones jurídicas entre las partes en el pleito. *Lozada Sánchez et al. v. JCA*, *supra*, pág. 913; *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*; *Noriega v. Hernández Colón*, 135 DPR 406, 421 (1994). Dicho de otro modo, para el ejercicio válido del poder judicial se requiere la existencia de una caso o controversia real. *P.I.P. v. E.L.A. et al.*, *supra*; *U.P.R. v. Laborde Torres y otros I*, 180 DPR 253, 279-280 (2010); *Noriega v. Hernández Colón*, *supra*, pág. 420.

Por ello, hemos señalado que no será justiciable aquella controversia en la que: 1) se trata de resolver una cuestión política; 2) una de las partes carece de legitimación activa; 3) después de comenzado un pleito, hechos posteriores lo convierten en académico; 4) las partes buscan obtener una opinión consultiva, o 5) se promueve un pleito que no está maduro. *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, pág. 932; *U.P.R. v. Laborde Torres y otros I*, *supra*, pág. 280; *Cruz v. Administración*, 164 DPR 341, 348 (2005).

A.

Como se desprende de lo anterior, la academicidad constituye una de las manifestaciones del principio de justiciabilidad, la cual acota los límites de la función judicial. *Torres Santiago v. Depto. Justicia*, 181 DPR 969,

982 (2011); *U.P.R. v. Laborde Torres y otros I*, *supra*, pág. 280; *Angueira v. J.L.B.P.*, 150 DPR 10, 19 (2000). En esencia, esta limitación sobre el poder de los tribunales procura evitar el uso innecesario de los recursos judiciales; asegurar que haya la adversidad suficiente para que las controversias se presenten y defiendan competente y vigorosamente, y evitar precedentes innecesarios. *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, pág. 932; *Torres Santiago v. Depto. Justicia*, *supra*; *U.P.R. v. Laborde Torres y otros I*, *supra*, pág. 281.

En consonancia con ello, en el pasado hemos señalado que un caso es académico cuando el paso del tiempo o los cambios fácticos o judiciales acaecidos durante el trámite judicial causan que el pleito pierda su carácter adversativo, es decir, que torna en ficticia su solución. *Lozada Sánchez et al. v. JCA*, *supra*, págs. 912-913; *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, págs. 932-933; *Torres Santiago v. Depto. Justicia*, *supra*. Conforme a ello, "una controversia puede convertirse en académica cuando su condición viva cesa por el transcurso del tiempo". *U.P.R. v. Laborde Torres y otros I*, *supra*, pág. 281.

En esa línea, esta Curia ha sentenciado que, al examinar si una controversia se ha tornado en académica, es menester evaluar "la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente". *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*,

pág. 933 citando a *P.P.D. v. Gobernador I*, 139 DPR 643, 676 (1995). Es decir, al realizar el referido ejercicio lo tribunales debemos considerar los eventos anteriores, próximos y futuros, para dirimir si su condición de controversia viva y presente subsiste con el transcurso del tiempo. *Torres Santiago v. Depto. Justicia*, *supra*, págs. 982-983; *U.P.R. v. Laborde Torres y otros I*, *supra*; *Cruz v. Administración*, *supra*, pág. 349.

Lo anterior, pues, de determinarse que ha desaparecido el carácter adversativo entre los intereses de las partes involucradas en el pleito, los tribunales pierden su jurisdicción y, por lo tanto, están impedidos de intervenir.[3] *U.P.R. v. Laborde Torres y otros I*, *supra*; *Cruz v. Administración*, *supra*; *C.E.E. v. Depto. de Estado*, 134 DPR 927, 935 (1993). Por ello, y como norma general, los tribunales tienen el deber de desestimar aquellos pleitos académicos, entiéndase, esos casos en los cuales "los hechos o el derecho aplicable ha[n] variado de tal forma que ya no existe una controversia vigente entre

---

[3] Ahora bien, esta Curia ha reconocido "una serie de excepciones a la doctrina de academicidad que permiten la consideración de un caso que, de otro modo, resultaría académico en cuanto a su resultado o efecto inmediato". *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*, pág. 933 citando a *P.P.D. v. Gobernador I*, *supra*. Entre las excepciones a la doctrina de academicidad se encuentran las siguientes: 1) cuando se trata de una controversia recurrente y capaz de evadir revisión judicial; 2) cuando el demandado ha modificado la situación de hechos, pero no tiene visos de permanencia, y 3) cuando aspectos de la controversia se han tornado académicos, pero subsisten consecuencias colaterales que tienen vigencia y actualidad. *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 933 (2011); *U.P.R. v. Laborde Torres y otros I*, 180 DPR 253, 281 (2010); *Moreno v. Pres. U.P.R. II*, 178 DPR 969, 974 (2010).

partes adversas". *Moreno v. Pres. U.P.R. II*, 178 DPR 969, 974 (2010) citando a *P.N.P. v. Carrasquillo*, 166 DPR 70, 75 (2005).

**Realizado el ejercicio antes descrito, y en lo que a la causa de epígrafe se refiere, bastaba con señalar que las órdenes ejecutivas que generaron todas las controversias que motivaron el presente litigio aún mantienen su vigencia. Véase, a modo de ejemplo Boletín Administrativo Núm. OE-2020-020 de 12 de marzo de 2020; Boletín Administrativo Núm. OE-2021-054 de 1 de julio de 2021; Boletín Administrativo Núm. OE-2022-019 de 7 de marzo de 2022; Orden Administrativa Núm. 2022-533 de 8 de marzo de 2022; Orden Administrativa Núm. 2022-548 de 13 de septiembre de 2022.** Lo anterior, por sí solo hacía que el caso ante nuestra consideración no fuera uno académico.

De forma específica, la Orden Ejecutiva Núm. OE-2020-020 es aquella mediante la cual el Poder Ejecutivo declaró un estado de emergencia en todo Puerto Rico respecto a la pandemia del COVID-19, y a través de la cual se han implementado -- mediante otras órdenes ejecutivas -- una serie de medidas para controlar los contagios producidas por ésta, -- tales como: 1) cuarentena; 2) distanciamiento físico; 3) uso obligatorio de mascarillas; 4) cernimiento contra el COVID-19 en varios sectores; 5) vacunación obligatoria; 6) evidencia de resultado negativo de pruebas de detención de COVID-19, y 7) limitación de aforo en

ciertos establecimientos comerciales --, aún mantiene su vigencia. Boletín Administrativo Núm. OE-2020-020 de 12 de marzo de 2020. Es, precisamente, de esta última orden ejecutiva de la cual se derivan las controversias que estábamos llamados a atender.

B.

Atendido aquello relacionado al tema de la academicidad, y en aras de auscultar si el matrimonio Marrero Amadeo poseía, o no, legitimación activa para presentar la petición de sentencia declaratoria objeto del presente litigio, -- asunto también concerniente al principio de justiciabilidad -- conviene comenzar esta parte de nuestro análisis recordando que la sentencia declaratoria es un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 109 (2020), citando a *Senado de PR v. ELA*, 203 DPR 62, 71 (2019), que a su vez cita a *Alcalde de Guayama v. ELA*, 192 DPR 329, 333 (2015). **En particular, "[l]a sentencia declaratoria es aquella que se dicta en un proceso en el cual los hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y**

**contribuir a la paz social".** (Énfasis suplido). *Beltrán Cintrón et al. v. ELA et al.*, *supra*, pág. 109, citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, Ed. LexisNexis, 2017, pág. 623.

En nuestro ordenamiento jurídico, es la Regla 59 de Procedimiento Civil, 32 LPRA Ap. V, la que regula todo lo concerniente al recurso extraordinario de sentencia declaratoria. De forma específica, la Regla 59.1 de Procedimiento Civil, *supra*, le confiere facultad al tribunal para que declare derechos, estados y otras relaciones jurídicas independientemente de que se solicite o pueda solicitarse otro remedio. Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V.

Respecto a quiénes podrán hacer uso del referido mecanismo remedial, la Regla 59.2(a) de Procedimiento Civil, *supra*, preceptúa que el mismo estará disponible para aquellas personas "cuyos derechos, estado[s] u otras relaciones jurídicas fuesen afectados por un estatuto, ordenanza municipal, un contrato o una franquicia". Regla 59.2(a) de Procedimiento Civil, *supra*. Al respecto, precisa señalar que los escenarios antes reseñados no limitan o restringen la facultad de los foros inferiores para emitir una sentencia o un decreto "en cualquier procedimiento en que se solicite un remedio declaratorio", siempre que ello

ponga fin a una controversia o despeje una incertidumbre.
Regla 59.2(c) de Procedimiento Civil, *supra*.

Así, por ejemplo, esta Curia ha expresado que "el mecanismo de sentencia declaratoria es el adecuado para adjudicar controversias de índole constitucional […] y, conforme a la doctrina prevaleciente, debe utilizarse cuando permite finalizar situaciones de incertidumbre o inseguridad en cuanto a derechos". *Suárez v. C.E.E. I*, 163 DPR 347, 354 (2004). Véase, además, *Asoc. de Periodistas v. González*, 127 DPR 704, 723-724 (1991). **Por ello, se ha sugerido que el mecanismo de sentencia declaratoria es el adecuado para impugnar o cuestionar una orden ejecutiva emitida por el Gobernador de Puerto Rico**. W. Vázquez Irizarry, *Los poderes del Gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 Rev. Jur. UPR 951, 1061 (2007).

En ese sentido, mediante el mecanismo de sentencia declaratoria, las personas afectadas por situaciones de incertidumbre e inseguridad en cuanto a sus derechos podrán solicitar al foro primario lo siguiente: a) que decida sobre cualquier divergencia en la interpretación o validez de un estatuto, ordenanza, contrato o franquicia y, además, b) que dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven. Véase, Regla 59.1 de Procedimiento Civil, *supra*.

Además, y ya más en lo relacionado a la controversia de índole jurisdiccional que nos ocupa, este Tribunal ha sentenciado que la parte que solicita una sentencia declaratoria está sujeta al cumplimiento de los criterios de legitimación activa. *Mun. Fajardo v. Srio. Justicia et al.,* 187 DPR 245, 254-255 (2012); *Romero Barceló v. E.L.A.,* 169 DPR 460, 475 (2006); *Sánchez et al. v. Srio. de Justicia et al., supra,* pág. 384. En consecuencia, el promovente de la acción deberá demostrar que: 1) ha sufrido un daño claro y palpable; 2) el daño es real, inmediato y preciso, no abstracto e hipotético; 3) existe una conexión entre el daño sufrido y la causa de acción ejercitada, y 4) la causa de acción surge al palio de la Constitución o de una ley. *Hernández, Santa v. Srio. de Hacienda,* 208 DPR 727 (2022); *Ramos, Méndez v. García García, supra,* págs. 394-395; *Bathia Gautier v. Gobernador,* 199 DPR 59, 69 (2017).

Sobre el particular, cabe mencionar que esta Curia ha expresado que, en el contexto de una acción en contra de funcionarios gubernamentales, los criterios de legitimación activa deben interpretarse de manera flexible y liberal para la parte promovente del pleito. *Ramos, Méndez v. García García, supra,* pág. 395; *Bhatia Gautier v. Gobernador, supra,* págs. 69-70; *Asoc. de Maestros v. Srio. de Educación,* 156 DPR 754, 765 (2002).

En esa dirección, y de conformidad con la naturaleza y propósitos que se persigue con la sentencia declaratoria,

hemos dispuesto que, para que dicho mecanismo sea justiciable, la controversia entre las partes que tengan intereses legales adversos debe ser sustancial, entiéndase, "de suficiente inmediación, madurez y realidad para que hagan aconsejables el remedio declaratorio". *Moscoso v. Rivera*, 76 DPR 481, 492 (1954). Es decir, debe demostrarse que los intereses de la justicia serán bien servidos y que la sentencia que en su día se dicte será efectiva y adecuada. *Íd.*, pág. 494.

Establecido lo anterior, y como ya anticipamos, en el caso de autos, el ELA -- como primer señalamiento de error -- sostiene que el matrimonio Marrero Amadeo carece de legitimación activa para solicitarle al Tribunal que emita una sentencia declaratoria que establezca derechos o estados y otras relaciones jurídicas en el marco de las controversias traídas ante su consideración. No le asiste la razón.

Y es que, de los hechos procesales que dan margen a este caso, claramente se desprende que la solicitud de sentencia declaratoria realizada por el matrimonio Marrero Amadeo se hizo a los únicos fines de cuestionar la validez -- procesal y sustantiva -- de las órdenes ejecutivas promulgadas por el Gobernador de Puerto Rico en el contexto de la pandemia del COVID-19, las cuales por sus propios términos obligan a la ciudadanía en general, incluyendo a éstos. Órdenes que, a todas luces, y como bien plantea el

referido matrimonio -- de no establecer en tiempo los derechos, estados y obligaciones jurídicas, si alguna, que se derivan de la misma -- pudieran llegar al punto de afectar su empleo y/o los servicios educativos que reciben sus hijos. No podemos cuestionar que se trata aquí de intereses legales adversos.

Es, precisamente, la sentencia declaratoria, -- por definición --, el mecanismo idóneo para disponer de este tipo de controversia. Ostenta, pues, el matrimonio Marrero Amadeo legitimación activa para instar tal petición ante los tribunales.

Aclarado los asuntos jurisdiccionales de umbral, pasamos a exponer el derecho aplicable a la controversia sustantiva que nos ocupa.

## III.

Como es sabido, el Artículo I, Sección 2 de nuestra Carta Magna dispone que "[e]l gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 273. De esta forma, desde la aprobación de la Constitución del Estado Libre Asociado de Puerto Rico allá para el 1952, adoptamos en nuestra jurisdicción un sistema republicano de gobierno fundamentado en la separación de poderes entre

las mencionadas ramas de gobierno. *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 109 (2014); *Brau, Linares v. ELA et als.*, 190 DPR 315, 340 (2014); *Córdova y otros v. Cámara Representantes*, 171 DPR 789, 799 (2007).

En términos generales, en este sistema republicano de gobierno, el Poder Legislativo aprueba las leyes, el Poder Ejecutivo las ejecuta y pone en vigor, y el Poder Judicial las interpreta. *Noriega v. Hernández Colón*, 135 DPR 406, 458 (1994); *Banco Popular de Puerto Rico, Liquidador v. Corte*, 63 DPR 66, 70 (1944). Véase, además, H. L. Acevedo, *Puerto Rico y su Gobierno: estructura, retos y dinámicas*, Puerto Rico, Ed. SM, 2016, págs. 345-346. Así, y para el descargue de dichas funciones, nuestra Constitución dispone la investidura de los precitados poderes de gobierno en una Asamblea Legislativa, un Gobernador y un Tribunal Supremo, respectivamente. Vázquez Irizarry, *supra*, 1005 (2007). Véase, además, Art. III, IV y V, Sec. 1, Const. ELA, *supra*.

"Al distribuir los poderes entre tres ramas iguales e independientes, la Constitución evitó la concentración del poder en una de ellas, y garantizó la libertad individual y colectiva de [la ciudadanía]". *Noriega v. Hernández Colón*, *supra*, págs. 458-459. Véase, además, *Senado de PR v. ELA*, *supra*, pág. 84; *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 88 (1998). Lo anterior, claro está, sin ignorar que la doctrina de separación de poderes no se concibió como una

estructura de naturaleza inmutable en que cada poder de gobierno funcionaría en un vacío e independiente de los otros. *Acevedo Vilá v. Meléndez*, 164 DPR 875, 883 (2005); *Noriega v. Hernández Colón*, *supra*, pág. 459; *Nogueras v. Hernández Colón*, 127 DPR 405, 426 (1990). Por el contrario, se procuró que la interacción entre los tres (3) poderes de gobierno promueva un sistema de pesos y contrapesos con el propósito de "generar un equilibrio dinámico entre poderes coordinados y de igual rango, y evitar así que ninguno de éstos amplíe su autoridad a expensas de otro". *Misión Ind. P.R. v. J.P.*, *supra*, pág. 89. Véase, también, *Acevedo Vilá v. Meléndez*, *supra*; *Nogueras v. Hernández Colón*, *supra*.

Por ello, -- y para dar vida a esos principios -- nuestra Constitución no solo proveyó un esquema de separación de poderes, sino que dispuso el ámbito de acción de cada uno de éstos. *Córdova y otros v. Cámara Representantes*, *supra*. En lo pertinente, nuestra Carta Magna "adoptó un Poder Ejecutivo unitario al investir a un solo funcionario -el Gobernador- con la autoridad suprema en la Rama Ejecutiva". *Santana v. Gobernadora*, 165 DPR 28, 47 (2005). De las memorias de la Convención Constituyente, surge que sus miembros rechazaron el sistema parlamentario y procuraron, en vez, fortalecer el Poder Ejecutivo concediéndole al Gobernador de Puerto Rico poderes que le permitieran responder a las eventualidades que surgieran

en el País. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. UPR, 1982, Vol. III, págs. 116-117. Véase, además, 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2272-2277 (2003).

Sobre el particular, este Tribunal ha sentenciado que "investir al Gobernador [de Puerto Rico] de la facultad y autoridad suprema con el Poder Ejecutivo […] requiere […] que, como mínimo, el Primer Ejecutivo tenga la autoridad legal para impartir instrucciones u órdenes de carácter obligatorio a los funcionarios de la Rama Ejecutiva […] [y] para [tomar] aquellas medidas que, a su juicio, adelanten la política pública del Gobierno". *Santana v. Gobernadora*, *supra*, pág. 47. **Cónsono con ello, esta Curia ha reconocido el uso de las órdenes ejecutivas como una actuación consustancial a las facultades del Gobernador de Puerto Rico como autoridad máxima del Poder Ejecutivo.** *Hernández, Romero v. Pol. De P.R.*, 177 DPR 121, 138 (2009); *Guzmán v. Calderón*, 164 DPR 220, 266 (2005) (Rivera Pérez, opinión de conformidad); *Otero De Ramos v. Srio. de Hacienda*, 156 DPR 876, 892 (2002).

A.

En esa dirección, es menester mencionar aquí que, en nuestro ordenamiento jurídico el Primer Ejecutivo puede emitir directrices a través de diversos documentos escritos, a saber: proclamas, memorandos y, según adelantamos, mediante órdenes ejecutivas. J. M. Gaffney,

*Executive Order: An Introduction*, U.S. Congressional Research Service, (R46738, Mar. 8, 2021), pág. 1. Estas últimas, entiéndase las órdenes ejecutivas, son el instrumento utilizado por el Gobernador de Puerto Rico para ejercer sus poderes ejecutivos, J. M. Farinacci Fernós, *Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias*, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR 190, 192 (2020), y, en la mayoría de las ocasiones se dictan para impartir instrucciones u órdenes de carácter obligatorio a los funcionarios de la Rama Ejecutiva.

Ahora bien, una orden ejecutiva tendrá fuerza de ley si descansa en la autoridad conferida al Primer Ejecutivo por: 1) nuestra Constitución, o 2) algún poder -- expreso o implícito -- delegado por la Asamblea Legislativa. Vázquez Irizarry, *supra,* pág. 1029. En específico, y sobre el primero de estos escenarios, el Artículo IV, Sección 4, de nuestra Carta Magna, preceptúa claramente que el Primer Ejecutivo ejercerá los siguientes deberes, funciones y/o atribuciones:

Cumplir y hacer cumplir las leyes.

Convocar la Asamblea Legislativa o el Senado a sesión extraordinaria cuando a su juicio los intereses públicos así lo requieran.

Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. […]

Ser comandante en jefe de la milicia.

> Llamar a la milicia y convocar el *posse comitatus* a fin de impedir o suprimir cualquier grave perturbación del orden público, rebelión o invasión.
>
> Proclamar la ley marcial cuando la seguridad pública lo requiera en casos de rebelión o invasión o inminente peligro de ellas. La Asamblea Legislativa deberá inmediatamente reunirse por iniciativa propia para ratificar o revocar la proclama.
>
> Suspender la ejecución de sentencias en casos criminales, conceder indultos, conmutar penas y condonar total o parcialmente multas y confiscaciones por delitos cometidos en violación de las leyes de Puerto Rico. […]
>
> Sancionar o desaprobar con arreglo a esta Constitución, las resoluciones conjuntas y los proyectos de ley aprobados por la Asamblea Legislativa.
>
> Presentar a la Asamblea Legislativa, al comienzo de cada sesión ordinaria, un mensaje sobre la situación del Estado y someterle además un informe sobre las condiciones del Tesoro de Puerto Rico y los desembolsos propuestos para el año económico siguiente. […]
>
> Ejercer las otras facultades y atribuciones y cumplir los demás deberes que se le señalen por esta Constitución o por ley. Art. IV, Sec. 4, Const. ELA, *supra*, págs. 417-418.

Por otro lado, y como hemos ido adelantando, el segundo de los escenarios antes reseñado contempla aquellas instancias donde el Gobernador de Puerto Rico emite órdenes ejecutivas de conformidad con los poderes delegados a éste por la Asamblea Legislativa.[4] De manera que, una "orden

---

[4] Mediante el Código Político de Puerto Rico, *infra*, la Asamblea Legislativa reafirmó las facultades constitucionalmente delegadas al Gobernador de Puerto Rico. Allí, se estableció que el Primer Ejecutivo ejecutará fielmente las leyes; procurará que todos los cargos estén debidamente cubiertos y que se cumplan con las obligaciones de dichos cargos, y ejercerá aquellas facultades y cumplirá con las obligaciones

ejecutiva emitida conforme a una facultad dispuesta en ley constituye […] un ejercicio de poderes delegados por la Asamblea Legislativa". Vázquez Irizarry, *supra,* pág. 1052.

Y es que, históricamente, y en lo aquí pertinente, el referido poder de gobierno, -- entiéndase el Poder Legislativo --, ha delegado en el Primer Ejecutivo determinados poderes extraordinarios para responder a emergencias o desastres. Para ello, el Poder Legislativo ha viabilizado el uso de las órdenes ejecutivas como la herramienta principal a disposición del Gobernador de Puerto Rico para que éste último, entre otras cosas, pueda implementar su política pública o dar directrices al Poder Ejecutivo durante circunstancias extraordinarias. J. E. Hernández Acevedo, *op. cit.*, pág. 439.

Así, por ejemplo, en el año 1938, la Asamblea Legislativa aprobó la *Ley Sobre la Declaración de Epidemias*, Ley Núm. 157 de 10 de mayo de 1938, 24 LPRA sec. 354 *et seq.*, mediante la cual le delegó al Gobernador de Puerto Rico la facultad para actuar ante una emergencia provocada específicamente por una epidemia. En particular, se dispuso que "[c]uando una epidemia sea declarada en uno o varios municipios, **mediante proclama del Gobernador de Puerto Rico**, el Secretario de Salud se hará cargo inmediatamente de la declaración de la epidemia […]".

---

que le fuesen asignadas por las leyes de Estados Unidos y las leyes de Puerto Rico. Art. 48 del Código Político de Puerto Rico de 1902, 3 LPRA sec. 1.

(Énfasis nuestro). Sec. 1 de la Ley sobre la Declaración de Epidemias, 24 LPRA sec. 354. Ahora bien, al conceder dicho poder, la Asamblea Legislativa advirtió que "**tan pronto la epidemia sea extinguida**, se declarará así oficialmente por el Gobernador de Puerto Rico a propuesta del Secretario de Salud, y cesarán entonces los efectos legales de [dicha declaración de epidemia]". (Énfasis nuestro). Sec. 5 de la Ley sobre la Declaración de Epidemias, 24 LPRA sec. 358.

Décadas más tarde, pero con igual lógica, mediante la *Ley de Procedimientos para Situaciones o Eventos de Emergencia*, *infra*, la Asamblea Legislativa autorizó al Gobernador de Puerto Rico a promulgar, enmendar o revocar aquellos reglamentos, convenios, órdenes, contratos o parte de éstos que entendiera necesario para gobernar **durante un estado de emergencia.** Art. 1 de la Ley de Procedimientos para Situaciones o Eventos de Emergencia, Ley Núm. 76-2000, 3 LPRA sec. 1941. Específicamente, la aludida pieza legislativa disponía que:

> **[d]urante el período de tiempo que dure una emergencia así declarada mediante Orden Ejecutiva por el Gobernador de Puerto Rico** al amparo [de la Ley Núm. 20-2017, *infra*,] o el Presidente de los Estados Unidos de América, aquellas obras íntimamente ligadas al problema o que respondan a una solución inmediata a la situación creada por la emergencia, que conlleven la expedición de algún permiso, endoso, consulta y/o certificación, […] se les dispensará del cumplimiento de los términos y procedimientos establecidos […]. (Énfasis nuestro). Art. 2 de la Ley de Procedimientos para

Situaciones o Eventos de Emergencia, Ley Núm. 76-2000, 3 LPRA sec. 1932.

A tenor con lo antes dispuesto, el referido poder gubernamental también limitó la vigencia de las órdenes ejecutivas promulgadas por el Gobernador de Puerto Rico al amparo de dicho estatuto a un término de seis (6) meses. Art. 12 de la Ley de Procedimientos para Situaciones o Eventos de Emergencia, Ley Núm. 76-2000, 3 LPRA sec. 1942. Sobre el particular, la *Ley de Procedimientos para Situaciones o Eventos de Emergencia*, *supra*, dispuso que:

> **[l]as Órdenes Ejecutivas para declarar emergencias emitidas por el Gobernador al amparo de las disposiciones de esta Ley, tendrán una vigencia no mayor de seis (6) meses.** El Gobernador podrá, mediante Orden Ejecutiva, extender el estado de emergencia por el tiempo que estime necesario, sin exceder el término de su incumbencia […]. **Dentro de dicho periodo de tiempo, la Asamblea Legislativa, de entenderlo necesario, pasará juicio sobre el contenido de las mismas y podrá delimitar sus alcances a través del mecanismo de la Resolución Concurrente.** *Íd.*

Por último, y ya más en lo relacionado a la controversia que nos ocupa, precisa señalar que, recientemente, la Asamblea Legislativa aprobó la Ley Núm. 20-2017, mejor conocida como *Ley del Departamento de Seguridad Pública de Puerto Rico*, (en adelante, "Ley del Departamento de Seguridad Pública"), 25 LPRA sec. 3501 *et seq.*, con el propósito de brindar a la ciudadanía "la confianza de que, en caso de una emergencia, el Gobierno estatal estar[ía] disponible y listo para prestarle auxilio

inmediato y adecuado para salvar su vida, su salud, su familia y su propiedad". Exposición de Motivos de la Ley del Departamento de Seguridad Pública, Ley Núm. 20-2017 (2017 Leyes de Puerto Rico). **En consecuencia, y para instrumentar tales propósitos, la Ley del Departamento de Seguridad Pública,** *supra,* **delegó al Primer Ejecutivo determinados poderes extraordinarios para responder a emergencias o desastres.** Art. 5.10 de la Ley del Departamento de Seguridad Pública, Ley Núm. 20-2017, 25 LPRA sec. 3650.

En ese sentido, el Gobernador de Puerto Rico podrá actuar -- conforme a la definición de *emergencia* dispuesta en la aludida disposición legal -- en aquellas situaciones o circunstancias en las cuales son "necesarios los esfuerzos estatales y municipales encaminados a salvar vidas y proteger propiedades, la salud y seguridad pública, o para minimizar o evitar el riesgo de que ocurra un desastre en cualquier parte de Puerto Rico". Art. 5.03(e) de la Ley del Departamento de Seguridad Pública, Ley Núm. 20-2017, 25 LPRA sec. 3643(e). De igual forma, el Primer Ejecutivo podrá emplear sus poderes extraordinarios en respuesta a un *desastre* o, lo que es igual, ante la ocurrencia de "un evento que resulte en daños a la propiedad, muertos y/o lesionados en una o más comunidades". Art. 5.03(c) de la Ley del Departamento de Seguridad Pública, Ley Núm. 20-2017, 25 LPRA sec. 3643(c).

En lo que nos atañe, el Art. 5.10 del referido cuerpo de ley dispone que el Gobernador de Puerto Rico podrá "decretar mediante proclama, que existe un estado de emergencia o desastre, según sea el caso, en todo el territorio de Puerto Rico o en parte del mismo". (Énfasis nuestro). 25 LPRA sec. 3650. Asimismo, el precitado artículo preceptúa que el Primer Ejecutivo, **mientras dure dicho estado de emergencia o desastre**, tendrá -- además de los poderes conferidos por otras leyes -- los poderes siguientes:

> (b) Podrá dictar, enmendar y revocar aquellos reglamentos y emitir, enmendar y rescindir aquellas órdenes que estime convenientes para regir durante el estado de emergencia o desastre. Los reglamentos dictados u órdenes emitidas durante un estado de emergencia o desastre tendrán fuerza de ley mientras dure dicho estado de emergencia o desastre.

> (c) Podrá darle vigencia a aquellos reglamentos, órdenes, planes o medidas estatales para situaciones de emergencia o desastre o variar los mismos a su juicio. *Íd*.

En fin, de un análisis detenido de las disposiciones antes expuestas, claramente podemos colegir que -- a través del tiempo y en escenarios como los que hoy nos ocupan -- la intención de la Asamblea Legislativa ha sido dotar al Gobernador de Puerto Rico de ciertos poderes extraordinarios para responder con prontitud a las situaciones de emergencia o desastre que surgen en el País mediante decreto y por un periodo de tiempo determinado.

Así pues, habiendo establecido que el Gobernador de Puerto Rico puede emitir órdenes ejecutivas en virtud de las facultades otorgadas a éste en nuestra Constitución o vía delegación estatutaria, procede, entonces, evaluar en detalle la naturaleza y el alcance de este tipo de acción ejecutiva.

B.

i.

Como se sabe, la facultad del Gobernador de Puerto Rico para emitir órdenes ejecutivas encuentra su origen en el ejercicio de dicha prerrogativa por parte de los Presidentes de Estados Unidos.[5] J. J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, Tomo 1, 2009, pág. 257. En el ámbito federal, se ha dispuesto que:

> Presidents have used the executive order in one form or another since the founding of this country. Historically, the standard occasions of these executive orders have been ceremonial purposes (such as a holiday proclamation); routine administrative matter of the executive branch; and presidential directives in his role as Commander-in-Chief (*e.g.*, national security or emergency matter, including war and international affairs). Particularly in the context of military and foreign policy, the President´s use of executive orders to effectuate policy and regulation affecting a

---

[5] Sobre ello, el Profesor William Vázquez Irizarry comenta que "[c]on mayor o menor debate, y más o menos intensidad en su uso, todos los Gobernadores han emitido órdenes [ejecutivas] como parte de sus funciones en La Fortaleza. Esta realidad está ligada al uso del instrumento por parte del Presidente de los Estados Unidos". Vázquez Irizarry, *supra*, pág. 3.

variety of sectors has been widely accepted. B.
A. Liang, *"A zone of twilight": executive orders
in the modern policy state*, Washington, D.C.,
National Legal Center for the Public Interest,
Vol. 3, Núm. 3, 1999, págs. 2-4.

Así pues, desde el año 1789, -- fecha en que George Washington, expresidente de Estados Unidos, emitió la primera orden ejecutiva -- los referidos decretos han sido utilizados por el Primer Ejecutivo como un vehículo de acción unilateral para responder a determinados momentos históricos. E. Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2291-2292 (2001). Por ejemplo, las órdenes ejecutivas han sido utilizadas, entre otras instancias, para establecer los campamentos que albergaron a los japoneses americanos durante la Segunda Guerra Mundial, suspender el auto de *hábeas corpus* durante la Guerra Civil y erradicar el discrimen basado en raza, color, religión, entre otros ("to establish internment camps that housed Japanese Americans during World War II; suspend the writ of habeas corpus during the Civil War; and bar discrimination based on race, color, religion, or national origin in the armed forces."). J. M. Gaffney, *Executive Order: An Introduction*, U.S. Congressional Research Service, (R46738, Mar. 8, 2021), págs. 1-2.

Ahora bien, aun cuando históricamente se ha reconocido la facultad del Primer Ejecutivo para emitir órdenes ejecutivas, en nuestra jurisdicción no existen parámetros constitucionales o estatutarios que regulen este poder.

*Hernández, Romero v. Pol. De P.R.*, *supra*, pág. 167 (Hernández Denton, opinión disidente). Véase, también, Vázquez Irizarry, *supra*, pág. 1020; Gaffney, *supra*, pág. 2. Por tanto, se trata de un mecanismo cuyo origen lo encontramos en la práctica. Álvarez González, *op. cit.*, pág. 257.

En ese sentido, existe un entendido general respecto a que una orden ejecutiva es "un mandato dirigido a uno de los brazos auxiliares del poder ejecutivo, conforme a nuestra Constitución y el ordenamiento jurídico estatutario". *Hernández, Romero v. Pol. De P.R.*, *supra*, pág. 138. Dicho de otro modo, es "un mandato del Gobernador a la rama ejecutiva". Vázquez Irizarry, *supra*, pág. 1020.

Sobre ello, el Profesor Farinacci Fernós nos comenta que las órdenes ejecutivas son una de las principales herramientas a disposición de un gobernante "para ejercer sus poderes *ejecutivos*, surjan estos explícita o implícitamente de la Constitución, o que sean de naturaleza inherente por virtud de su rol como Primer(a) Ejecutivo(a)". Farinacci Fernós, *supra,* pág. 192. Por ende, la facultad del Gobernador de Puerto Rico para emitir órdenes ejecutivas, mediante las cuales dispone la realización de determinados actos, emana de los poderes inherentes a su cargo por virtud de la Constitución o de aquellos delegados estatutariamente por el Poder

Legislativo.[6] Op. Sec. Just. Núm. 7 de 12 de febrero de 2008; Op. Sec. De Just. Núm. 25 de 3 de octubre de 1991; Op. Sec. Just. Núm. 10 de 29 de marzo de 1985.

Particularmente, se ha dispuesto que algunas órdenes ejecutivas encuentran apoyo legal en la obligación constitucional del Primer Ejecutivo de: 1) cumplir y hacer cumplir las leyes; 2) vigilar y supervisar la conducta oficial del funcionariado del Poder Ejecutivo, y 3) de cuidar que éste cumpla con los deberes y las obligaciones de su cargo de acuerdo con la ley. *Hernández Romero v. Pol. De P.R.*, *supra*; *Guzmán v. Calderón*, *supra*, pág. 266 (Rivera Pérez, opinión de conformidad). Véase, además, Op. Sec. Just. Núm. 5 de 27 de febrero de 1985. Se trata, pues, de un instrumento disponible al Gobernador de Puerto Rico para que éste ejerza su facultad de supervisión y dirección de los componentes del Poder Ejecutivo. *Asoc. Alcaldes v. Contralor*, 176 DPR 150, esc. 7 (2009).

A esos efectos, las órdenes ejecutivas constituyen, sin lugar a duda, un útil mecanismo de poder a disposición del Primer Ejecutivo. Vázquez Irizarry, *supra*, pág. 953. Ello, debido a que no están inmediatamente limitadas al proceso exhaustivo y delicado del bicameralismo, ni a las

---

[6] En el ámbito federal, "executive orders, which can derive their power from congressional delegations of authority to the President (explicit, implicit, or anticipated), from the President´s independent authority under Article II of the Constitution, or from some vague combinations of the two, are generally enforceable by courts against private citizens." E. Newland, *Executive Order in Court*, 124 Yale L.J. 2026, 2031 (2015). Véase, además, Gaffney, *supra*, págs. 4-7.

limitaciones de la ley del procedimiento administrativo ("they are not immediately constrained by the finely wrought and exhaustively considered process of bicameralism and presentment, nor are they subject to the hoop and constraints of the Administrative Procedure Act."). E. Newland, *Executive Order in Court*, 124 Yale L.J. 2026, 2031-2032 (2015). Sobre esto último, se ha dispuesto que:

> [i]n contrast to legislation or agency regulation, there are almost no legally enforceable procedural requirements that the president must satisfy before issuing (or repealing) an executive order or other presidential directive. That, no doubt, is central to their appeal to presidents [and governors]. They rid the president of the need to assemble majorities in both houses of Congress, or to wait through administrative processes, such as notice-and-comment rulemaking, to initiate policy. K. M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 552-553 (2005).

ii.

Delineada la naturaleza de este tipo de acción ejecutiva, conviene también señalar que en ninguna parte de nuestra Constitución, ni en ley alguna, se estatuye el procedimiento o los requisitos de forma para promulgar una orden ejecutiva. Gaffney, *supra*, pág. 2. De manera que, las formalidades y los atributos propios de las órdenes ejecutivas son producto de su uso y costumbre, plasmado precisamente en el contenido de éstas. Vázquez Irizarry, *supra*, pág. 1020. Véase, además, *Hernández, Romero v. Pol*

*de P.R.*, *supra,* págs. 167-168 (Hernández Denton, opinión disidente).

Sobre lo antes expuesto precisa señalar que, en los Estados Unidos, allá para el año 1962, el entonces Presidente John F. Kennedy promulgó la Orden Ejecutiva Núm. 11,030 mediante la cual prescribió las normas que regirían la preparación, presentación, archivo y publicación de las proclamas y de las órdenes ejecutivas.[7] Gaffney, *supra*, pág. 3. En cambio, en Puerto Rico, las reglas que gobiernan el procedimiento de aprobación y divulgación de las proclamas y órdenes ejecutivas están recogidas en la Orden Ejecutiva Núm. 5550 promulgada el 29 de enero de 1990. Vázquez Irizarry, *supra*, pág. 1022. Véase, además, *Hernández, Romero v. Pol de P.R., supra,* págs. 167-168 (Hernández Denton, opinión disidente).

En términos generales, la Orden Ejecutiva Núm. 5550 preceptúa que los decretos que emita un gobernante deberán cumplir con las siguientes formalidades:

> 1) un título que resuma su propósito; 2) preparada a doble espacio en un papel de tamaño y márgenes legales; 3) hará referencia en la parte superior al Estado Libre Asociado de Puerto Rico y al lugar donde se firma y se otorga; 4) proveerá para un número de Boletín Administrativo; 5) seguirá un formato de cláusulas "POR CUANTO" a manera de exposición de motivos, seguida por una parte dispositiva con cláusulas "POR TANTO"; 6) se establecerá si la facultad para emitir surge de la Constitución, legislación específica o "en virtud de los poderes inherentes al cargo de Gobernador"; 7)

---

[7] Para una discusión sobre el procedimiento dispuesto en la orden ejecutiva de referencia, véase, Gaffney, *supra*, pág. 3.

contendrá una recitación final indicando que se firma en una fecha dada y que se estampa el Gran Sello del Estado Libre Asociado de Puerto Rico; 8) la firma del Gobernador; 9) el Sello Oficial de Puerto Rico; 10) una cláusula de promulgación y, 11) finalmente, la firma del Secretario de Estado. Vázquez Irizarry, *supra*, pág. 1023. Véase, además, Orden Ejecutiva Núm. 5550 de 29 de enero de 1990.

Como se puede apreciar, una orden ejecutiva siempre tiene que hacer referencia a la disposición legal que autoriza su ejercicio. Farinacci Fernós, *supra*, pág. 193; Vázquez Irizarry, *supra*, pág. 1024. Ello, pues, según adelantamos, una orden ejecutiva solo tiene fuerza de ley cuando ha sido promulgada de acuerdo con la autoridad conferida al Primer Ejecutivo en la Constitución del Estado Libre Asociado de Puerto Rico o por la Asamblea Legislativa.[8] *Hernández, Romero v. Pol. De P.R.*, *supra*,

---

[8] Sobre el particular, en el ámbito federal se ha dicho que "[b]ecause an executive order is an exercise of presidential power, its legal effect depends upon its reliance on a valid source of presidential authority. Thus, it is 'black letter law' that for an executive order to have legal effect, its authority 'must stem either from an act of Congress or from the Constitution itself'." Gaffney, *supra*, pág. 4-5. Particularmente, en dicha esfera se ha señalado que,

> [t]here are two sources of authority though which executive orders may claim "the force and effect of law." The first is Article II of the Constitution. Article II authorizes presidents to issue executive orders that operate within areas exclusively subject to presidential power. Article II also authorizes the President to issue executive orders that (a) operate in areas of concurrent congressional-executive authority and (b) do not contravene the "expressed or implied will of Congress". The second source of authority trough which executive orders assume the force and effect of law is statutory -that is, congressional delegation of power. Newland, *supra,* pág. 2050.

A modo de ejemplo, la Orden Ejecutiva Núm. 14,014, 86 Fed. Reg. 9429 (Feb. 10, 2021), dispone que la autoridad del Presidente para emitir dicha orden surge del *International Emergency Economic Powers Act*, 50 U.S.C. 1701 *et seq.*, del *National Emergencies Act*, 50 U.S.C. 1601 *et seq.*, de la sección 212(f) del *Immigration and Nationality Act of 1952*, 8 U.S.C. 1182(f), y de la sección 301 del Título 3 del *United States*

pág. 138. Véase, también, Vázquez Irizarry, *supra*, pág. 1029.

Por consiguiente, una orden ejecutiva que sea ambigua respecto a la fuente legal que la autoriza puede oscurecer los contornos del poder delegado ("[a]n executive order that is ambiguous about the statutory source(s) of its claimed authority can obscure the contours of its power."). Newland, *supra,* pág. 2050. Ahora bien, "el [hecho de] que una orden ejecutiva no tenga fuerza de ley no quiere decir que esta sea un ejercicio ilegal de parte del Gobernador, [pues de] lo que se trata es de las consecuencias que tenga el incumplimiento con la orden".[9] A. Acevedo Vilá, *Separación de Poderes en Puerto Rico: entre la teoría y la práctica*, Ed. SITUM, 2018, pág. 97. Es decir:

> [h]ay órdenes ejecutivas, como las de declaración de estados de emergencia, que emanan de delegaciones específicas legisladas y que tienen consecuencias legales y su incumplimiento puede exigirse en los tribunales. Hay otras que meramente hacen declaraciones de política pública o una expresión de parte del Gobernador que no tiene mayores consecuencias legales. Ahora, hay unas órdenes ejecutivas, en las cuales el Gobernador les da instrucciones específicas a las agencias de la Rama Ejecutiva, que, aunque

---

*Code*. Asimismo, la Orden Ejecutiva Núm. 13,963, 85 Fed. Reg. 81,331 (Dec. 10, 2020), establece que la misma se promulga conforme a la autoridad conferida al Presidente en la "Constitution and the laws of the United States of America, including the Federal Vacancies Reform Act of 1998, as amended, 5 U.S.C. 3345 *et seq.*"

[9] Sobre el particular, se ha dispuesto que, aun cuando una orden ejecutiva haya sido promulgada originalmente sin autoridad legal, una acción posterior del Congreso puede conferirle tal autoridad de manera retroactiva ("[a]ccordingly, even if the executive order was originally issued without statutory authority, later action by Congress retroactively conferred that authority"). Gaffney, *supra*, pág. 8. Véase, además, *United States v. Alaska*, 521 US 1, 36 (1997).

no puedan ponerse en vigor a través de los tribunales, pueden conllevar cambios de política pública o énfasis en la ejecución de políticas públicas y, aunque no otorguen derechos a tercero, pueden conllevar consecuencias disciplinarias dentro de la Rama Ejecutiva. A. Acevedo Vilá, *op. cit.*, págs. 97-98.

iii.

Por último, y en esta tarea de auscultar la naturaleza y el alcance de las órdenes ejecutivas, debemos subrayar que estos decretos, como regla general, no pueden tener el efecto de ser obligatorios para persona o entidad privada alguna, ajena a la propia Rama Ejecutiva, o fuera del ámbito legal jurisdiccional del Gobernador de Puerto Rico. Op. Sec. Just. Núm. 2 de 6 de febrero de 1968, esc. 1. "La orden que pretenda afectar conducta de terceros ciudadanos particularmente con efectos sobre sus derechos y obligaciones, constituye en potencia un acto estatal de naturaleza legislativa". Vázquez Irizarry, *supra*, pág. 1030.

En ese sentido, tratadistas del tema han comentado que, para que una orden ejecutiva pueda aplicar a personas privadas y exigir algún tipo de conducta a la ciudadanía, ésta debe ser producto del ejercicio de algún poder cuasi-legislativo debidamente delegado por la Asamblea Legislativa mediante estatuto. Farinacci Fernós, *supra*, pág. 194. De lo contrario, "estaríamos ante un acto patentemente inconstitucional, por violar la Separación de Poderes". *Íd.* En cuanto a ello y, en definitiva:

[u]na orden ejecutiva no puede intervenir con derechos constitucionalmente protegidos. **Sólo se permitiría tal acción en casos de extrema emergencia y por tiempo limitado.** Permitir tal actuación constituiría un abuso de poder por parte de la Rama Ejecutiva. Además, tal abrogación de poder podría resultar inconstitucional por lesionar el sistema de pesos y contrapesos establecido en la Constitución del Estado Libre Asociado de Puerto Rico. *Hernández, Romero v. Pol. De P.R., supra*, pág. 138.

En ese contexto, en determinadas instancias se ha cuestionado el uso de las órdenes ejecutivas, particularmente, en lo relacionado a "si -al emitirlas- el Gobernador está usurpando los poderes de la Asamblea Legislativa de legislar". Acevedo Vilá, *op. cit.*, pág. 94. Es decir, si "el primer ejecutivo [...] ha invadido esferas tradicionalmente consideradas propias del poder legislativo". Álvarez González, *op. cit.*, pág. 257.

Así las cosas, y en aras de lograr un acercamiento completo al estado de derecho que gobierna los asuntos ante nuestra consideración, no podemos culminar este análisis sin antes reseñar el procedimiento judicial, -- derivado en parte de la jurisprudencia federal --, para atender aquellas controversias que surgen cuando un gobernante hace uso de su facultad -- mediante la vía constitucional o estatutaria -- de emitir órdenes ejecutivas y, con ello, se genera un choque con el Poder Legislativo. Ello, pues, como advertimos, se ha considerado que, en diversos escenarios, al emitir este tipo de decreto el Primer

Ejecutivo pudiese estar usurpando poderes constitucionales expresamente delegados al Poder Legislativo.

C.

Dicho ello, precisa señalar aquí que, aun cuando en nuestra jurisdicción se han emitido órdenes ejecutivas desde tiempos inmemorables, "[l]a jurisprudencia puertorriqueña en unas pocas ocasiones ha tenido ante sí o ha mencionado órdenes ejecutivas específicas, en circunstancias que no presentaban problemas de separación de poderes, bien porque respondían a una delegación legislativa […], o canalizaban el ejercicio de poderes que la Constitución confiere al Gobernador [de Puerto Rico]". Álvarez González, *op. cit.*, pág. 257. El Tribunal se ha limitado a señalar meramente la existencia de órdenes ejecutivas, sin entrar a un análisis detallado en, *El Pueblo v. Arrillaga*, 30 DPR 940 (1922); *Landrón v. Domenech, Tes.*, 61 DPR 242 (1943); *Buscaglia, Tes. v. Tribl. De Contribuciones*, 67 DPR 28, 29 (1947); *Sosa v. Tribunal de Distrito*, 70 DPR 62 (1949); *Pueblo v. Vidal*, 78 DPR 76 (1955); *Noriega v. Gobernador*, 122 DPR 650 (1988); *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864 (1990); *Mun. de Ponce v. A.C. et al.*, 153 DPR 1 (2001), y *Otero de Ramos v. Srio. de Hacienda*, 156 DPR 876 (2002).[10] *Íd.*

---

[10] Para una discusión detallada de los casos que han aludido a órdenes ejecutivas en Puerto Rico, véase, Álvarez González, *op. cit.*, págs. 257-259.

Sin embargo, en el ámbito federal han sido múltiples las controversias que se han generado en torno a las órdenes ejecutivas, particularmente en cuanto a la validez de este tipo de acción ejecutiva. Gaffney, *supra*, pág. 8; Newland, *supra*, pág. 2034. En términos generales, algunas de esas controversias estriban, precisamente, en dilucidar de dónde emana el poder del Presidente para emitir determinada orden ejecutiva; si de sus poderes constitucionales o de aquellos delegados por el Congreso. *Íd.* En este último escenario, también se ha cuestionado si cierta acción del Primer Ejecutivo, -- implementada mediante una orden ejecutiva --, está o no dentro del alcance de la facultad que le ha sido expresamente conferida por el Congreso. *Íd.* En esa dirección, se ha planteado por igual la pregunta sobre cuándo "una orden ejecutiva constituye un ejercicio legítimo de poder ejecutivo o bien una usurpación de facultades legislativas". Vázquez Irizarry, *supra*, pág. 1046.

En el normativo caso *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 582 (1952), por ejemplo, el Tribunal Supremo de los Estados Unidos estableció el marco de análisis que debe emplearse para disponer de controversias como las antes descritas. En esa ocasión, el Máximo Foro Judicial federal tuvo la oportunidad de dirimir si el Presidente de los Estados Unidos tenía o no la autoridad para emitir la Orden Ejecutiva Núm. 10,340, a los fines de

ordenar al Secretario de Comercio ha incautar y operar la mayoría de las minas de acero de la Nación, en aras de garantizar la producción continua de dicho material y evitar los efectos de una huelga de trabajadores durante la Guerra de Corea. *Íd*. En palabras del propio Tribunal Supremo de Estados Unidos:

> [w]e are asked to decide the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation´s steel mills. The mill owners argue that the President´s order amounts to lawmaking, a legislative function which the Constitution expressly confided to the Congress and no to the President. The Government's position is that the order was made on finding of the President that his action was necessary to avert a national catastrophe which would inevitably result from a stoppage of steel production, and that in meeting this grave emergency the President was acting within the aggregate of his constitutional powers as the Nation´s Chief Executive and the Commander in Chief of the Armed Forces of the United States. *Íd*.

Tras evaluar detenidamente los poderes constitucionales del Presidente de los Estados Unidos y aquellos delegados por el Congreso a éste, el Tribunal Supremo federal, por voz del Juez Black, emitió una Opinión mediante la cual declaró inconstitucional la precitada orden ejecutiva. *Íd.* Fundamentó su determinación en que "the President´s power to see that laws are faithfully execute refute the idea that he is to be a lawmaker." *Íd*., pág. 587.

Es decir, el Máximo Foro Judicial federal razonó que la autoridad del Primer Ejecutivo para emitir la orden ejecutiva en controversia, o cualquiera otra, debía provenir de las facultades que se le delegaron en la Constitución o vía estatuto aprobado por el Congreso. *Íd.*, pág. 585. Al ello no existir en ese caso, procedía, pues, declarar la inconstitucionalidad de la orden ejecutiva bajo estudio.

Así pues, en el mencionado caso el Tribunal Supremo de los Estados Unidos razonó que el decreto emitido por el Presidente constituyó un acto legislativo, pues ninguna disposición constitucional o estatutaria autorizaba dicha acción.[11] *Íd.* En consecuencia, el Máximo Foro Judicial federal concluyó que la orden ejecutiva en cuestión violó la doctrina de separación de poderes consagrada en la Constitución federal. *Íd.* A esos efectos, apuntó que "[t]he Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times". *Íd.*, pág. 589.

---

[11] Sobre el particular el Tribunal Supremo federal dispuso lo siguiente:

> [t]he order cannot properly be sustained as an exercise of the President´s military power as Commander in Chief of the Armed Forces. […]. Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the Presidents. […] The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -it directs that a presidential policy be executed in a manner prescribe by the President. *Íd.*, págs. 587-588.

Nótese que el análisis empleado por la mayoría en *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, es uno que, como cuestión de umbral, cuestiona de dónde emana el poder del Presidente de los Estados Unidos para promulgar la orden ejecutiva en controversia, si de la Constitución o de una delegación del Congreso. De concluirse que no existe fuente alguna que le delegue dicho poder, -- es decir, que valide la actuación del Primer Ejecutivo --, procede entonces que se declare la inconstitucionalidad de la referida actuación por ser contraria a la doctrina de separación de poderes.

Respecto al análisis antes reseñado, es menester mencionar que, en *Youngstown Sheet & Tube Co. v. Sawyer, supra*, el Juez Jackson emitió una Opinión concurrente a los efectos de proponer un esquema de análisis -- de tres escenarios -- para determinar el acercamiento que le va a hacer el Tribunal a la conducta en controversia del Primer Ejecutivo. Estos tres escenarios requieren evaluar si: 1) el Primer Ejecutivo actúa por virtud de una autorización legislativa expresa o implícita ("[w]hen the President acts pursuant to an express or implied authorization of Congress"); 2) el Primer Ejecutivo actúa en ausencia de autorización o prohibición estatutaria y alude a sus poderes constitucionales independientes ("[w]hen the Presidents acts in absence of either a congressional grant or denial of authority, he can only rely upon his own

independent powers"), o 3) el Primer Ejecutivo actúa de forma contraria a la voluntad legislativa expresa o implícita ("[w]hen the President takes measures incompatible with the expressed or implied will of Congress"). *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, págs. 635-638 (Jackson, opinión concurrente). Véase, además, E. Chemerinsky, *Constitutional Law: principles and policies*, 5th ed., New York, Wolters Kluwer, 2015, pág. 355; L. Fisher y otros, *American Constitutional Law*, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, págs. 273-274.

En cuanto al primero de los escenarios, el Juez Jackson apuntó que la autoridad del Primer Ejecutivo para emitir órdenes ejecutivas bajo este supuesto -- entiéndase, cuando el Presidente actúa al amparo de la autoridad expresa o implícita delegada por el Congreso -- es total, pues incluye todo el poder que posee como Primer Ejecutivo y aquel que le ha sido delegado por la legislatura. *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, págs. 635-638 (Jackson, opinión concurrente). Por lo que, de dicha acción ser impugnada, estará "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Íd.*, pág. 636.

Sobre el segundo escenario, -- a saber, cuando el Primer Ejecutivo emite órdenes ejecutivas en ausencia de

autorización o prohibición estatutaria -- el Juez Jasckson

destacó que se trata de una zona de penumbra en la que el

Presidente de los Estados Unidos y el Congreso pueden tener

autoridad concurrente o donde la distribución de dicha

autoridad es incierta.[12] *Íd.*, pág. 637. Sobre este escenario

en particular, el profesor William Vázquez Irizarry explica

que:

> [s]e trata de una zona gris creada por el hecho de que el interés público requiere tomar acción gubernamental pero no existe una clara designación de responsabilidades en la Constitución, ni el propio poder legislativo ha expresado su voluntad sobre el tema. En tal caso las experiencias históricas pueden ser un factor determinante, así como la acción o inacción de la rama legislativa ante conductas del ejecutivo tendientes a querer afirmar o utilizar las facultades en controversia. En este renglón, el silencio legislativo ante una reiterada práctica del primer ejecutivo de emitir órdenes ejecutivas sobre determinado tema puede ser un elemento a ser considerado en favor de la existencia de un entendido constitucional entre las dos ramas. Vázquez Irizarry, *supra*, pág. 1047.

Por último, el tercer escenario -- esto es, cuando el

Primer Ejecutivo emite órdenes ejecutivas de forma

contraria a la voluntad legislativa expresa o implícita -

- "supone un choque frontal entre el poder ejecutivo y el

legislativo". *Íd*. Al respecto, el Juez Jackson señala que

cuando el Primer Ejecutivo actúa bajo este supuesto se

entenderá que su autoridad está en su punto más débil;

---

[12] En *United States v. Midwest Oil Co.*, 236 U.S. 459, 470-471 (1915) el Tribunal Supremo federal avaló el "President´s power to create reservations, notwithstanding that no specific statute conferred that power."

contrario a lo que sucede cuando se está ante el primer escenario. *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, pág. 637 (Jackson, opinión concurrente). Lo anterior, pues la única base legal en la cual el Primer Ejecutivo podría sustentar su pretensión en este tercer escenario sería al amparo de sus poderes constitucionales o mediante un reclamo de poderes inherentes. *Íd.*, págs. 637-638. Véase, además, Vázquez Irizarry, *supra*, pág. 1047. En ese sentido, el Juez Jackson advirtió que "[p]residential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Íd.*, pág. 638.

Así las cosas, tras aplicar el análisis al que hemos hecho referencia, el Juez Jackson concluyó que la incautación de las minas de acero por parte del Presidente de los Estados Unidos, mediante órdenes ejecutivas, se trató de una acción -- como la descrita en el tercer escenario -- incompatible con la voluntad del Congreso, debido a que el "Congress has not left seizure of private property an open field but has covered it by three statutory policies inconsistent with this seizure." *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, pág. 639 (Jackson, opinión concurrente). Subrayó, además, que "[t]he Executive, except for recommendation and veto, has no legislative power. The executive action we have here

originates in the individual will of the President and represents an exercise of authority without law." *Íd.*, pág. 655.

Desde entonces, el análisis de los tres escenarios propuesto por el Juez Jackson ha sido empleado por los tribunales federales inferiores e inclusive por el propio Tribunal Supremo de los Estados Unidos, para dirimir la validez de las acciones del Presidente con relación a la autoridad delegada a éste ya sea en virtud de la Constitución o vía legislación del Congreso.[13] Gaffney, *supra*, pág. 8; Vázquez Irizarry, *supra*, pág. 1046; Liang, *supra*, pág. 26. Sobre ello, nos comenta el tratadista Erwin Chemerinsky que:

> **[a]nalysis of presidential power often starts with Justice Jackson´s three-part test.** Interestingly, his first and third zones involve situations in which Congress has acted, and thus the issue is the constitutionality of the federal law. The second approach concerns inherent powers -when the president is acting without constitutional or statutory authority. This is the situation in issue such as executive privilege, impoundment, rescission of treaties, executive agreements, removal of executive officials from office, and the like. (Énfasis suplido). Chemerinsky, *op. cit.*, pág. 355.

Dicho ello, es preciso aclarar que si bien el análisis empleado en el precitado caso de *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*, así como el de los tres escenarios

---

[13] Véase, a modo de ejemplo *Zivotofsky v. Kerry*, 576 US 1 (2015) donde el Máximo Foro Judicial federal dispuso que "[i]n considering claims of Presidentials power this Court refers to Justice Jackson's familiar tripartite framework."

posibles propuesto por el Juez Jackson en su Opinión concurrente, ha sido y es relevante a la hora de dirimir si una acción del Primer Ejecutivo mediante una orden ejecutiva es válida, existen otras consideraciones que ameritan ser mencionadas. Gaffney, *supra*, pág. 11. Así, por ejemplo, hay controversias en las cuales existe una delegación expresa por parte del Poder Legislativo -- entiéndase, el primer escenario de la Opinión concurrente del Juez Jackson --, no obstante, se cuestiona si la acción del Primer Ejecutivo está o no dentro del alcance del poder que le ha sido conferido por ley y si dicha acción viola o no lo dispuesto en la Constitución. Gaffney, *supra*, pág. 12.

Para los escenarios como el antes descrito, jurisprudencialmente se ha establecido que el análisis que debe guiar a los tribunales para considerar si la actuación del Primer Ejecutivo es válida o no siempre deberá tener presente: el texto del estatuto o legislación que le delegó el poder al Presidente de los Estados Unidos; el alcance del poder delegado por el Congreso en dicho estatuto; el poder que tradicionalmente ostenta el Presidente de los Estados Unidos en el tema particular bajo estudio; y la acción o inacción del Congreso, tras un patrón prologado de la acción del Primer Ejecutivo ejercitada al amparo de

determinado estatuto.[14] ("will begin with the text of the statute delegating power to the President to determine the scope of Congress´s delegation of power. Courts will also consider the amount of power typically afforded to the President in the particular subject area at issue. In limited circumstances, courts may also consider whether Congress has failed to act after a consistent and long-standing pattern of executive action taken under the statute. If so, then a court may view Congress as having acquiesced to the President´s power to act under the statute."). *Íd.*

Recientemente, en *Trump v. Hawaii*, 138 S.Ct. 2392 (2018), el Tribunal Supremo de los Estados Unidos empleó el precitado análisis al evaluar una proclama emitida por el Presidente Trump, mediante la cual éste suspendió la entrada de ciertos inmigrantes a Estados Unidos. En esencia, el Presidente Trump argumentó que, por virtud de la *Immigration and Nationality Act*, 8 U.S.C. sec. 1101 *et seq.*, el Congreso le había delegado el poder para suspender o restringir la entrada de inmigrantes al País en determinadas circunstancias, por lo que arguyó que el

---

[14] Es decir, si el Poder Legislativo se ha cruzado de brazos y, con su silencio, ha avalado la actuación ejecutiva. Así, por ejemplo, en *Zemel v. Rusk*, 381 US 1, 11 (1965), el Máximo Foro Judicial federal sentenció que "[u]nder some circumstances, Congress's failure to repeal or revise in the face of such administrative interpretation has been held to constitute persuasive evidence that interpretation is the one intended by Congress. In this case, however, the inference is supported by more than mere congressional inaction."

referido decreto constituía un ejercicio válido de poder. *Trump v. Hawaii*, *supra*, pág. 2407.

El razonamiento articulado por el Presidente Trump fue acogido por el Tribunal Supremo de los Estados Unidos al sentenciar que, la *Immigration and Nationality Act*, *supra*, -- debido a su lenguaje sencillo -- otorgaba al Presidente amplia discreción para suspender la entrada de determinados inmigrantes a Estados Unidos. *Íd.*, pág. 2408. A esos efectos, la Corte determinó que "[t]he President lawfully exercised that discretion based on his findings -following a worldwide, multi-agency review- that entry of the covered aliens would be detrimental to the national interest." *Íd.*

En lo pertinente, y respecto al análisis empleado por el Máximo Foro Judicial federal, conviene destacar que dicho Foro federal, en primer lugar, examinó el texto de la *Immigration and Nationality Act*, *supra*, estatuto en el cual el Presidente Trump sustentaba su autoridad. *Íd.* De forma específica, evaluó la Sección 1182(f) de la *Immigration and Nationality Act*, 8 U.S.C sec. 1182(f), la cual preceptuaba que:

> [w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Al realizar dicho ejercicio, el Máximo Foro Judicial federal resolvió que, mediante la aludida disposición legal el Congreso, en efecto, le había otorgado al Presidente de los Estados Unidos amplia discreción para suspender la entrada de determinados inmigrantes al País. *Íd.*, pág. 2408. Así, concluyó que el texto de la *Immigration and Nationality Act*, *supra*, le permitía al Presidente establecer "whether and when to suspend entry […]; whose entry to suspend […]; for how long […]; and on what conditions […]." *Íd.*

En segundo lugar, el Tribunal Supremo de Estados Unidos evaluó si la acción del Presidente de los Estados Unidos -- de suspender la entrada de ciertos inmigrantes -- estaba intrínsicamente relacionada con las facultades que le habían sido delegadas mediante la *Immigration and Nationality Act*, *supra*. *Íd.* Evaluado el particular, ese Tribunal determinó que la proclama emitida por el Presidente Trump se enmarcaba dentro del alcance de la autoridad delegada por el Congreso. *Íd.*

Por último, y, en tercer lugar, el Máximo Foro Judicial federal analizó el poder que tradicionalmente el Primer Ejecutivo ostentaba en determinada materia, en ese caso sobre inmigración y seguridad nacional. *Íd.* Al realizar dicho ejercicio, el Tribunal Supremo de los Estados Unidos rechazó una petición presentada por los

demandantes, a los fines de que se indagara sobre las razones que el Presidente había articulado en la proclama para justificar suspenderles la entrada al País, al entender que ello era contrario a la amplia deferencia que tradicionalmente se le había reconocido al Presidente en dichas materias ("searching inquiry […] is inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere."). *Íd.*, pág. 2409.

Así pues, el caso de *Trump v. Hawaii*, *supra*, ilustra el análisis que los tribunales debemos emplear cuando se cuestiona si determinada actuación ejecutiva está o no dentro del alcance del poder expresamente delegado por el Congreso. Eso es, "analyzing the scope of the granted power (here the [Immigration and Nationality Act, *supra*]) and whether the particular action (here, the proclamation) falls within that grant of power." Gaffney, *supra*, pág. 13.

En fin, luego de examinar el desarrollo jurisprudencial relacionado al análisis que se debe emplear cuando se cuestiona la facultad de un gobernante para emitir una orden ejecutiva, en resumen, queda claro que, debemos evaluar si el referido decreto ha sido promulgado al amparo de los poderes constitucionales delegados al Primer Ejecutivo o de aquellos delegados por el Poder Legislativo a éste.

Realizado dicho ejercicio, y estando ante una delegación de poder estatutaria, corresponde dirimir si la acción del Primer Ejecutivo está o no enmarcada dentro de la facultad que expresamente le ha sido conferida por la legislatura. A esos fines, es menester examinar: 1) el texto del estatuto que, presuntamente, le delega el poder al Primer Ejecutivo; 2) el alcance del poder delegado por la legislatura en el estatuto bajo estudio; 3) el poder que tradicionalmente se le ha reconocido al Primer Ejecutivo en la materia o asunto en controversia, y 4) la acción o inacción del Poder Legislativo tras un patrón prolongado del Primer Ejecutivo ejecutando determinada acción en virtud de dicho estatuto.[15]

Por último, resulta necesario añadir que, al evaluar la validez de una orden ejecutiva, en ocasiones no bastará con examinar el estatuto del cual se aduce emana el poder del Primer Ejecutivo para actuar en determinada situación, sino que también puede resultar necesario interpretar la orden ejecutiva misma para la correcta disposición de una controversia de esta naturaleza. Lo anterior, con el

---

[15] Además, el Tribunal Supremo de Estado Unidos ha sentenciado que el Primer Ejecutivo no puede incurrir en una acción inconstitucional aún cuando el Poder Legislativo haya autorizado tal acción. Gaffney, *supra*, pág. 11. De forma específica, en *Clinton v. New York*, 524 U.S. 417 (1998) el Máximo Foro Judicial federal determinó que, aún cuando el Congreso le había otorgado al Presidente la facultad de vetar disposiciones particulares de un proyecto de ley, dicha delegación de poder violaba la "Presentment Clause of the U.S. Constitución", y, por tanto, no podía ejercerse. *Íd.*, pág. 436.

propósito de determinar el alcance y el impacto del referido decreto. Gaffney, *supra*, pág. 14.

IV.

Para concluir, es menester recordar aquí que en diciembre de 2019 surgió una nueva enfermedad infecciosa conocida como COVID-19, perteneciente a una extensa familia de virus llamados coronavirus. El 11 de marzo de 2020 la Organización Mundial de Salud (OMS) catalogó la enfermedad del COVID-19 como una pandemia debido a su alto nivel de contagio, es decir, una emergencia de salud pública internacional. Consecuentemente, la OMS sugirió a los países adoptar aquellas medidas necesarias para impedir la proliferación del virus.

A tenor con lo anterior, el 12 de marzo de 2020 la entonces Gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, -- ante el llamado de la OMS -- promulgó la Orden Ejecutiva Núm. OE-2022-019, **-- la cual está vigente al momento de disponer del presente caso --**, mediante la cual declaró un estado de emergencia en todo Puerto Rico respecto al brote del COVID-19. Boletín Administrativo Núm. OE-2020-020 de 12 de marzo de 2020. Apoyó su actuación en lo dispuesto en la *Ley del Departamento de Seguridad Pública*, *supra*, mediante la cual, como adelantamos, la Asamblea Legislativa le delegó al Primer Ejecutivo la facultad para decretar un estado de emergencia o desastre.

*Íd*. En la orden ejecutiva de referencia se dispuso que la misma se promulgaba con el fin de:

> llevar a cabo todos los esfuerzos e implementar todas aquellas medidas necesarias para salvaguardar la salud, bienestar y seguridad pública de nuestra ciudadanía, a los fines de minimizar o evitar el riesgo de que ocurra cualquier situación que represente o constituya una amenaza de salud o seguridad pública a consecuencia del brote del COVID-19. *Íd*.

Así las cosas, desde la referida declaración de emergencia hasta el presente **-- entiéndase, hace ya más de dos (2) años --,** en Puerto Rico se han emitido alrededor de sesenta y tres (63) órdenes ejecutivas para atender la emergencia provocada por la pandemia del COVID-19.[16] En esencia, mediante los referidos decretos el ELA ha implementado diversas medidas restrictivas con el fin de

---

[16] De forma específica, se han promulgado las siguientes órdenes ejecutivas relacionadas a la pandemia del COVID-19: **1) OE-2020-020 "para declarar un estado de emergencia ante el inminente impacto del Coronavirus (COVID-19)";** 2) OE-2020-021; 3) OE-2020-022; 4) OE-2020-023; 5) OE-2020-024; 6) OE-2020-025; 7) OE-2020-026; 8) OE-2020-029; 9) OE-2020-030; 10) OE-2020-031; 11) OE-2020-033; 12) OE-2020-035; 13) OE-2020-036; 14) OE-2020-038; 15) OE-2020-039; 16) OE-2020-041; 17) OE-2020-044; 18) OE-2020-045; 19) OE-2020-048; 20) OE-2020-054; 21) OE-2020-057; 22) OE-2020-060; 23) OE-2020-061; 24) OE-2020-062; 25) OE-2020-066; 26) OE-2020-068; 27)OE-2020-076; 28) OE-2020-077; 29) OE-2020-079; 30) OE-2020-080; 31) OE-2020-081; 32) OE-2020-086; 33) OE-2020-087; 34) OE-2021-001; 35) OE-2021-010; 36) OE-2021-014; 37) OE-2021-019; 38) OE-2021-026; 39) OE-2021-027; 40) OE-2021-028; 41) OE-2021-032; 42) OE-2021-036; 43) OE-2021-043; 44) OE-2021-044; **45) OE-2021-054 "delegar en el Secretario del Departamento de Salud el poder de implementar medidas para enfrentar la emergencia causada por el COVID-19 en Puerto Rico y para derogar el boletín administrativo Núm. OE-2021-043";** 46) OE-2021-058; 47) OE-2021-062; 48) OE-2021-063; 49) OE-2021-064; 50) OE-2021-065; 51) OE-2021-075; 52) OE-2021-080; 53) OE-2021-081; 54) OE-2021-082; 55) OE-2021-086; 56) OE-2021-087; 57) OE-2022-003; 58) OE-2022-006; 59) OE-2022-007; 60) OE-2022-010; 61) OE-2022-011; 62) OE-2022-015; **63) OE-2022-019 "a los fines de modificar las medidas implementadas contra el COVID-19, y para derogar los Boletines Administrativos núms. OE- 2021-075, OE-2021-082, OE-2021-087, OE-2022-003, OE- 2022-006, OE-2022-009, OE-2022-010, OE-2022-011 y OE- 2022-015".** *Órdenes Ejecutivas*, Departamento de Estado, https://www.estado.pr.gov/en/executive-orders/ (última visita, 25 de agosto de 2022).

controlar los contagios del COVID-19 en el País. Así, por ejemplo, se impuso el "uso obligatorio de mascarillas, el distanciamiento físico y el requerimiento a ciertos sectores importantes de la sociedad de estar vacunados contra el referido virus o el presentar un resultado negativo a una prueba de detección de COVID-19". Boletín Administrativo Núm. OE-2022-019 de 7 de marzo de 2022.

En lo pertinente al asunto que nos ocupa, el 1 de julio de 2021 el actual Gobernador de Puerto Rico, Hon. Pedro Pierluisi Urrutia, emitió -- también al amparo de la autoridad delegada a éste por la Asamblea Legislativa en la *Ley del Departamento de Seguridad Pública*, *supra* -- **la Orden Ejecutiva Núm. OE-2021-054** objeto de la presente controversia, la cual -- al momento de disponer de la causa de epígrafe -- no ha sido derogada. Mediante la referida orden ejecutiva el Gobernador de Puerto Rico decretó lo siguiente:

> delego en el Secretario del Departamento de Salud el poder de establecer las guías, directrices, protocolos y recomendaciones para atender -de forma particularizada por cada servicio, negocio, actividad o área, según sea necesario conforme al riesgo de contagio- la emergencia del COVID-19. Las medidas adoptadas por el Secretario de Salud aplicarán a la población en general, así como a los patronos y entidades en el sector público y privado.

> No obstante, aún **continúa el estado de emergencia** en todo Puerto Rico decretado para atender la pandemia, según declarado en el Boletín Administrativo Núm. OE-2020-020. Hasta tanto el Secretario de Salud no concluya que la pandemia está controlada o extinguida, dicha declaración

de estado de emergencia se mantendrá vigente.[17]
(Énfasis nuestro). Boletín Administrativo Núm.
OE-2021-054 de 1 de julio de 2021.

Posteriormente, el 7 de marzo de 2022 el Gobernador de Puerto Rico emitió una nueva orden ejecutiva, -- la cual al escribir estas líneas también se encuentra vigente --, en ésta si bien dejó en vigor la Orden Ejecutiva Núm. OE-2021-054, flexibilizó ciertas medidas que se habían implementado dirigidas a reducir la propagación del COVID-19.

En específico, eliminó el mandato de mascarillas, el cernimiento en contra del COVID-19 en varios sectores, la limitación de aforo en establecimientos comerciales, los mandatos de vacunación obligatoria, entre otras. Boletín Administrativo Núm. OE-2022-019 de 7 de marzo de 2022.

---

[17] A tales efectos, el Secretario del Departamento de Salud, el Dr. Carlos Mellado López, de conformidad con la autoridad que le confirió "la Ley Núm. 81 del 14 de marzo de 1912, según enmendada, conocida como la Ley Orgánica del Departamento de Salud, la Constitución de Puerto Rico, y el Boletín Administrativo Núm. OE-2021-054" promulgó las órdenes administrativas números 2021-508, 508A y 509. Boletín Administrativo Núm. 2021-508 de 1 de julio de 2021; Boletín Administrativo Núm. 2021-508A de 8 de julio de 2021; Boletín Administrativo Núm. 2021-509 de 22 de julio de 2021. En término generales, mediante los aludidos boletines administrativos el Secretario del Departamento de Salud estableció las medidas de prevención, contención y mitigación relacionadas al COVID-19 que aplicarían a la población en general. Entre ellas, el aislamiento físico, la cuarentena y el uso de mascarillas. **Particularmente, a través del Boletín Administrativo 2021-509 el Secretario del Departamento de Salud impuso la vacunación obligatoria como un requisito de admisión presencial escolar y universitario. A su vez, exigió la prueba de vacunación de forma obligatoria al personal docente y no docente de las escuelas, los centros educativos y las universidades públicas y privadas.** No obstante, exoneró de dicho requisito de vacunación a aquellas personas cuyos sistemas inmunes estuvieran comprometidos y los que por motivos religiosos no pudiesen vacunarse. Orden Administrativa Núm. 2021-509 de 22 de julio de 2021.

Ahora bien, aún cuando el Primer Ejecutivo dejó sin efecto los mandatos de vacunación contra el COVID-19, toda vez que la gran mayoría de la población estaba vacunada, reiteró que el Secretario del Departamento de Salud era el encargado de "emitir por vía administrativa las recomendaciones sobre la vacunación para toda la población". *Íd.* Además, dispuso que el Secretario del Departamento de Salud determinaría lo relativo a los certificados de salud y la vacunación para los estudiantes.[18] *Íd.*

---

[18] En respuesta, el Secretario del Departamento de Salud promulgó la Orden Administrativa Núm. 2022-533 -- la cual al momento de disponer del caso de marras no ha sido derogada --, mediante la cual dispuso las nuevas medidas de salud pública que imperarían en Puerto Rico relacionadas al COVID-19. A esos efectos, el Secretario del Departamento de Salud eliminó el mandato de utilización de mascarillas en área exteriores e interiores, salvo para aquellas personas que trabajen o visiten facilidades de salud, hogares de cuidado prolongado, que laboren o se encuentren en una institución correccional o utilicen el transporte público. Además, en cuanto al uso de mascarillas en los centros de cuidos de niños, escuelas públicas o privadas y las universidades ordenó "el uso obligatorio de mascarilla en salones de clases o lugares cerrados, de conformidad con las guías de los CDCs". Orden Administrativa Núm. 2022-533 de 8 de marzo de 2022.

Sobre el requisito de vacunación, si bien el Secretario del Departamento de Salud reconoció que la OE-2022-019 promulgada por el Gobernador de Puerto Rico eliminó dicho requisito, señaló que cada operador privado o gubernamental, a su discreción, podría exigir evidencia de vacunación a los empleados o visitantes, sujeto a las excepciones médicas y religiosas aplicables. Asimismo, en cuanto a la vacunación de los estudiantes menores de edad contra el COVID-19 estableció que éstos estaban sujetos a la vacunación obligatoria, de conformidad con lo dispuesto en la Ley Núm. 25 del 25 de septiembre de 1983, mejor conocida como *Ley de las Inmunizaciones Compulsorias a los Niños Pre-escolares y Estudiantes en el Estado Libre Asociado de Puerto Rico*, 24 LPRA sec. 182 *et seq*. Ahora bien, quedaron exceptuados del requisito de vacunación obligatoria los estudiantes entre cinco (5) a quince (15) años y aquellos estudiantes a los cuales les eran aplicables las excepciones médicas o religiosas. Orden Administrativa Núm. 2022-533 de 8 de marzo de 2022.

Posteriormente, el Secretario del Departamento de Salud, -- por virtud de la autoridad delegada a éste mediante los Boletines Administrativos OE-2021-054 y OE-2022-019 --, promulgó la Orden Administrativa Núm. 2022-548 mediante la cual enmendó la Orden Administrativa Núm. 2022-

El Gobernador de Puerto Rico justificó dicha actuación con el poder de razón de estado el cual "faculta al gobierno a tomar las medidas necesarias para proteger la salud y seguridad de la población. [A su modo de ver] […], es el poder inherente del Estado el que [le ha permitido] crear y promover regulación con el fin de proteger la salud, la seguridad y el bienestar general".[19] *Íd.*

---

533 para disponer que el uso de mascarillas en las instituciones educativas del País sería opcional. Además, mediante la referida orden, también, eliminó la obligatoriedad del uso de mascarillas en las instituciones correccionales y en el servicio de transporte público. Orden Administrativa Núm. 2022-548 de 13 de septiembre de 2022.

[19] Sobre ello, es preciso apuntar que, como correctamente señaló el Gobernador de Puerto Rico en la orden ejecutiva de referencia, es norma bien establecida que el Estado está investido de autoridad para implementar medidas dirigidas a salvaguardar la salud y la seguridad pública. *Barnes v. Glen Theatre, Inc.*, 501 US 560, 569 (1991); *Jacobson v. Commonwealth of Massachusetts*, 197 US 11 (1905). En esa dirección, desde el normativo caso de *Jacobson v. Commonwealth of Massachusetts*, *supra*, se han validado políticas de vacunación dirigidas, precisamente, a salvaguardar la salud y la seguridad pública. Así, por ejemplo, en *Zucht v. King*, 260 US 174 (1922), el Tribunal Supremo de Estados Unidos sostuvo la validez del requisito de vacunación impuesto a ciertos estudiantes como condición para asistir a las escuelas públicas o privadas.

Consecuentemente, y en lo aquí pertinente, es menester señalar que los tribunales inferiores federales, al enfrentarse a controversias como las que hoy nos ocupan y tras aplicar lo dispuesto en *Jacobson v. Massachusetts, supra*, y su progenie, han validado el requisito de vacunación obligatoria en distintos escenarios como medida para mitigar los efectos de la emergencia provocada por la pandemia del COVID-19.

Véase, por ejemplo, *Klaasen v. Trusteed of Indiana University*, 7 F.4th 592 (2021) (donde se validó una política de vacunación en contra del COVID-19 como requisito para que los estudiantes pudieran asistir de forma presencial a clase); *Harris v. University of Massachusetts*, 557 F. Sup.3d 304 (D.Mass. 2021) (donde se validó el requisito de vacunación impuesto por una universidad a sus estudiantes como condición para asistir de forma presencial); *Maniscalco v. New York City Dept. of Education*, 563 F. Supp.3d 33 (E.D.N.Y. 2021) (donde se validó el requisito de vacunación impuesto a los empleados y contratistas del Departamento de Educación de la ciudad de New York que trabajaran de manera presencial en las escuelas de dicho sistema); *Johnson v. Brown*, 567 F. Supp.3d 1230 (D.Ore. 2021) (donde se sostuvo la validez de un mandato de vacunación a empleados públicos y privados en áreas relacionadas con salud y educación).

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer de las controversias ante nuestra consideración.

V.

Como mencionamos anteriormente, a nuestro juicio, en el presente caso se cuestionaba 1) si el Primer Ejecutivo del País, en medio de la emergencia que representó la pandemia del COVID-19, tenía la facultad o no para emitir órdenes ejecutivas dirigidas a atender la misma, y 2) si la acción del Primer Ejecutivo de promulgar órdenes ejecutivas -- a casi tres años de decretado el estado de emergencia por la pandemia del COVID-19 -- está o no dentro del alcance de la facultad que expresamente le fue conferida por la legislatura en la aludida disposición legal. De conformidad con la normativa antes expuesta, entendemos la primera interrogante debió ser contestada en la afirmativa, la segunda en la negativa.

---

Ahora bien, sobre el requisito de vacunación obligatoria en Puerto Rico, llama la atención lo esbozado por este Tribunal en el escolio número trece (13) en *Lozada Tirado et al. v. Testigo Jehová*, 177 DPR 893 (2010), donde se dispuso lo siguiente:

> el interés del Estado en proteger a terceros inocentes puede ser invocado en casos de emergencia de salud pública. **Así, se ha reconocido que el Estado puede aprobar leyes que requieran de manera compulsoria ciertas vacunas ante la amenaza de una epidemia.** […] En Puerto Rico, por ejemplo, la Ley Núm. 25 de 25 de septiembre de 1983 regula lo concerniente a la inmunización de estudiantes y niños de edad preescolar y permite que se exima de dicho requisito a los niños que demuestren que ellos o sus padres pertenecen a una religión que no permite la inmunización. 24 LPRA sec. 182d. No obstante, dicha exención quedará sin efecto en caso de una epidemia declarada por el Departamento de Salud. (Énfasis nuestro). *Lozada Tirado et al. v. Testigo Jehová*, *supra*, esc. 13.

Y es que, sobre la facultad del Primer Ejecutivo del País para, en medio de la emergencia que representó la pandemia del COVID-19 emitir órdenes ejecutivas dirigidas a atender la misma, ha quedado claramente demostrado que nos encontramos ante una delegación de poder a éste que emana de una ley, en específico, de lo dispuesto en *Ley del Departamento de Seguridad Pública*, *supra*. Por tanto, estamos ante el primero de los escenarios identificados por el Juez Jackson en su Opinión concurrente en el caso de *Youngstown Sheet & Tube Co. v. Sawyer*, *supra*; esto es, ante una delegación de autoridad expresa por parte del Poder Legislativo al Gobernador de Puerto Rico.

Siendo ello así, las órdenes ejecutivas aquí en controversia son válidas. No podía, pues, el Tribunal de Apelaciones dejarlas sin efecto.

Ahora bien, y para consideraciones futuras, en cuanto a si la acción del Primer Ejecutivo de promulgar órdenes ejecutivas -- a casi tres años de decretado el estado de emergencia por la pandemia del COVID-19 -- está o no dentro del alcance de la facultad que expresamente le fue conferida por la legislatura en la aludida disposición legal, no podemos llegar a igual conclusión. **Para ello, basta con señalar que de una revisión detenida del texto de la *Ley del Departamento de Seguridad Pública*, *supra*, surge que la Asamblea Legislativa le delegó al Gobernador de Puerto Rico poderes extraordinarios para responder exclusivamente a una**

**emergencia o desastre. Y mientras durara dicho estado de**

**emergencia o desastre.**[20]

Pasados casi tres años de declarada la emergencia, somos de la opinión que el nivel de emergencia disminuyó. Tanto es así que, el Centro para el Control y la Prevención de Enfermedades (CDC, por sus siglas en inglés) flexibilizó las restricciones relacionadas al COVID-19 y, en Puerto Rico, al 3 de agosto de 2021, el 75.6% de la población se había vacunado con al menos una dosis, y el propio Gobernador

---

[20] A través de la referida legislación, la Asamblea Legislativa procuró: 1) que el Gobernador de Puerto Rico respondiera con prontitud y celeridad ante una emergencia o desastre; 2) viabilizó el uso de órdenes ejecutivas para responder a dichas situaciones, y **3) delimitó el alcance de los poderes allí delegados únicamente para que pudiesen ser invocados por el Primer Ejecutivo mientras durara dicha emergencia o desastre, es decir, sujeto a un requisito de temporalidad.**

Sobre esto último, es menester precisar que la Asamblea Legislativa intentó limitar el poder delegado al ejecutivo para responder a una emergencia. Ello, al aprobar el Proyecto de la Cámara 515 -- el cual se presentó el 9 de febrero de 2021 -- que procuró crear la *Ley para la Fiscalización y Rendición de Cuentas en Tiempos de Emergencia*. P. de la C. 515 de 9 de febrero de 2021, 1era Sesión Ordinaria, 19na. Asamblea Legislativa. En particular, la referida medida pretendía:

> establecer los términos de un estado de emergencia; prohibir la suspensión de leyes con motivo de un estado de emergencia mientras la Asamblea Legislativa se encontr[ara] en sesión; establecer el deber del Gobernador o Gobernadora de someter informes cada quince (15) días a la Asamblea Legislativa si un estado de emergencia se extiende por más de treinta (30) días; establecer el deber de divulgación de acciones de la Rama Ejecutiva realizadas al amparo de una declaración de estado de emergencia; establecer el deber del Gobernador o Gobernadora o su representante de comparecer a una vista pública ante la Asamblea Legislativa si un estado de emergencia se extiende por más de treinta (30) días; establecer las obligaciones del Gobernador o Gobernadora cuando un estado de emergencia se extienda por más de sesenta (60) días; establecer los requisitos para extender un estado de emergencia por más de seis (6) meses; y para otros fines relacionados. *Íd.*, pág. 1.

No obstante, el 30 de diciembre de 2022, el Gobernador de Puerto Rico vetó el referido proyecto legislativo. Véase, Veto del Gobernador de Puerto Rico de 30 de diciembre de 2021.

de Puerto Rico reconoció en la Orden Ejecutiva Número OE-2022-019 que procedía flexibilizar las medidas implementadas para atender la pandemia del COVID-19 debido a la disminución de contagios en el País. En específico, a esa fecha, el Poder Ejecutivo eliminó la cuarentena, el distanciamiento físico, el uso obligatorio de mascarillas, el cernimiento en contra del COVID-19, la vacunación obligatoria, el requisito de evidencia de resultado negativo de pruebas de detención de COVID-19 y la limitación de aforo en ciertos establecimientos comerciales.

Dicho de otra forma, el nivel de la emergencia que en su día justificó que el Gobernador de Puerto Rico actuara unilateralmente en su rol como autoridad máxima en el Poder Ejecutivo, y que permitió prescindir de la intervención de la Asamblea Legislativa para salvaguardar la vida y salud de la ciudadanía ante la pandemia del COVID-19, ha disminuido. Por tanto, a nuestro juicio, y para consideraciones futuras como ya mencionamos, el Primer Ejecutivo no debe continuar dirigiendo los destinos del País -- en lo relacionado a ese asunto -- mediante órdenes ejecutivas o decretos.

Es así, y únicamente así, que cumplimos con nuestra función constitucional de procurar mantener el sistema de pesos y contrapesos imperante en nuestro sistema republicano de gobierno. **Resolver lo contrario equivaldría a preterir el curso ordinario de los procesos democráticos.**

## VI.

Procedía, pues, revocar el dictamen emitido por el foro apelativo intermedio. Como ese fue el curso de acción seguido por una mayoría de este Tribunal, estamos conformes.


                                        Ángel Colón Pérez
                                        Juez Asociado